Appeal No. 23-1182

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

**ANGELO BROCK,**

*Plaintiff-Appellee*,

v.

**FLOWERS FOODS, INC.; FLOWERS BAKERIES, LLC;
FLOWERS BAKING CO. OF DENVER, LLC,**

*Defendants-Appellants.*

_____

On Appeal from the United States District Court
for the District of Colorado, Case No. 1:22-cv-02413-CNS-MEH
The Honorable Charlotte N. Sweeney, District Judge

_____

**BRIEF OF DEFENDANTS-APPELLANTS**
**(*oral argument requested*)**

_____

Jared Lee Palmer
OGLETREE DEAKINS
One Embarcadero Center, Suite 900
San Francisco, CA 94111
(415) 442-4810

David Lee Zwisler
OGLETREE DEAKINS
2000 South Colorado Blvd.
Tower 3, Suite 900
Denver, CO 80222
(303) 764-6800

Traci L. Lovitt
Matthew W. Lampe
Jack L. Millman
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-7830
tlovitt@jonesday.com

Amanda K. Rice
JONES DAY
150 W. Jefferson Ave.,
Suite 2100
Detroit, MI 48226

July 24, 2023                          *Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... iii

STATEMENT OF PRIOR OR RELATED CASES ................................ 1

STATEMENT OF JURISDICTION.................................................... 1

STATEMENT OF THE ISSUES........................................................ 2

INTRODUCTION ......................................................................... 2

STATEMENT OF THE CASE........................................................... 6

    A.    The Flowers Franchise Model................................ 6

    B.    The Distributor Agreement .................................. 8

    C.    Procedural History............................................. 11

STANDARD OF REVIEW ............................................................. 12

SUMMARY OF THE ARGUMENT ................................................. 13

ARGUMENT .............................................................................. 15

I.    THE ARBITRATION AGREEMENT IS ENFORCEABLE UNDER COLORADO LAW ............................................................... 15

    A.    Section 1 Of The FAA Does Not Limit The Availability Of Arbitration Under State Law ............................. 16

    B.    Colorado Law Provides For Arbitration Of Plaintiff's Claims.......... 18

II.   THE ARBITRATION AGREEMENT IS ENFORCEABLE UNDER THE FAA................................................................ 21

    A.    Plaintiff Is Not Directly Engaged In Foreign Or Interstate Transportation ............................... 23

    B.    The Distributor Agreement Is Not A Contract For The Employment Of Transportation Workers.......... 29

        1.    Plaintiff Works Outside the Transportation Industry ............. 30

        2.    The Distributor Agreement Is Not a "Contract of Employment" for Transportation Services ............... 35

CONCLUSION ........................................................................... 40

# **TABLE OF CONTENTS**
(continued)

Page

ADDENDUM: Order Denying Defendants' Motion to Dismiss or Stay
    Proceedings and Compel Individual Arbitration,
    ECF No. 34 (May 16, 2023) .................................................................. ADD 1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atwood v. Rent-A-Ctr. E., Inc.*,
  No. 15-cv-1023-MJR-SCW, 2016 WL 2766656
  (S.D. Ill. May 13, 2016)......................................................................21

*Beltran v. AuPairCare, Inc.*,
  907 F.3d 1240 (10th Cir. 2018) .........................................................12

*Bissonnette v. LePage Bakeries Park St., LLC*,
  49 F.4th 655 (2d Cir. 2022) ..........................................................*passim*

*Breazeale v. Victim Servs., Inc.*,
  198 F. Supp. 3d 1070 (N.D. Cal. 2016).............................................17

*Byars v. Dart Transit Co.*,
  414 F. Supp. 3d 1082 (M.D. Tenn. 2019) ..........................................20

*Canales v. CK Sales Co., LLC*,
  67 F.4th 38 (1st Cir. 2023)..................................................................38

*Capriole v. Uber Tech., Inc.*,
  7 F.4th 854 (9th Cir. 2021) ................................................................24

*Circuit City Stores, Inc. v. Adams*,
  532 U.S. 105 (2001)......................................................................*passim*

*Cole v. Burns Int'l Sec. Servs.*,
  105 F.3d 1465 (D.C. Cir. 1997).........................................................17

*Cunningham v. Lyft, Inc.*,
  17 F.4th 244 (1st Cir. 2021).........................................................*passim*

*D.V.C. Trucking, Inc. v. RMX Global Logistics*,
  No. 05-CV-00705, 2005 WL 2044848 (D. Colo. Aug. 24, 2005).....................36

*Davis v. EGL Eagle Glob. Logistics L.P.*,
  243 F. App'x 39 (5th Cir. 2007) (per curiam) ...................................17

*Espinosa v. SNAP Logistics Corp.*,
No. 17 Civ. 6383, 2018 WL 9563311 (S.D.N.Y. Apr. 3, 2018) .......................17

*Fraga v. Premium Retail Servs., Inc.*,
61 F.4th 228 (1st Cir. 2023)................................................................33

*Freeman v. Easy Mobile Labs, Inc.*,
No. 16-CV-00018, 2016 WL 4479545 (W.D. Ky. Aug. 24, 2016)....................26

*Gilmer v. Interstate/Johnson Lane Corp.*
500 U.S. 20 (1991)............................................................................35

*Hamrick v. Partsfleet, LLC*,
1 F.4th 1337 (11th Cir. 2021) .......................................................26, 27

*Harper v. Amazon.com Servs., Inc.*,
12 F.4th 287 (3d Cir. 2021) ................................................................15

*Harrington v. Atl. Sounding Co., Inc.*,
602 F.3d 113 (2d Cir. 2010) ................................................................12

*Hill v. Rent-A-Center Inc.*,
398 F.3d 1286 (11th Cir. 2005) ...................................................*passim*

*Immediato v. Postmates, Inc.*,
54 F.4th 67 (1st Cir. 2022)......................................................25, 28, 39

*Kauffman v. U-Haul Int'l, Inc.*,
No. 5:16-CV-04580, 2018 WL 4094959 (E.D. Pa. Aug. 28, 2018)...................21

*Level 3 Comm., LLC v. Liebert Corp.*,
535 F.3d 1146 (10th Cir. 2008) ...........................................................20

*Lopez v. Cintas Corp.*,
47 F.4th 428 (5th Cir. 2022) .......................................................*passim*

*Michel v. Parts Auth., Inc.*,
No. 15-CV-5730, 2016 WL 5372797 (E.D.N.Y. Sept. 26, 2016).....................21

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985)................................................................13, 23

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)..........................................................................22

*Oliveira v. New Prime, Inc.*,
   857 F.3d 7 (1st Cir. 2017).....................................................*passim*

*Omni Tech Corp. v. MPC Sols. Sales, LLC*,
   432 F.3d 797 (7th Cir. 2005) .........................................................2

*Palcko v. Airborne Express, Inc.*,
   372 F.3d 588 (3d Cir. 2004) ..................................2, 4, 16, 17, 19

*Patterson v. Domino's Pizza, LLC*,
   333 P.3d 723 (Cal. 2014) ...............................................................7

*R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*,
   447 F. Supp. 3d 339 (W.D. Pa. 2020).....................................35, 36

*Rittman v. Amazon.com, Inc.*,
   971 F.3d 904 (9th Cir. 2020) ...................................................28, 39

*Saxon v. Southwest Airlines Co.*,
   No. 19-cv-403, 2023 WL 2456382 (N.D. Ill. Mar. 10, 2023)....................18, 21

*Shanks v. Swift Transp. Co.*,
   No. L-07-55, 2008 WL 2513056 (S.D. Tex. June 19, 2008)............................17

*Shearson/Am. Exp., Inc. v. McMahon*,
   482 U.S. 220 (1987).......................................................................12

*Singh v. Uber Tech., Inc.*,
   67 F.4th 550 (3d Cir. 2023) ....................................................*passim*

*Singh v. Uber Techs. Inc.*,
   939 F.3d 210 (3d Cir. 2019) ........................................................39

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Sw. Airlines Co. v. Saxon*,
142 S. Ct. 1783 (2022)...............................................................*passim*

*Tran v. Texan Lincoln Mercury, Inc.*,
No. H-07-1815, 2007 WL 2471616 (S.D. Tex. Aug. 29, 2007).........................32

*Tug Hill Marcellus LLC v. BKV Chelsea LLC*,
486 P.3d 461 (Colo. App. 2021)..........................................................19

*Valdes v. Swift Transp. Co.*,
292 F. Supp. 2d 524 (S.D.N.Y. 2003) ..............................................16

*Vargas v. Delivery Outsourcing, LLC*,
No. 15-CV-03408, 2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ......................26

*Waithaka v. Amazon.com, Inc.*,
966 F.3d 10 (1st Cir. 2020)..................................................19, 28, 39

*Wallace v. Grubhub Holdings, Inc.*,
970 F.3d 798 (7th Cir. 2020) .................................................*passim*

## STATUTES

9 U.S.C. § 1 ...........................................................................*passim*

9 U.S.C. § 2 ..............................................................................22

9 U.S.C. § 3 ................................................................................1

9 U.S.C. § 4 ................................................................................1

9 U.S.C. § 16 .........................................................................1, 12

28 U.S.C. § 1331 ..........................................................................1

28 U.S.C. § 1367 ..........................................................................1

29 U.S.C. § 216 ...........................................................................1

C.R.S. § 13-22-203 ....................................................................18

## OTHER AUTHORITIES

10th Cir. R. 25.5 .........................................................................43

**Page(s)**

10th Cir. R. 28.2 .......................................................................................1, 2

Margaret Gadsby, *Strike of the Railroad Shopmen*,
   15 MONTHLY LAB. REV. 1 (1922) ........................................................31

A.P. Winston, *The Significance of the Pullman Strike*,
   9 J. POL. ECON. 540 (1901) ...............................................................31

<u>**STATEMENT OF PRIOR OR RELATED CASES**</u>

There are no prior or related appeals in this case. *See* 10th Cir. R. 28.2(C)(3).

<u>**STATEMENT OF JURISDICTION**</u>

This is an appeal from an order of the United States District Court for the District of Colorado, which had original subject matter jurisdiction over Plaintiff's Fair Labor Standards Act claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Defendants-Appellants Flowers Foods, Inc. and its subsidiaries (collectively, unless otherwise specified, "Flowers") moved to dismiss or stay proceedings and compel Plaintiff to arbitrate his claims. Vol. 1 App. 26.[1] On May 16, 2023, the District Court denied Flowers' motion. Add. 1.

On May 24, 2023, Flowers filed a timely notice of appeal. Vol. 2 App. 316. This Court has appellate jurisdiction under 9 U.S.C. § 16(a)(1), which permits appeal of any "order" "denying a petition under [9 U.S.C. § 4] to order arbitration to proceed" or "refusing a stay of any action under [9 U.S.C. § 3]." This Court's appellate jurisdiction extends to all issues disposed of in the District Court's order, including the enforceability of the arbitration agreement under state law. *See, e.g.,*

---

[1] Flowers' Addendum is cited as "Add." (*see* 10th Cir. R. 28.2(A)), and Flowers' Appendix is cited by volume as "Vol. 1 App." or "Vol. 2 App." (*see id.* 28.1(A); 30.1(B)).

*Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594–95 (3d Cir. 2004); *Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 800 (7th Cir. 2005).

## STATEMENT OF THE ISSUES

**I.**     Is the Arbitration Agreement enforceable under Colorado law?[2]

**II**.     Is the Arbitration Agreement enforceable under the FAA?[3]

## INTRODUCTION

Flowers Foods, through its portfolio of independent subsidiaries, produces and markets a wide range of food products, including well-known brands of breads and snacks. To facilitate local sales of Flowers products, Flowers subsidiaries like Flowers Baking Co. of Denver, LLC ("FBC Denver") contract with business entities known as "Independent Distributors." Independent Distributors are independently operated franchise businesses that market, sell, and distribute Flowers products exclusively within defined geographic territories. Independent Distributors can turn a profit (or incur a loss) by, among other things, increasing (or decreasing) sales, cutting (or growing) expenses, owning multiple territories, or reselling their territories for more (or less) than the original purchase price. To succeed, Independent Distributors must use their business acumen—for example, by

---

[2] This issue was raised in (Vol. 1 App. 44–45, Vol. 2 App. 296), and ruled upon by (Add. 13–16), the District Court. *See* 10th Cir. R. 28.1(A).

[3] This issue was raised in (Vol. 1 App. 33–44, Vol. 2 App. 287–96), and ruled upon by (Add. 5–13), the District Court. *See* 10th Cir. R. 28.1(A).

soliciting new accounts, growing existing ones, and using displays and other effective merchandising techniques.

Plaintiff is the owner of Brock Inc., an Independent Distributor that purchased the rights to market, sell, and distribute Flowers products in a defined territory located entirely within the State of Colorado. In this lawsuit, Plaintiff alleges that he qualifies as a Flowers employee and, as a result, is entitled to unpaid wages, overtime compensation, and other damages under Colorado and federal law. Plaintiff's claims lack merit. This appeal, however, is limited to the threshold question of whether a court or an arbitrator should resolve them. Because Plaintiff signed an Arbitration Agreement that covers any claim he might have against Flowers, including claims "premised upon [Brock Inc.'s] alleged status as anything other than an independent contractor," the District Court should have granted Flowers' motion to compel arbitration. Vol. 1 App. 85.

Instead, the District Court held that Flowers cannot enforce the Arbitration Agreement either under the FAA or under Colorado law. As for the FAA, Plaintiff argued that he cannot be compelled to arbitrate under § 1 of that statute, which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In interpreting that provision, the Supreme Court has emphasized that its residual clause (*i.e.*, the "other class of workers" phrase) must be "afforded a narrow construction" and

"controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115, 118 (2001). Nevertheless, the District Court ruled that Plaintiff—who works exclusively within the State of Colorado; who sells baked goods, not transportation services; and whose Distributor Agreement does not require him to perform any part personally—qualifies as a "transportation worker" under § 1. As for Colorado law, the District Court found that the Arbitration Agreement does not allow for arbitration under Colorado law if arbitration is not also available under the FAA.

The District Court erred on both scores. As an initial matter, this Court need not reach the § 1 issue because the Arbitration Agreement is independently enforceable under Colorado law regardless of whether it is enforceable under the FAA. The Agreement provides that it is "governed by the FAA *and* Colorado law to the extent Colorado law is not inconsistent with the FAA." Vol. 1 App. 86 (first emphasis added). There is no dispute that this case is arbitrable under Colorado law, which contains no "transportation" exemption. And even assuming § 1 of the FAA applied, enforcing the Arbitration Agreement under Colorado law would not be "inconsistent" with the FAA because the FAA does not *prohibit* the enforcement of arbitration agreements covered by § 1. Instead, as various courts have recognized, "the effect of Section 1 is merely to leave the arbitrability of disputes in the excluded categories as if the [FAA] had never been enacted." *Palcko*, 372 F.3d at 596 (internal

quotation marks omitted). Moreover, enforcing the Arbitration Agreement under state law would further federal and state policies favoring arbitration and effectuate the parties' unambiguous intent to submit disputes like this one to arbitration.

In any event, the Arbitration Agreement is enforceable under the FAA because § 1 does not apply. *First*, transportation workers must "play a direct and necessary role in the free flow of goods *across borders*" to fall under § 1. *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1790 (2022) ("*Saxon I*") (emphasis added). Because Plaintiff works exclusively within the State of Colorado, § 1 does not apply. *Second*, § 1 "exempts from the FAA only contracts of employment of transportation workers." *Circuit City*, 532 U.S. at 119. Plaintiff is not a "transportation worker" operating under a "contract of employment" contemplated by § 1 because he does not work in the transportation industry and because he is a franchise business owner who entered into a franchise agreement that conveys an ownership interest and under which he need not perform *any* work personally. In all of these respects, Plaintiff looks nothing like the "seamen" and "railroad employees" with personal services contracts § 1 was designed to cover.

This Court should enforce the terms of the Arbitration Agreement, reverse the decision below, and compel arbitration of this dispute.

## STATEMENT OF THE CASE

### A.    The Flowers Franchise Model

"Flowers Foods is the parent holding company of numerous operating subsidiaries, which produce fresh breads, buns, rolls, and snack cakes." Vol. 1 App. 47 ¶ 3.[4] FBC Denver is one such subsidiary. FBC Denver divides the market for Flowers products into franchised geographic territories, within which they sell distribution rights to an independent network of companies called "Independent Distributors." *Id.* at 47–49 ¶¶ 5–6, 8–11. Independent Distributors own the right to market, sell, and distribute Flowers products to retail customers within their respective territories. *Id.* at 49 ¶ 10.

Independent Distributors operate under a straightforward business model: They purchase products from FBC Denver at one price and then resell those products to their customers at a higher price. *Id.*; *see also id.* at 55 ¶ 4.1. An Independent Distributor's running profits thus consist of the difference between the products' purchase price and their sale price, minus the Independent Distributor's business expenses. Independent Distributors can increase their profits by marketing and selling more products in their existing territories, buying or selling territories or portions of territories, expanding relationships with local retailers, and keeping

---

[4] Flowers Bakeries is an intermediate parent company between the local subsidiaries and the ultimate parent company.

expenses in check, among other things. On the flipside, Independent Distributors can incur losses when marketing efforts flounder, accounts shrink or shut down, or expenses get out of hand. In the meantime, the value of their territories (like any other asset) increases or decreases with their successes and failures. In the end, Independent Distributors can resell their territories, in whole or in part, and capitalize on any increase in their value. *See id.* at 49 ¶ 9.

This franchise model benefits both parties. For its part, FBC Denver receives an initial fee for selling the franchise and distribution rights. It also benefits by outsourcing local retail relationships to local entities with the entrepreneurial drive and "resources, expertise and capability" to understand and service the unique needs of their customers. *Id.* at 52. For their part, Independent Distributors gain a valuable asset with a built-in revenue stream. They also benefit from and gain access to protected trademarks and tradenames, as well as the brand recognition, customer loyalty, and reputation for quality associated with each. *See id.* at 52, 59–60; *see also generally Patterson v. Domino's Pizza, LLC*, 333 P.3d 723, 725, 733–34 (Cal. 2014) ("the self-motivated franchisee profits from the expertise, goodwill, and reputation of the franchisor"). And they gain access to business and technology supports available through FBC Denver's established franchise system, along with sales management and customer-support systems. *See* Vol. 1 App. 59–60 ¶ 10.1; *see also Patterson*, 333 P.3d at 733–34 (discussing the benefits of access to franchise system,

including a right to use trademarks and "[a] long list of marketing, productions, operations, and administrative areas").

**B. The Distributor Agreement**

Plaintiff is the sole owner of Brock Inc., a Colorado corporation that serves as an Independent Distributor for FBC Denver. Vol. 1 App. 47–48 ¶ 4. In 2016, Brock Inc. entered into a Distributor Agreement with FBC Denver to acquire a territory located entirely within the State of Colorado. *Id.* at ¶¶ 4–5. To service that territory, Brock Inc.'s agents need *never* cross state lines. *Id.* at ¶ 5. Instead, Brock, Inc. orders goods from FBC Denver, and FBC Denver delivers those goods to Brock Inc.'s warehouse in Colorado. *Id.* at 48–49 ¶¶ 8, 10–11. Brock Inc. then resells those goods to its local customers. *Id.* at 49 ¶ 11.

The relationship between FBC Denver and Brock Inc. is spelled out in the Distributor Agreement that Plaintiff signed on Brock Inc.'s behalf. *Id.* at 51–86. The Distributor Agreement makes clear that Brock Inc. is "an independent business." *Id.* at 64 ¶ 16.1 ("DISTRIBUTOR's business is separate and apart from that of COMPANY and it is of the essence of this Agreement that DISTRIBUTOR is an independent business."). The Agreement also makes clear that FBC Denver does not control "the specific details or manners and means of DISTRIBUTOR's business." *E.g.*, *id.* at 54, 56 ¶¶ 2.6, 5.1.

These general provisions are consistent with more specific ones. For instance, the Agreement provides that Brock Inc. is "responsible for obtaining [its] own delivery vehicle(s) and purchasing adequate insurance thereon[.]" *Id.* at 59 ¶ 9.1. And Brock Inc. can decide whether to dispose of "[s]tale" products, sell them for non-human consumption, donate them to charity, or sell them back to FBC Denver. *Id.* at 61 ¶¶ 12.1–12.3. Brock Inc. is also "solely responsible for all taxes and transactional reporting requirements." *Id.* at 63 ¶ 15.4. It may "engage any legal and/or accounting professional services it deems necessary." *Id.* at 65 ¶ 16.4. And it can operate outside businesses and sell noncompetitive products. *Id.* at 55 ¶ 5.1. Moreover, the "Agreement does not require that [Brock Inc.]'s obligations hereunder be conducted personally" by anyone. *Id.* at 64 ¶ 16.2. Instead, Brock Inc. is "free to engage such persons as [it] deems appropriate." *Id.*

The Distributor Agreement also contains a "Mandatory and Binding Arbitration" provision that incorporates, as Exhibit K, a separate Arbitration Agreement. *See id.* at 67 ¶ 18.3 (Distributor Agreement provision); *id.* at 84–86 (Arbitration Agreement). The Arbitration Agreement provides:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR (*including its owner or owners*) may have against COMPANY ([or its affiliates and agents]) or that COMPANY may have against DISTRIBUTOR (or its owners[] [and agents]), arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY ("Agreement"), including the termination of the Agreement, services provided to COMPANY by

DISTRIBUTOR, or any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, *et seq.*) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein.

*Id.* at 84 (emphasis added). The Arbitration Agreement states that it "shall be governed by the FAA and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent with the FAA." *Id.* at 86.

The claims covered by the Arbitration Agreement specifically include "claims challenging the independent contractor status of [the Independent Distributor], claims alleging that [the Independent Distributor] was misclassified as an independent contractor, [and] any other claims premised upon [the Independent Distributor's] alleged status as anything other than an independent contractor[.]" *Id.* at 85. In addition, "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class . . . arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court." *Id.* at 85.

In connection with the Distributor Agreement, Plaintiff also signed a separate Personal Guaranty, in which he expressly agreed and acknowledged that he would be "subject to the Arbitration Agreement attached hereto as Exhibit K." *Id.* at 79.

### C.     Procedural History

On September 19, 2022, Plaintiff filed a class and collective action complaint in the U.S. District Court for the District of Colorado alleging that Defendants had misclassified him and other Independent Distributors as independent contractors in violation of Colorado and federal law. Vol. 1 App. 5, 19–21. Defendants moved to dismiss Plaintiff's lawsuit in favor of arbitration or, alternatively, to stay the lawsuit pending arbitration. *Id.* at 26–46. As relevant to this appeal, Plaintiff argued in response that he cannot be compelled to arbitrate under the FAA because he qualifies as a "transportation worker[]" under § 1, and that he cannot be compelled to arbitrate under Colorado law if the FAA does not apply. *Id.* at 116–22.

On May 16, 2023, the District Court denied Defendants' motion. First, the District Court found that Plaintiff "has met his burden of showing that, under *Saxon* [*I*], he is a transportation worker exempt from the Federal Arbitration Act under 9 U.S.C. § 1 . . . ." Add. 13. In so doing, the District Court found that Plaintiff is engaged in interstate commerce, even though he only ever moves goods intrastate, because he "plac[es] orders for products that arrive from out-of-state-bakeries and then deliver[s] those products to his Colorado customers." *Id.* at 9–13. It rejected Second and Eleventh Circuit precedent holding that § 1 applies only to workers in the transportation industry. *Id.* at 6–8. And it concluded that Plaintiff falls within a "class" of transportation workers because he "brings Flowers bakery products to

- 11 -

market." *Id.* at 8–9.

Second, the District Court then found that Flowers could not compel arbitration under Colorado law either. Colorado, the District Court recognized, has no "transportation worker" exemption. *See id.* at 14. However, the Court interpreted the Arbitration Agreement to prohibit arbitration under Colorado law in cases where the § 1 exemption applies. *Id.* at 14–16.

On May 24, 2023, Defendants timely appealed, invoking their right to interlocutory review of orders denying motions to compel arbitration. *See* 9 U.S.C. § 16(a)(1).

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion to compel arbitration. *See Beltran v. AuPairCare, Inc.*, 907 F.3d 1240, 1251 (10th Cir. 2018). "In doing so, [this Court applies] the same legal standard as the district court." *Id.* On the merits, "[a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010); *see also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue."). And courts must construe "any doubts concerning the scope of arbitrable issues . . . in favor of

arbitration[.]" *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (citation omitted).

## SUMMARY OF THE ARGUMENT

The Arbitration Agreement is enforceable both under Colorado law and under the FAA, each of which constitutes an independent basis for reversal.

**I.** First, even assuming the FAA's § 1 exemption applied, the Arbitration Agreement is enforceable under Colorado law.

**A**. Section 1 excludes a limited class of arbitration agreements from the FAA's coverage. But it "has no impact on other avenues (such as state law) by which a party may compel arbitration." *Oliveira v. New Prime, Inc.*, 857 F.3d 7, 24 (1st Cir. 2017) ("*New Prime I*"), *aff'd*, 139 S. Ct. 532 (2019) ("*New Prime II*").

**B**. Here, the Arbitration Agreement makes clear that Colorado law applies "to the extent <u>Colorado</u> law is not inconsistent with the FAA." Vol. 1 App. 86. The Arbitration Agreement is enforceable under Colorado law because Colorado law does not contain a "transportation worker" exemption. And there is no "inconsisten[cy]" between FAA and Colorado law on that score, since the FAA is simply silent with respect to agreements that fall under § 1. Indeed, enforcing the Arbitration Agreement would advance federal and state policies favoring arbitration, as well as the parties' unambiguous intent to arbitrate disputes like this one.

**II**. Second, the Arbitration Agreement is enforceable under the FAA because § 1 does not apply. Plaintiff is not "engaged in foreign or interstate commerce" for purposes of § 1, and the Distributor Agreement is not a "contract[ ] of employment of transportation workers," *Circuit City*, 532 U.S. at 119.

**A.** The § 1 exemption applies only to classes of transportation workers who are "engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiff does not fit that bill because he markets, sells, and distributes Flowers products only within the borders of Colorado and plays no role—much less a "direct and necessary" one, *Saxon I*, 142 S. Ct. at 1790—in the flow of those products across state lines. Brock Inc. takes title to Flowers products at its Colorado warehouse, and then sells them to its Colorado customers. The fact that those products may have crossed state lines prior to reaching Brock Inc. makes no difference. *See, e.g.*, *Lopez v. Cintas Corp.*, 47 F.4th 428, 430 (5th Cir. 2022) (holding that § 1 does not apply to a "local delivery driver" who "picked up items from a Houston warehouse (items shipped from out of state) and delivered them to local customers").

**B.** Even if the required "foreign or interstate" nexus were present, § 1 "exempts from the FAA only contracts of employment of transportation workers." *Circuit City*, 532 U.S. at 119.

**a.** Text, history, and persuasive authority all demonstrate that "transportation workers" must work *within* the transportation industry. *See, e.g.*, *Bissonnette v.*

*LePage Bakeries Park St., LLC*, 49 F.4th 655, 661 (2d Cir. 2022) ("[O]nly a worker in a transportation industry can be classified as a transportation worker."). Because Flowers and Brock Inc. sell baked goods, not transportation services, Plaintiff is not a "transportation worker" for purposes of § 1.

**b.** In any event, the Distributor Agreement is not a "contract of employment" for transportation services because it is a commercial franchise agreement between two entities: FBC Denver and Brock Inc., that conveys an ownership interest that can be sold and under which no specific person needs to perform any services personally. *See* Vol. 1 App. 50–93. The Distributor Agreement also makes clear that "the interstate movement of goods" is not "a central part of [Plaintiff's] . . . job description." *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 801 (7th Cir. 2020) (Barrett, J.). To the contrary, Plaintiff is a franchise business owner with a wide variety of sales and customer-service responsibilities. He is not required to perform any transportation work personally. Accordingly, the "class of workers" to which he belongs looks nothing like the "seamen" and "railroad employees" covered by § 1.

## ARGUMENT

## I.   THE ARBITRATION AGREEMENT IS ENFORCEABLE UNDER COLORADO LAW.

This Court need not reach the question whether the Arbitration Agreement is exempt from the FAA, because even assuming the § 1 exemption applies, the Agreement is enforceable under Colorado Law. *Cf. Harper v. Amazon.com Servs.,*

*Inc.*, 12 F.4th 287, 291 (3d Cir. 2021) (holding a federal court sitting in diversity should decide state-law arbitrability before determining whether FAA § 1 exemption applies). Section 1 merely exempts covered agreements from the FAA's scope; it does not displace existing state-law mechanisms for enforcing arbitration agreements. And here, the Arbitration Agreement is clearly enforceable under Colorado law.

**A.   Section 1 Of The FAA Does Not Limit The Availability Of Arbitration Under State Law.**

Section 1 of the FAA is an exemption, not a prohibition. It "does not . . . in any way address the enforceability of employment contracts exempt from the FAA." *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003). "It simply excludes [covered] contracts from FAA coverage entirely." *Id.*; *see* 9 U.S.C. § 1 ("*[N]othing herein contained shall apply* to contracts of employment of . . . workers engaged in foreign or interstate commerce." (emphasis added)). In other words, "the effect of Section 1 is merely to leave the arbitrability of disputes in the excluded categories as if the [FAA] had never been enacted." *Palcko*, 372 F.3d at 596 (internal quotation marks omitted).

The applicability of the FAA's "transportation worker" exemption thus "has no impact on other avenues (such as state law) by which a party may compel arbitration." *New Prime I*, 857 F.3d at 24. Even where the exemption applies, "enforcement of the arbitration agreement . . . under . . . state law, as if the FAA 'had

never been enacted,' does not contradict any of the language of the FAA, but in contrast furthers the general policy goals of the FAA favoring arbitration." *Palcko*, 372 F.3d at 596; *see also Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1472 (D.C. Cir. 1997) ("[W]e have little doubt that, even if an arbitration agreement is outside the FAA, the agreement still may be enforced . . . ."); *Davis v. EGL Eagle Glob. Logistics L.P.*, 243 F. App'x 39, 44 (5th Cir. 2007) (per curiam) ("[T]he FAA does not preempt [Texas law] because this case presents the situation where the FAA refuses to enforce an arbitration provision (assuming for the moment that [the plaintiff] meets the exception for transportation workers) that [Texas law] would enforce.").

Consistent with these principles, courts around the country have found state arbitration law applicable—and enforced arbitration agreements under state law— even where the "transportation worker" exemption applies. *See, e.g.*, *Espinosa v. SNAP Logistics Corp.*, No. 17 Civ. 6383, 2018 WL 9563311, at *5 (S.D.N.Y. Apr. 3, 2018) ("[E]ven if Plaintiff is exempt from the FAA, the application of the exemption does not preclude enforcement of the arbitration provision under New York state law."); *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016) ("When a contract with an arbitration provision falls beyond the reach of the FAA, courts look to state law to decide whether arbitration should be compelled nonetheless."); *Shanks v. Swift Transp. Co.*, No. L-07-55, 2008 WL 2513056, at *4

(S.D. Tex. June 19, 2008) ("The weight of authority shows that even if the FAA is inapplicable, state arbitration law governs."). Indeed, after the Supreme Court held that § 1 applied to an airline employee in *Saxon I*, the district court still compelled arbitration on remand "because [the plaintiff] signed an enforceable contract under Illinois state law." *Saxon v. Southwest Airlines Co.*, No. 19-cv-403, 2023 WL 2456382, *4–5 (N.D. Ill. Mar. 10, 2023) ("*Saxon II*").

**B.      Colorado Law Provides For Arbitration Of Plaintiff's Claims.**

The Arbitration Agreement in this case is enforceable under Colorado's Uniform Arbitration Act, which applies to any "agreement to arbitrate made on or after August 4, 2004." C.R.S. § 13-22-203. The Uniform Arbitration Act contains no transportation worker or other relevant exception. *See id.* And to the extent Plaintiff disputes the arbitrability of any of his claims under Colorado law, the Arbitration Agreement specifically provides that such disputes "shall be resolved by the arbitrator, not a court." Vol. 1 App. 85.

The District Court erred in finding that the Arbitration Agreement itself forecloses arbitration under Colorado law. Add. 15–16. To be sure, the Agreement repeatedly invokes the FAA, for the simple reason that both parties assumed that the FAA would apply. *See, e.g.*, Vol. 1 App. 84 (providing that covered claims "shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act"). But the Arbitration Agreement also expressly invokes Colorado

law, stating that the Agreement "shall be governed by the FAA and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent with the FAA." *Id.* at 86. That belt-and-suspenders language makes clear that the parties intended state law to fill the gap even if a court were to somehow find that the FAA did not apply.

If there were any doubt about that, the Agreement includes a savings clause, which confirms that the rest of the Agreement, including the commitment to arbitrate disputes, must "continue in full force and effect" even if a court were to find any specific provision somehow inapplicable or invalid. *Id.* at 85–86. "Because the FAA is inapplicable, the portions of the governing law and dispute resolution sections selecting the FAA must be stricken from the Agreement, leaving [Colorado] law as the default choice of law for assessing the enforceability of the arbitration . . . provisions of the parties' contract." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 27 (1st Cir. 2020).

Moreover, FAA and Colorado law are not "inconsistent" with respect to the Agreement's enforceability. Again, the FAA does not *bar* enforcement of "transportation worker" arbitration agreements; it simply does not cover them. *See supra* Part I.A. Even where § 1 applies, "enforcement of [an] arbitration agreement . . . under . . . state law . . . furthers the general policy goals of the FAA favoring arbitration." *Palcko*, 372 F.3d at 596. It also advances Colorado's policy of "encourag[ing] settlement of disputes through the arbitration process." *Tug Hill*

*Marcellus LLC v. BKV Chelsea LLC*, 486 P.3d 461, 463 (Colo. App. 2021) (quoting *Sopko v. Clear Channel Satellite Servs., Inc.*, 151 P.3d 663, 666 (Colo. App. 2006)). And it effectuates the clear intent of these parties to submit disputes—including "claims challenging … independent contractor status"—to arbitration. Vol. 1 App. 85.

The District Court's contrary interpretation would undermine federal and state policies favoring arbitration and flout the clear intent of these parties to submit disputes like this one to arbitration. It would also render the parties' alternative invocation of Colorado law meaningless. Under Colorado law, "every relevant provision" of a contract "must be considered and given effect." *Level 3 Comm., LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). Only Flowers' interpretation of the parties' reference to Colorado law gives that language independent effect.

Courts that have addressed state-law enforceability in the context of arbitration agreements similar to the one at issue here have consistently enforced those agreements under state law. *Byars v. Dart Transit Co.*, 414 F. Supp. 3d 1082 (M.D. Tenn. 2019), for instance, involved an arbitration provision that was governed *only* by the FAA but that was part of a broader agreement subject to Minnesota law. *Id.* at 1088. After finding that the agreement was exempt from the FAA under § 1, the court granted the defendants' motion to compel arbitration under Minnesota law. *See id.* at 1094–95. In *Saxon II*, the court enforced the arbitration agreement under

state law "even [though] the contract says that the Federal Arbitration Act applies *and mentions no other law." Saxon II*, 2023 WL 2456382, at *4 n.5 (quoting *Atwood v. Rent-A-Ctr. E., Inc.*, No. 15-cv-1023-MJR-SCW, 2016 WL 2766656, at *3 (S.D. Ill. May 13, 2016)) (emphasis added). And many other courts across the country have reached the same result in the face of similar agreements. *See, e.g.*, *Atwood*, 2016 WL 2766656, at *3; *Michel v. Parts Auth., Inc.*, No. 15-CV-5730, 2016 WL 5372797, at *4 (E.D.N.Y. Sept. 26, 2016); *Kauffman v. U-Haul Int'l, Inc.*, No. 5:16-CV-04580, 2018 WL 4094959, at *5 (E.D. Pa. Aug. 28, 2018). "[I]f the federal act doesn't apply," those courts have reasoned, "the agreement to arbitrate remains viable, and the only question becomes what state's law applies to the contract to arbitrate." *Atwood*, 2016 WL 2766656, at *3. This case is far easier than most of those, as the Arbitration Agreement expressly invokes Colorado law in the alternative.

\*   \*   \*

Because the Arbitration Agreement is enforceable under Colorado law *regardless of whether* the FAA applies, this Court need not reach the § 1 question. It should simply reverse the decision below and allow this case to proceed to arbitration under Colorado law.

## II. THE ARBITRATION AGREEMENT IS ENFORCEABLE UNDER THE FAA.

The FAA embodies a "liberal federal policy favoring arbitration agreements."

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The Act's primary substantive provision, § 2, states that arbitration agreements "in any . . . contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Relevant here, however, § 1 of the Act provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Id.* § 1.

The Supreme Court has afforded § 1 "a narrow construction," holding that the exemption's "residual clause" extends only to contracts of employment with other classes of interstate transportation workers. *Circuit City* 532 U.S. at 119; *see Saxon I*, 142 S. Ct. at 1790. To determine whether § 1 applies, courts ask two key questions. *First*, they ask whether the plaintiff is "engaged in foreign or interstate commerce"— *i.e.*, whether the "class of workers" to which the plaintiff belongs "play[s] a direct and necessary role in the free flow of goods *across borders*." *Saxon I*, 142 S. Ct. at 1790 (emphasis added). *Second*, they ask whether the agreement at issue is a "contract[ ] of employment of transportation workers," *Circuit City*, 532 U.S. at 119—*i.e.*, whether it is an agreement for work and whether the "class of workers" to which the plaintiff belongs is similar to "seamen" and "railroad employees," *see Saxon I*, 142 S. Ct. at 1788–90 (internal quotation marks omitted).

Plaintiff misses both marks. He plays no role in cross-border transportation

because Brock Inc. operates exclusively within the State of Colorado and executes purely intrastate transactions. And the Distributor Agreement is not a "contract[ ] of employment of transportation workers" because Plaintiff works outside the transportation industry, and because the Distributor Agreement under which his business operates is a commercial franchise agreement between two businesses that conveys an ownership interest that can be sold and that does not require Plaintiff to personally perform any work. He therefore looks nothing like the "seamen" and "railroad employees" with personal services contracts § 1 was designed to capture. To the extent this Court has "doubts" about whether § 1 applies, they must be resolved "in favor of arbitration." *Mitsubishi Motors Corp.*, 473 U.S. at 626.

## A. Plaintiff Is Not Directly Engaged In Foreign Or Interstate Transportation.

Section 1 does not apply to this case, first and foremost, because any transportation in which Plaintiff engages occurs exclusively within the State of Colorado. There is no dispute that the "territory owned by Brock Inc. is entirely within Colorado." Vol. 1 App. 48 ¶ 5. There is also no dispute that "neither Brock nor any others he employed crossed state lines to deliver goods in connection with the operation of his business." *Id.*; *see also id.* at 120 (acknowledging Flowers' assertion that Plaintiff "does not cross state lines" and arguing only that "this is irrelevant"). Instead, Brock Inc. takes title to products he purchases from FBC Denver at a Colorado warehouse and sells those products exclusively to Colorado

customers. *See id.* at 49 ¶ 11; *id.* at 53 ¶ 2.4; *id.* at 55 ¶ 4.1. Plaintiff, accordingly, is in "the business of facilitating local, intrastate" sales. *Cunningham v. Lyft, Inc.*, 17 F.4th 244, 253 (1st Cir. 2021). He plays no "direct and necessary role in the free flow of goods across borders," *Saxon I*, 142 S. Ct. at 1790.

That means Plaintiff is "fundamentally unlike seamen and railroad employees" mentioned in § 1. *Cunningham*, 17 F.4th at 253. He is also fundamentally unlike other classes of workers that the Supreme Court has found to be sufficiently connected to foreign or interstate commerce to fall under § 1. The Southwest Airlines employees in *Saxon I*, for example, were responsible for "physically loading cargo directly on and off an airplane headed out of State." 142 S. Ct. at 1792. And the plaintiff in *New Prime* worked for an "interstate trucking company" that transported goods across state lines. *New Prime II*, 139 S. Ct. at 536.

Plaintiff much more closely resembles classes of workers that courts have held *not* to qualify as interstate transportation workers under § 1. In *Singh v. Uber Tech., Inc.*, 67 F.4th 550 (3d Cir. 2023), for instance, the Third Circuit rejected a § 1 claim by Uber drivers because "[t]he work of Uber drivers is centered on local transportation," even though drivers sometimes cross state lines in the course of their work. *Id.* at 553, 560; *see also Capriole v. Uber Tech., Inc.*, 7 F.4th 854, 861 (9th Cir. 2021) (also holding that Uber drivers are not covered by § 1); *Cunningham*, 17 F.4th at 253 (same for Lyft drivers). Similarly, in *Wallace*, the Seventh Circuit held

that Grubhub drivers who deliver food from local restaurants are not covered by § 1 because their work is not connected to "the act of moving . . . goods across state or national borders." 970 F.3d at 802–03; *see also Immediato v. Postmates, Inc*., 54 F.4th 67, 78 (1st Cir. 2022) (same for Postmates drivers). Finally, in *Lopez*, the Fifth Circuit held that § 1 does not apply to a delivery driver who picks up goods from a warehouse and delivers them to local customers because he is not involved in the transportation of "goods across borders." 47 F.4th at 433.

Indeed, this case is much easier than the rideshare and delivery cases because Plaintiff literally never crosses state lines in the course of his work. The limited geographic scope of Plaintiff's work is fundamental to his business and spelled out in the Distributor Agreement. *See, e.g.*, Vol. 1 App. 73 (describing Brock Inc.'s geographic territory). By contrast, the evidence in *Singh* showed that Uber drivers make millions of cross-border trips each year. 67 F.4th at 560. The Lyft driver plaintiffs in *Cunningham* alleged that they "occasionally transport[ed] passengers across state lines." 17 F.4th at 252. And restaurant delivery is fluid between border towns. *See Immediato*, 54 F.4th at 78 (noting that "almost all"—but not "all"—deliveries were in-state).

This case is also easier than *Lopez*. In that case, the defendant corporation "processe[d], distribute[d], and deliver[ed] work uniforms and other facility-services products to clients nationwide." *Lopez*, 47 F.4th at 430. And the plaintiff signed an

employment contract to work for that corporation as a "local delivery driver." *Id.* Like in this case, the plaintiff "enter[ed] the scene [only] after the goods ha[d] already been delivered across state lines." *Id.* at 432. And like in this case, the plaintiff had "a more customer-facing role" than the "seamen" and "railroad employees" mentioned in § 1. *Id.* at 433. But unlike in this case, there was no suggestion that the plaintiff bought and operated a franchise business, took title to the goods at issue, serviced his own customers, or had any latitude to delegate any of his responsibilities to others.

In nevertheless finding that Plaintiff is engaged in interstate transportation, the District Court focused heavily on the fact that Flowers products travel across state lines before they reach Brock Inc.'s warehouse in Colorado. *See, e.g.*, Add. 11. But the fact that Flowers products may have traveled in interstate commerce at some point in their lifespans does not bring Plaintiff within the scope of § 1.[5]

---

[5] To be sure, the fact that Flowers products cross state lines at some point in their journey *does* mean that Plaintiff works within "interstate commerce" for purposes of the Motor Carrier Act exemption to the FLSA. But the Motor Carrier Act is a completely different statutory framework that is "irrelevant" to "the issue of whether [the plaintiff] is excepted from arbitration under Section 1 of the FAA." *Freeman v. Easy Mobile Labs, Inc.*, No. 16-CV-00018, 2016 WL 4479545, at *2 n.2 (W.D. Ky. Aug. 24, 2016); *see also Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1349 (11th Cir. 2021) (explaining that the text and "purpose of the Federal Arbitration Act" are "completely different from the Fair Labor Standards Act and the Motor Carrier Act"); *Vargas v. Delivery Outsourcing, LLC*, No. 15-CV-03408, 2016 WL 946112, at *4 (N.D. Cal. Mar. 14, 2016) (explaining that cases addressing the FLSA are not relevant to the FAA question because the FLSA is "construed broadly" whereas § 1 of the FAA is "construed narrowly"). Unlike § 1, which focuses more

That is clear, first and foremost, from the text of § 1, which extends only to classes of workers who are "engaged in foreign or interstate commerce." 9 U.S.C. § 1. In *Circuit City*, the Court undertook an extended interpretation of the phrase "interstate commerce" in § 1, and concluded that that language cannot be read to extend to "the outer limits of [Congress's] authority under the Commerce Clause." 532 U.S. at 115–16. Instead, the Court "relied on two well-settled canons of statutory interpretation"—meaningful variation and *ejusdem generis*—to conclude that workers "must at least play a direct and 'necessary role in the free flow of goods' *across borders*" to fall under the residual clause. *Saxon I*, 142 S. Ct. at 1789–90 (summarizing and quoting *Circuit City*, 532 U.S. at 115–17, 119, 121) (emphasis added). Accordingly, "to fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders." *Wallace*, 970 F.3d at 802; *see also Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1350 (11th Cir. 2021) ("Section one is directed at what the class of workers is engaged in, and not what it is carrying."); *accord Lopez*, 47 F.4th at 431–33.

Consistent with these principles, courts have consistently rejected the argument that § 1's "residual clause . . . applies to a class of workers that *only* makes

---

narrowly on cross-border transportation, the Motor Carrier Act "express[es] congressional intent to regulate to the outer limits of authority under the Commerce Clause." *Circuit City*, 532 U.S. at 115–16.

'intrastate trips' transporting goods that have moved in interstate commerce."
*Hamrick*, 1 F.4th at 1351; *see also Wallace*, 970 F.3d at 802 (holding that local
delivery drivers did not qualify as "transportation workers" merely because "they
carr[ied] goods that have moved across state and even national lines"); *Immediato*,
54 F.4th at 76 ("'engaged in interstate commerce' is a term of art that does not
encompass the local retail of goods, even if those goods previously have been
shipped interstate"); *cf. Cunningham*, 17 F.4th at 251 (rejecting the argument that
"plaintiffs are engaged in interstate travel merely because they bring passengers to
and from an airport"). "[O]nce an interstate shipment arrives at a local retailer and
is there held solely for local disposition and use, the goods are no longer considered
to be in interstate commerce" for purposes of § 1. *Immediato*, 54 F.4th at 76 (internal
quotation marks and citation omitted).

To be sure, a few courts have found that workers in the transportation industry
who provide last-mile services as part of an integrated interstate shipping
operation—*e.g.*, "truckers who drive an intrastate leg of an interstate route"—can
qualify as "transportation workers" for purposes of § 1. *Wallace*, 970 F.3d at 802
(citing *Waithaka*, 966 F.3d at 25–26); *see also Rittman v. Amazon.com, Inc.*, 971
F.3d 904, 915 (9th Cir. 2020). But this case looks nothing like those. The Amazon
delivery drivers in *Waithaka* and *Rittman* were simply links in an unbroken interstate
delivery transit chain—executing unified "interstate transactions between Amazon

and the customer [that] do not conclude until the packages reach their intended destinations." *Rittman*, 971 F.3d at 916. Plaintiff, by contrast, operates a "fundamentally local" franchise business, *Singh*, 67 F.4th at 553, whereby Brock Inc. purchases Flowers products and then sells those products to its local customers in Colorado, engaging in various activities to increase sales and the resulting value of its business in the process. *See* Vol. 1 App. 49 ¶ 11; *id.* at 53 ¶ 2.4; *id.* at 55 ¶ 4.1.

A contrary ruling would stretch § 1 far beyond its intended bounds. It is a fact of modern life that much of what we use and consume at some point travels in interstate commerce. If working with goods that once travelled in interstate commerce were enough to make someone an *interstate* transportation worker for purposes of § 1, then just about everyone would qualify. Take, for example, a paperboy, who receives newspapers from out of state and then cycles around his neighborhood dropping them off at subscribers' homes. Or take the franchise owner of a 7-Eleven store who orders out-of-state goods based on corporate's recommendations and then sells them locally. Those workers, like Plaintiff here, look nothing like "seamen" or "railroad employees" § 1 was drafted to capture.

Because Plaintiff is not "engaged in foreign or interstate commerce" under 9 U.S.C. § 1, § 1 does not apply.

**B.    The Distributor Agreement Is Not A Contract For The Employment Of Transportation Workers.**

Even if the Court were to somehow find that Plaintiff is engaged in "foreign

or interstate commerce" for purposes of § 1, *id.*, the Distributor Agreement is not a "contract[ ] of employment of transportation workers," *Circuit City*, 532 U.S. at 119. Plaintiff does not work in the "transportation industry." *Bissonnette*, 49 F.4th at 660. Moreover, the Distributor Agreement is a commercial franchise agreement under which Plaintiff need not personally undertake any services at all.

### 1.    Plaintiff Works Outside the Transportation Industry.

Section 1's text and history confirm that "transportation workers" are, first and foremost, "workers involved in the transportation industry." *Bissonnette*, 49 F.4th at 660; *see also Hill v. Rent-A-Center Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005) ("[I]t is apparent Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry."). Plaintiff does not belong to a class of workers in the transportation industry because Brock Inc. sells baked goods, not transportation services. And Flowers, through its independent subsidiaries, produces and markets baked goods, but does not sell transportation services. Accordingly, § 1 does not apply.

With respect to § 1's text, the Supreme Court has instructed that the residual clause must be "controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Circuit City*, 532 U.S. at 115, 118. The "seamen" and "railroad employee" "examples are telling because they locate the 'transportation worker' in the context of a *transportation industry*." *Bissonnette*, 49

F.4th at 660. The word "seamen" refers to a "subset of workers engaged in the maritime shipping industry." *Saxon I*, 142 S. Ct. at 1791. Likewise, the term "railroad employee" speaks not to the role of the individual worker but to the industry in which he works. So too should the residual clause be understood to refer to "workers in a *transportation industry*." *Bissonnette*, 49 F.4th at 660.

Section 1's history underscores Congress's intent to capture workers in the transportation industry. At the time the FAA was passed, the country had been deeply impacted by transportation strikes, which threatened to disrupt other industries that depended on transportation services for their livelihoods. *See, e.g.*, A.P. Winston, *The Significance of the Pullman Strike*, 9 J. POL. ECON. 540 (1901); Margaret Gadsby, *Strike of the Railroad Shopmen*, 15 MONTHLY LAB. REV. 1, 6 (1922). As a result, "Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers" and adopted "grievance procedures . . . for railroad employees." *Circuit City*, 532 U.S. at 121 (citing Shipping Commissioners Act of 1872, 17 Stat. 262, and Transportation Act of 1920, 41 Stat. 456). And "the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes"—later extended to cover airline labor disputes—"was imminent[.]" *Id.* (citing Railway Labor Act of 1926, 44 Stat. 577). By exempting classes of workers in the transportation industry from the FAA, Congress ensured that the FAA would not preempt these "established or

developing statutory dispute resolution schemes covering specific workers." *Id.* Conversely, Congress did not seek to capture "workers who incidentally transport[] goods interstate as part of their job in an industry that would otherwise be unregulated." *Hill*, 398 F.3d at 1289.

The transportation industry encompasses businesses that sell transportation services—*i.e.*, businesses that "peg[ ] [their] charges chiefly to the movement of goods or passengers" and whose "predominant source of commercial revenue is generated by that movement." 49 F.4th at 661; *see also, e.g.*, *Tran v. Texan Lincoln Mercury, Inc.*, No. H-07-1815, 2007 WL 2471616, at *5 (S.D. Tex. Aug. 29, 2007) (explaining that the "transportation industry[]" is "an industry whose mission it is to move goods"). Shipping companies, trucking companies, airlines, and even ride-share companies are all prime examples. After all, when you pay UPS, a long-distance moving company, Southwest Airlines, or Uber, the thing you're buying *is* transportation. The individuals who work for those businesses resemble "seamen" and "railroad employees." And strikes among those workers have the potential to disrupt commerce nationwide.

Conversely, the transportation industry does not include businesses who produce or provide other products and services, even if their workers may "incidentally transport[] goods interstate." *Hill*, 398 F.3d at 1289. For example, § 1 does not apply to "an interstate traveling pharmaceutical salesman," as his business

is selling pharmaceuticals, not transporting goods. *Id.* at 1290. It does not apply to a Rent-A-Center employee who spends some of her time delivering furniture, as her business is renting furniture, not transporting goods. *Id.* at 1289–90. And it does not apply to Flowers' Independent Distributors, who traffic "in breads, buns, rolls, and snack cakes—not transportation services." *Bissonnette*, 49 F.4th at 662. While all of those workers may "spend appreciable parts of their working days moving goods from place to place," their customers are buying their wares, not their transportation services. *Id.* at 661. And when Plaintiff sells baked goods to his customers, he is paid by the loaf, not by the mile. *Id.* at 661–62 ("Customers pay for the baked goods themselves; the movement of those goods is at most a component of total price.").

The Supreme Court had no occasion to address the "transportation industry" issue in *Saxon I*, because "the plaintiff worked for an airline" that was clearly "in the business of moving people and freight." *Bissonnette*, 49 F.4th at 661. But its analysis is entirely consistent with the proposition that a "class of workers" must at least work in the transportation industry to qualify as "transportation workers." To be sure, *Saxon I* further "teaches[] [that] not *everyone* who works in a transportation industry is a transportation worker." *Id.* (emphasis added) (discussing *Saxon I*). Working within the transportation industry, in other words, is a necessary condition for qualifying as a "transportation workers" but not a sufficient one. "[T]he distinctions drawn in *Saxon [I]*" *among* transportation industry workers, however, "do not come

into play" where, as here, an individual works in a different industry entirely. *Id.*; *see also Hill*, 398 F.3d at 1289–90.

The First Circuit's contrary ruling is entirely unpersuasive. In *Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228 (1st Cir. 2023), the court "recognize[d] that *Saxon*'s holding does not strictly foreclose the possibility that being employed in the transportation industry may be a necessary threshold criterion for qualifying as a transportation worker." *Id.* at 235. Nevertheless, it rejected the consensus view among other Courts of Appeals that "transportation workers" must work in the "transportation industry." *See, e.g.*, *Bissonnette*, 49 F.4th at 661; *Hill*, 398 F.3d at 1290. In so doing, the First Circuit did not even attempt to undertake a statutory or historical analysis. Nor did it grapple with the logical consequences of its decision. Under the First Circuit's rule, § 1's residual clause will touch every company that makes, sells, and distributes a product. *Circuit City*—which involved an employee of an electronics retailer—rejected that sweeping view of § 1. *See* 532 U.S. at 118.

This Court should follow *Bissonnette* and *Hill* instead. "The specification of workers in a *transportation industry* is a reliable principle for construing [§ 1's residual] clause." *Bissonnette*, 49 F.4th at 660. It reflects § 1's text and history. And it hews to the Supreme Court's instruction that § 1 must be "narrow[ly]" construed. *Circuit City*, 523 U.S. at 118. "Because [Plaintiff] do[es] not work in the transportation industry," he is not a "transportation worker" for purposes of § 1.

- 34 -

*Bissonnette*, 49 F.4th at 662.

### 2. The Distributor Agreement Is Not a "Contract of Employment" for Transportation Services.

Even if Plaintiff belonged to a class of workers in the transportation industry, § 1 exempts from the FAA's coverage only those arbitration agreements contained within "contracts of employment of … any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Distributor Agreement does not qualify because it is not a "contract of employment" for purposes of § 1 and it does not require that Plaintiff personally provide any services (much less transportation services) at all.

In *New Prime*, the Supreme Court clarified that "contracts of employment" include not only "agreements between employers and employees" but also "agreements that require independent contractors to perform work." *New Prime II*, 139 S. Ct. at 539. But a contract governing employment—for "work by workers"— is still required. *R & C Oilfield Servs., LLC v. Am. Wind Transp. Grp., LLC*, 447 F. Supp. 3d 339, 347 (W.D. Pa. 2020). Other kinds of contracts, even when they in some respects entail the performance of work, are not covered by § 1.

For instance, in *Gilmer v. Interstate/Johnson Lane Corp.*, an employee sued his employer for age discrimination and sought to avoid arbitration under § 1. 500 U.S. 20, 23–25 (1991). But the arbitration clause at issue was contained in the employee's "securities registration application" with a third party, not in the

employee's "employment agreement with [defendant]." *Id.* at 25 n.2. The Supreme Court held that § 1 did not apply "because the arbitration clause being enforced here is not contained in a contract of employment." *Id.* Similarly, in *R & C Oilfield Services*, the plaintiff was an independent contractor who had agreed to transport the defendant's products by truck. 447 F. Supp. 3d at 347–48. The court found that § 1 did not apply because the arbitration clause at issue was part of an agreement "between two businesses … for the transport of the vendor's goods," not an agreement "for work by workers." *Id.* at 347. Indeed, the agreement did not require that any that "particular driver associated with [the trucking company] would actually perform the work." *Id.* Finally, in *D.V.C. Trucking, Inc. v. RMX Global Logistics*, No. 05-CV-00705, 2005 WL 2044848 (D. Colo. Aug. 24, 2005), the court found that "an arm's length business contract for carrier services" was not a "contract of employment" under § 1 even though the owner of one of those businesses personally drove a truck in order to provide those services. *Id.* at *3.

This case is just like those. The Distributor Agreement is a "commercial contract between two business[es]." *R & C Oilfield*, 447 F. Supp. 3d at 347. It was entered at "arm's length." *D.V.C. Trucking*, 2005 WL 2044848, at *3. And it does not require that Plaintiff himself personally perform *any* work at all—it is not a personal services contract. *See* Vol. 1 App. 64 ¶ 16.2 ("This Agreement does not require that DISTRIBUTOR's obligations hereunder be conducted

personally . . . ."). It is therefore not a "contract[ ] of employment of … any other class of workers engaged in foreign or interstate commerce" under § 1.

Moreover, the Distributor Agreement makes clear that Independent Distributors like Plaintiff are business owners with a wide array of responsibilities that distinguish them from "seamen" and "railroad employees." *See Wallace*, 970 F.3d at 801 (holding that a class of workers is covered by § 1 when "the interstate movement of goods is a central part of the[ir]. . . job description"); *Saxon I*, 142 S. Ct. at 1789–90 (explaining that the class of workers must "frequently" engage in activity "intimately involved with the commerce (e.g., transportation) of . . . cargo").

In assessing whether a class of workers is engaged to perform transportation work, courts look to the "typical duties" of workers within that class. *See Singh*, 67 F.4th at 556–57, 560. In so doing, courts focus primarily on the "contracts of employment" at issue. 9 U.S.C. § 1; *see Singh*, 67 F.4th at 557 (explaining that courts should consider "the contents of the parties' agreement(s)"). They also look to other "information regarding the industry in which the class of workers is engaged" and "the work performed by those workers." *Singh*, 67 F.4th at 557.

Here, the Distributor Agreement confirms that franchise owners like Plaintiff are far more than just truck drivers. Rather, Plaintiff is a franchise business owner of a business that is "responsible for obtaining [its] own delivery vehicle(s) and purchasing adequate insurance thereon[.]" *Id.* at 59 ¶ 9.1. Brock Inc. is also

"responsible for all taxes and transactional reporting requirements." *Id.* at 63 ¶ 15.4. It makes and uses "advertising materials." *Id.* at 61 ¶ 13.1. It may "engage any legal and/or accounting professional services [it] deems necessary." *Id.* at 65. ¶ 16.4. And it can operate outside businesses and sell noncompetitive products. *Id.* at 55 ¶ 5.1. Moreover, the Agreement "does not require" Plaintiff to perform *any* work—much less any transportation work—"personally." *Id.* at 64 ¶ 16.2. Instead, Brock Inc. is free to hire and delegate tasks to employees as it "deems appropriate." *Id.* Brock Inc. is also free to buy additional territories or portions of territories or sell all or part of its territory to a third party. *See id.* at 62–63 ¶ 15.1.

The Agreement therefore reflects that Plaintiff is a franchise business owner with every "entrepreneurial incentive to develop the business and generate additional sales." *Id.* at 270 ¶ 5. To do that, he must back all of the "decisions inherent in operating the distribution business in the territory, including acquiring trucks and trailers, managing fuel costs, employee matters, and other strategic decisions." *Id.* at 212. The fact that Plaintiff may choose to personally drive trucks in operating his business does not fundamentally transform his role—which is nothing like that of the "seamen" and "railroad employees" specifically identified in § 1.

In ruling otherwise, the District Court, like the First Circuit in *Canales v. CK Sales Co., LLC*, 67 F.4th 38 (1st Cir. 2023), afforded too much weight to an individual worker's idiosyncratic choices and not enough to the Distributor

Agreement and the work that "members of the class, as a whole, typically carry out." *Saxon I*, 142 S. Ct. at 1788. Just as § 1 was not designed to cover "transportation activity incidental to . . . employment as an account manager," *Hill*, 398 F.3d at 1289, neither was it designed to cover transportation activity voluntarily undertaken by a franchise business owner. Indeed, Plaintiff's status as independent business owners and the wide array of responsibilities that role entails readily distinguishes him from the plaintiffs in just about every other § 1 case on the books—including the cargo loaders in *Saxon*, the food-delivery drivers in *Wallace* and *Immediato*, the rideshare drivers in *Singh* and *Cunningham*, the Amazon delivery drivers in *Waithaka* and *Rittman*, and the local driver in *Lopez*.

To the extent this Court believes that the Distributor Agreements and undisputed facts regarding the role of Independent Distributors do not definitively answer the § 1 question (and finds that the Flowers' other arguments are not dispositive), it should remand for the District Court to develop and assess facts regarding the role of Independent Distributors more broadly. *See, e.g., Singh v. Uber Techs. Inc.*, 939 F.3d 210, 228 (3d Cir. 2019) (remanding on similar grounds).

## CONCLUSION

For the foregoing reasons, the Court should reverse the District Court's order and remand for arbitration of this dispute.

Dated: July 24, 2023

Respectfully Submitted,

*/s/ Traci L. Lovitt*

Jared Lee Palmer
OGLETREE DEAKINS
One Embarcadero Center, Suite 900
San Francisco, CA 94111
(415) 442-4810

David Lee Zwisler
OGLETREE DEAKINS
2000 South Colorado Blvd.
Tower 3, Suite 900
Denver, CO 80222
(303) 764-6800

Traci L. Lovitt
Matthew W. Lampe
Jack L. Millman
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-7830
tlovitt@jonesday.com

Amanda K. Rice
JONES DAY
150 W. Jefferson Ave.,
Suite 2100
Detroit, MI 48226

*Counsel for Defendants-Appellants*

## REQUEST FOR ORAL ARGUMENT

Flowers respectfully requests oral argument. This appeal raises important questions about the interaction of state law and the FAA. It also raises important questions about the meaning and scope of the FAA's "transportation worker" exemption, 9 U.S.C. § 1, which is the subject of a recent decision by the U.S. Supreme Court, *Saxon*, 142 S. Ct. 1783, as well as many other recent and pending cases across the country. Flowers respectfully submits that oral argument will help the Court analyze and resolve the issues.

Dated: July 24, 2023          Respectfully submitted,

                          */s/ Traci L. Lovitt*
                          Traci L. Lovitt

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,725 words, excluding the parts of the brief exempted by Rule 32(f) and 10 Cir. R. 32(B), as counted using the word-count function on Microsoft Word 2016 software.

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word 2016, in Times New Roman style, 14 point font.

Dated: July 24, 2023          Respectfully submitted,

*/s/ Traci L. Lovitt*
Traci L. Lovitt

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing Brief of Defendants-Appellants: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submission has been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Malware Protection, Product Version 1.393.1305.0, updated July 24, 2023, and according to the program are free of viruses.

Dated: July 24, 2023                     Respectfully submitted,

                                         */s/ Traci L. Lovitt*
                                         Traci L. Lovitt

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2023, I electronically filed the original of the foregoing Brief of Defendants-Appellants with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Dated: July 24, 2023        Respectfully submitted,

                                       */s/ Traci L. Lovitt*
                                       Traci L. Lovitt

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02413-CNS-MEH

ANGELO BROCK, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

FLOWERS FOOD, INC., a Georgia corporation,
FLOWERS BAKERIES, LLC, a Georgia limited liability company, and
FLOWERS BAKING CO. OF DENVER, LLC, a Colorado limited liability company,

      Defendants.

---

## ORDER

---

    Before the Court is Defendants Flowers Food, Inc., Flowers Bakeries, LLC, and Flowers Baking Co. of Denver, LLC's Motion to Dismiss or Stay Proceedings and Compel Individual Arbitration (ECF No. 28). For the reasons set forth below, the Court DENIES the motion.

### I. BACKGROUND[1]

    Flowers Foods, Inc. is a baking company that operates several subsidiaries (*see, e.g.,* ECF No. 28-1 at 1 ¶ 3). Flowers Foods, Inc. is the ultimate parent company of Flowers Bakeries, LLC, and Flowers Baking Company of Denver, LLC, which is a wholly owned subsidiary of Flowers Bakeries, LLC (*id.* at ¶ 2). Flowers Foods, Inc., and its subsidiaries (collectively "Flowers")

---

[1] The background facts are taken from materials submitted in connection with the parties' briefing. *See Bigben 1613, LLC v. Belcaro Grp., Inc.*, No. 17-CV-00272-PAB-STV, 2017 WL 9938347, at *1 (D. Colo. Apr. 25, 2017).

ADD 1

produce "fresh breads, buns, rolls, and snack cakes" (*id.* at ¶ 3). These products are sold in supermarkets, drug stores, and convenient stores throughout the United States (ECF No. 29-3 at 8). Flowers' sale of these products generates billions of dollars in revenue each year (ECF No. 29-1 at 2 ¶ 2).

Flowers uses "Direct-Store-Delivery" to sell its products (ECF No. 29-2 at 2). Under this sales model, Flowers produces and markets its baked goods, and "sells its products through a network of independent distributors to retail and foodservice customers" (*id.*). Independent distributors are responsible for ordering products, which are then delivered to them from bakeries for sale and "direct delivery to customer stores" (ECF No. 29-3 at 9). Bakeries are located throughout the United States (*see, e.g.,* ECF No. 29-2 at 3; ECF No. 29-8 at 7–8). Flowers Baking Company of Denver, LLC contracts with independent distributor franchisees, including Brock, Inc., the company owned and operated by Plaintiff Angelo Brock, to bring Flowers bakery products to market (ECF No. 28-1 at 1 ¶ 4).

Most products that Brock Inc. orders for Mr. Brock's customers "are produced by out-of-state bakeries in response to his specific orders" (ECF No. 28-1 at 3 ¶ 11). These products are then shipped to Mr. Brock's warehouse in Colorado, where Mr. Brock and Brock Inc.'s "ultimate sale and delivery of the products to end customers for whom he ordered them pursuant to the Direct Store Delivery system" occurs (*id.*; *see also* ECF No. 28-1 at 36). When delivery trucks containing the Flowers products that he has ordered arrive at Mr. Brock's warehouse, he accepts the products, "sign[s] off" on them, loads them onto trucks, and "gets to work in [his] territories" (ECF No. 29-6 at 2 ¶¶ 3–4). Then, Mr. Brock "begin[s] to service the customers on [his] stops immediately after" (*id.* at ¶ 4).

ADD 2

To become an independent distributor for Flowers, Mr. Brock signed a Distributor Agreement (*see* ECF No. 28-1 at 6). The Distributor Agreement contained an "Arbitration Agreement" (*id.* at 38–40). The Arbitration Agreement provides:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR may have against COMPANY (and/or its affiliated companies . . . ) . . . arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including . . . any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") . . . .

> Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, … claims for alleged unpaid compensation, … or statutory penalties under either federal or state law

(ECF No. 28-1 at 38–39). The Arbitration Agreement also states that it "shall be governed by the [Federal Arbitration Act] and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent" with the Federal Arbitration Act (*id.* at 38, 40 (original emphasis)).

Mr. Brock filed his Class and Collective Action Complaint in September 2022, alleging that Flowers violated the Fair Labor Standards Act and Colorado law principally by misclassifying its employees as independent contractors and failing to pay overtime and other wages (*see generally* ECF No. 1). Flowers filed the instant motion to compel in February 2023, seeking to compel Mr. Brock to individual arbitration (*see, e.g.,* ECF No. 28 at 20). The motion to compel is fully briefed (*see* ECF Nos. 29 and 33).

## II. LEGAL STANDARD

A strong federal policy favoring arbitration "is about treating arbitration contracts like all others, not about fostering arbitration." *Morgan v. Sundance, Inc*., 142 S. Ct. 1708, 1713 (2022) (citation omitted). The Federal Arbitration Act requires courts to enforce arbitration agreements in contracts "evidencing a transaction involving commerce . . . save upon such grounds as exist at law or in equity" for contracts' revocation. 9 U.S.C. § 2. Under the Federal Arbitration Act, a party may bring a motion to compel arbitration. *See, e.g.,* 9 U.S.C. § 4; *Fundamental Admin. Servs., LLC v. Patton*, 504 F. App'x 694, 698 (10th Cir. 2012). The party attempting to compel arbitration bears the burden of "demonstrating a valid arbitration agreement" exists. *Fundamental Administrative Services*, 504 F. App'x at 698 (quotations omitted); *see also Burgess v. Johnson*, 835 F. App'x 330, 332 (10th Cir. 2020). The party opposing arbitration based on an arbitration exemption bears the burden of demonstrating that they fall within an exemption under the Federal Arbitration Act. *See, e.g., Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 227 (1987) ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." (citation omitted)); 9 U.S.C. § 1.

"When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (citation omitted). The Federal Arbitration Act contains several "enforcement mechanisms" for parties to compel arbitration pursuant to a valid agreement to arbitrate. *Rittmann v. Amazon.com, Inc*., 971 F.3d 904, 909 (9th Cir. 2020). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 84 (2002)

(quotations omitted). Moreover, § 1 of the Federal Arbitration Act provides that "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" are exempt from the Act's coverage. "[A] court should decide for itself whether § 1's 'contracts of employment' exclusion applies before ordering arbitration." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).

## III. ANALYSIS

Having considered Flowers' motion, related briefing, and relevant legal authority, the Court denies Flowers' motion. In explaining this denial, the Court first details recent legal developments regarding the Federal Arbitration Act, and then applies those developments in its analysis of Flowers' motion.

### A. *Southwest Airlines Company v. Saxon* and Section 1

Central to the parties' dispute is the Supreme Court's recent decision in *Southwest Airlines Company v. Saxon*, 142 S. Ct. 1783 (2022). Flowers urges an interpretation of § 1 and *Saxon* under which the Court, in determining whether § 1's "transportation workers" exemption applies, should look to the nature of Flowers' business and whether Mr. Brock is "involved in interstate commerce" (ECF No. 28 at 9). Mr. Brock reads § 1 and *Saxon* differently, arguing that the Court's inquiry should focus on the relevant class of workers to which he belongs, and if that class of workers is engaged in interstate commerce (*see, e.g.,* ECF No. 29 at 19). The Court agrees with Mr. Brock.

*Saxon*'s import is widely acknowledged. *See, e.g., Bissonnette v. LePage Bakeries Park St., LLC*, 59 F.4th 594 (2d Cir. 2023) ("The Supreme Court's decision in *Saxon* . . . is [an] intervening decision . . . [warranting] rehearing *en banc*.") (Nathan, J., dissenting from denial of

rehearing *en banc*). *Saxon* clearly established the legal framework for applying § 1's "transportation workers" exemption: in assessing § 1's applicability, courts first "define the relevant 'class of workers' to which [the plaintiff] belongs [and then] determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Saxon*, 142 S. Ct. at 1788; *see also id.* at 1793. Although divided on the factual circumstances that warrant § 1's application in *Saxon*'s wake, appellate courts are largely in accord on the § 1 framework that *Saxon* established. *Compare Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 234 (1st Cir. 2023), *with Lopez v. Cintas Corp.*, 47 F.4th 428, 431 (5th Cir. 2022).[2]

Flowers interprets *Saxon* and § 1 differently. According to Flowers, in determining whether § 1 applies the Court should look to the nature of its own business—and that, dispositively in this case, Flowers is not a transportation company (ECF No. 28 at 9). But *Saxon* forecloses this interpretation of § 1. Assessing § 1's applicability, the nature of an employer's business is not dispositive, given courts' focus on the work a plaintiff performs. *See, e.g., Canales v. CK Sales Co., LLC*, --- F.4th ----, No. 22-1268, 2023 WL 3269173, at *5 (1st Cir. May 5, 2023) ("[T]he inquiry trains on what the worker does at the company, not what the company does generally . . . . [therefore] [w]e look to what work plaintiffs do, not what defendants do generally." (first alteration added) (quotations removed)); *Saxon*, 142 S. Ct. at 1788 ("Saxon is therefore a member of a 'class of workers' based on what she does at Southwest, *not what Southwest does generally*." (emphasis added)).

In its invitation to misinterpret *Saxon* and § 1, Flowers relies chiefly on two appellate cases, *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655 (2d Cir. 2022), and *Hill v. Rent-A-*

---

[2] As Mr. Brock notes, the Tenth Circuit has not yet had occasion to interpret or apply *Saxon* (ECF No. 29 at 25).

*Ctr., Inc.*, 398 F.3d 1286 (11th Cir. 2005). The Court declines Flowers' invitation and rejects the reasoning of *Hill* and *Bissonnette*. First, *Hill* was decided without *Saxon*'s controlling guidance on § 1's interpretation. *See generally Hill*, 398 F.3d 1286. Second, *Bissonnette* discussed *Saxon* in concluding that "an individual works in a transportation industry if the industry in which the individual works pegs its charges chiefly to the movement of goods or passengers, and the industry's predominant source of commercial revenue is generated by that movement." *Bissonnette*, 49 F.4th at 661. But in the Second Circuit's view, *Saxon* was speed bump: "[O]nly a worker in a transportation industry can be classified as a transportation worker. That point needed no elaboration in *Saxon* because there the plaintiff worked for an airline." *Id.* This—as the dissent from the order denying rehearing of *Bissonnette en banc* persuasively observed—did "the opposite of what *Saxon*'s reasoning and holding require." *Bissonnette*, 59 F.4th at 596 (Nathan, J., dissenting from denial of rehearing *en banc*). Recall *Saxon*—as this dissent reiterates— "emphasizes 'the *performance* of work' and 'the actual work that the members of the class, as a whole, typically carry out.'" *Id.* (quoting *Saxon*, 142 S. Ct. at 1788) (emphasis in original). Other courts have declined to follow the *Bissonnette* majority. *See, e.g., Fraga*, 61 F.4th at 234. The Court joins them, finding that *Saxon*'s guidance is abundantly clear. *See, e.g., id.* at 235.[3]

Accordingly, and for the reasons set forth above, in its analysis of Flowers' motion to compel, the Court applies *Saxon*'s clearly established legal framework, asking: (1) to what class of workers did Mr. Brock belong, and (2) was that class of workers in engaged in foreign or

---

[3] Curiously, in arguing that Mr. Brock does not satisfy § 1's "engaged in foreign or interstate commerce" requirement, Flowers appears to acknowledge that *Saxon* looks to a plaintiff's class of workers and rejects an "industrywide approach" (ECF No. 28 at 13).

interstate commerce? *See Saxon*, 142 S. Ct. at 1788. The Court proceeds to answer these questions below.

### B.  Class of Workers

Flowers argues that Mr. Brock does not satisfy § 1's first requirement because he "cannot be a transportation worker," given that Flowers "is not in the transportation industry" (ECF No. 28 at 9; *see also* ECF No. 33 at 7–9). Flowers further argues that the class of workers to which Mr. Brock belongs "are not transportation workers" (ECF No. 28 at 18). Mr. Brock contends that, looking to the work he performs, the Court should characterize the "class of workers" for its § 1 first-step inquiry as Flowers "Distributors" who "load and unload bakery products" (ECF No. 29 at 20). The Court agrees with Mr. Brock.

As discussed above, the Court first asks to what class of workers Mr. Brock belongs. *See Saxon*, 142 S. Ct. at 1788. In doing so, the Court looks to the work he performs. *See id.*

This question is easily answered. Mr. Brock is an independent distributor who brings Flowers bakery products to market (*see, e.g.,* ECF No. 28-1 at 1 ¶ 4). In doing so, he receives shipments of Flowers products prepared outside of Colorado that he has ordered for his customers, loads them onto his own trucks, and delivers the products to his customers (*see id*; *see also* ECF No. 29-6 at ¶ 4). Accordingly, Mr. Brock belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products (*see* ECF No. 29 at 20). *See also Canales*, --- F.4th ----, 2023 WL 3269173, at *6 (1st Cir. May 5, 2023); *Saxon*, 142 S. Ct. at 1788–89 (2022). Mr. Brock's status as an independent distributor who owns his own company, Brock, Inc., does not disturb this conclusion. *See Canales*, --- F.4th ----, 2023 WL 3269173, at *6 ("[The] plaintiffs' additional membership in a class of workers who own companies

that distribute products for defendants does not remove them from the class of workers who deliver goods.").[4]

Flowers' argument that Mr. Brock does not belong to a class of "transportation workers"—and that, crucially, Flowers' distributors are factually dissimilar to the airline cargo loaders in *Saxon*—fails to persuade, given that *Saxon*'s definition of "class of workers" was not confined to airline cargo loaders (ECF No. 28 at 19). *See Saxon*, 142 S. Ct. at 1788–89. Instead, *Saxon* teaches that, in defining a "class of workers," courts should look to "the actual work that the members of the class, as a whole, typically carry out." *Id.* For this reason, reading *Saxon* as Flowers urges disserves—and ignores—its thorough textual analyses and ultimate instruction. And to the extent that Flowers argues that Mr. Brock belongs to a class of workers who are not engaged in foreign or interstate commerce, this is a separate analytical exercise that the Court conducts below (*see* ECF No. 28 at 18–19). *See also Saxon*, 142 S. Ct. at 1788.

### C.  Engaged in Foreign or Interstate Commerce

Flowers argues that Mr. Brock cannot satisfy § 1's "engaged in foreign or interstate commerce" requirement because essentially he is a "purely local distributor who does not cross state lines" (ECF No. 28 at 13). Mr. Brock contends that the class of workers to which he belongs is "directly involved" in interstate commerce as contemplated by § 1 (ECF No. 29 at 20). The Court agrees with Mr. Brock.

---

[4] Nor does the nature of Flowers' business alter the Court's characterization of the class of workers to which Mr. Brock belongs, or foreclose his membership into a class of workers that falls under § 1's exemption (*see* ECF No. 29 at 20 n.8). *See also Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 23 (1st Cir. 2020) ("[W]e do not hold that a class of workers must be employed by an interstate transportation business or a business of a certain geographic scope to fall within the Section 1 exemption."); *Rittmann*, 971 F.3d at 919. Flowers' argument to the contrary is unavailing (*see, e.g.,* ECF No. 28 at 9–12; ECF No. 33 at 8).

To be sure, § 1's scope is limited. *See Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001) ("[T]he § 1 exclusion provision [is] afforded a narrow construction."); *see also id.* at 119 ("[T]he text of § 1 precludes interpreting the exclusion provision to defeat the language of § 2 as to all employment contracts. Section 1 exempts from the FAA only contracts of employment of transportation workers."); *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998) ("[A] narrow construction of 9 U.S.C. § 1 to include only employees actually engaged in the channels of foreign or interstate commerce comports with both the text and history of the Federal Arbitration Act.").[5]

In addressing whether a class of workers who "physically load and unload cargo on and off airplanes on a frequent basis" was engaged in interstate commerce under § 1, the Supreme Court concluded that the airplane cargo loaders "plainly do perform activities within the flow of interstate commerce when they handle goods traveling in interstate and foreign commerce, either to load them for air travel or to unload them when they arrive." *Saxon*, 142 S. Ct. at 1789, 1792 (quotations omitted); *see also id.* at 1790 ("[A]ny [transportation] worker must at least play a direct and 'necessary role in the free flow of goods' across borders . . . . transportation workers must be actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." (citations omitted)). In reaching this conclusion, *Saxon* explicitly rejected an interpretation of § 1 under which "only workers who physically move goods or people across foreign or international boundaries" qualify for its exemption. *Id.* at 1791. Before and after *Saxon*, appellate courts have reached differing conclusions regarding the applicability of § 1's "engaged

---

[5] As the Supreme Court in *Circuit City* noted, textual differences distinguish § 1 from § 2 of the Federal Arbitration Act. *See Circuit City*, 532 U.S. at 114 ("Unlike the 'involving commerce' language in § 2, the words 'any other class of workers engaged in . . . commerce' [in § 1] constitute a residual phrase."); *see also Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020) (explaining textual differences between § 1 and § 2).

in foreign or interstate commerce" requirement. *Compare Fraga*, 61 F.4th at 240, *and Rittmann*, 971 F.3d at 917–18, *with Lopez*, 47 F.4th at 433, *and Wallace*, 970 F.3d at 802.

 In arguing that Mr. Brock cannot satisfy § 1's "engaged in foreign or interstate commerce" requirement because he is a local, "intrastate" delivery person—who does not transport Flowers' products across state lines—and is too far removed from the interstate transportation of products, Flowers relies on many of these appellate decisions, and encourages the Court to adopt their reasoning (*see* ECF No. 28 at 14–15; ECF No. 33 at 10). The Court declines to do so. For instance, Flowers cites *Wallace*, emphasizing that § 1 is "about what the worker does, and not where the goods have been" (ECF No. 28 at 15 (quotations omitted)). *See also Wallace*, 970 F.3d at 802. *Wallace* reasoned—relying heavily on *Circuit City*'s "narrow" construction of § 1—that delivery drivers who collected takeout orders from "local restaurants" did not fall under § 1's exemption because they were not "connected . . . to the act of moving [the orders] across state or national borders." *Id.* at 799, 802.

 *Wallace* is factually distinguishable. Unlike the *Wallace* drivers who delivered takeout orders from intrastate restaurants to intrastate customers, Mr. Brock orders Flowers products from bakeries across state borders, "sign[s] off" on them at his warehouse, loads them onto his trucks, and delivers them (ECF No. 29-6 at 2 ¶¶ 3–4). *Cf. Wallace*, 970 F.3d at 802. As Mr. Brock argues, he belongs to a class of workers who "haul goods on the final legs of interstate journeys"—in this case, Flowers baked goods from out-of-state bakeries—and is therefore engaged in interstate commerce, "regardless of whether [he] physically cross[es] state lines" (*see* ECF No. 29 at 22–23). *See also Waithaka*, 966 F.3d at 26 (quotations omitted); *Rittmann*, 971 F.3d at 916 ("The packages . . . are simply part of a process by which a delivery provider transfers the packages to a

different vehicle for the last mile of the packages' interstate journeys."). At bottom, this—unlike *Wallace*—is not a case where Mr. Brock's delivery of Flowers' products "occur[s] in an entirely *separate* intrastate transaction." *Fraga*, 61 F.4th at 240 (emphasis added); *see also Immediato v. Postmates, Inc.*, 54 F.4th 67, 77 (1st Cir. 2022) ("[The] work, though, must be a constituent part of that [interstate] movement, as opposed to a part of an *independent* and contingent intrastate transaction." (citation omitted) (emphasis added)). Instead, Mr. Brock is actively engaged in the transportation of Flowers' products across state lines into Colorado, by placing orders for products that arrive from out-of-state bakeries and then delivering those products to his Colorado customers, through Flowers' "Direct-Store-Delivery" sales model (*see* ECF No. 29 at 23). *See also Saxon*, 142 S. Ct. at 1790. This directly affects channels of commerce and constitutes the requisite engagement with interstate commerce that § 1 contemplates. *See id; see also Rittman*, 971 F.3d at 916; *McWilliams*, 143 F.3d at 576.[6]

Flowers also urges the Court to adopt the reasoning of *Lopez v. Cintas Corporation*, 47 F.4th 428 (5th Cir. 2022), where the Fifth Circuit concluded that "[once] the [relevant] goods arrived at the [at-issue] warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Id.* at 433. The Court rejects the reasoning of *Lopez*. *Lopez* determined that its relevant class of workers—a class that "pick[ed] up items from a local warehouse and deliver[ed] those items to local customers, with an emphasis on sales and customer service"—lacked a "direct and necessary role" in interstate commerce, emphasizing the class's

---

[6] The Court's conclusion is bolstered by the nature of Brock, Inc.'s contractual relationship with Flowers Baking Company of Denver, LLC—a subsidiary of Flower Bakeries, LLC—under which Brock, Inc. gained the authorization to "sell certain defined [Flowers] products within . . . territories" as an independent contractor, "act[ing] as a franchise distributor of [Flowers Baking Company of Denver, LLC's] products in" that territory (*see, e.g.,* ECF No. 28-1 at 1 ¶¶ 2, 6). *See Fraga*, 61 F.4th at 240–41.

"customer-facing role." *Id.* at 432–33. However, *Lopez*'s abbreviated analysis of its class's engagement with interstate commerce went no further. *See id.* Compared to other courts' thorough analysis of their class's engagement with interstate commerce, *Lopez* fails to persuade—especially, where, as here, Mr. Brock's job duties as an independent distributor included more "sales and customer service" tasks (*see, e.g.* ECF Nos. 28-1 at 36, 29-6 at 2 ¶¶ 3–4). *Compare id.*, *with Fraga,* 61 F.4th at 234; *Rittmann,* 971 F.3d at 917–18. *See also Canales,* --- F.4th ----, 2023 WL 3269173, at \*6 ("Workers who frequently perform transportation work do not have their transportation-worker status revoked merely because they also have other responsibilities.").[7]

\* \* \*

Mr. Brock belongs to a class of workers: independent distributors who load and unload Flowers bakery products. For the reasons set forth above, as a member of this class of workers, Mr. Brock is engaged in interstate commerce. Accordingly, Mr. Brock has met his burden of showing that, under *Saxon*, he is a transportation worker exempt from the Federal Arbitration Act under 9 U.S.C. § 1, and therefore the Arbitration Agreement is unenforceable. *See, e.g., Wynn v. United Parcel Serv., Inc.*, No. 21-cv-10029-CRB, 2022 WL 18912481, at \*5 (N.D. Cal. Oct. 4, 2022) (concluding that where plaintiff was a "transportation worker exempt from the FAA" under § 1 that "the arbitration agreement [was] unenforceable" (citing *Rittmann*, 971 F.3d at 915)).

### D.  Colorado's Uniform Arbitration Act

---

[7] The same is true for Flower's citation to *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337 (11th Cir. 2021), where central to the Eleventh Circuit's reasoning was its determination that "[t]he transportation worker exemption applies only if the worker belongs to a class of workers in the transportation industry and the class of workers actually engages in foreign or interstate commerce." *Id.* at 1351 (citation omitted). The cramped requirement that a worker must belong to a class of workers in the "transportation industry" is, for the reasons set forth above, inconsistent with § 1, and the Court declines to impose this unnecessary requirement in its § 1 analysis. *See, e.g., Waithaka*, 966 F.3d at 23; *Rittmann*, 971 F.3d at 919; *Bissonnette*, 59 F.4th at 596 (Nathan, J., dissenting from denial of rehearing *en banc*).

Flowers argues that, even if Mr. Brock falls under § 1's transportation workers exemption, he must be compelled to arbitrate under the Colorado Uniform Arbitration Act (ECF No. 28 at 19). The Uniform Arbitration Act does not contain a transportation worker exemption, Flowers' argument goes, and for this reason it applies broadly and reaches Mr. Brock's claims (*see id.*). Mr. Brock contends that the Arbitration Agreement's plain language renders the Uniform Arbitration Act inapplicable in this case (ECF No. 29 at 25). The Court agrees with Mr. Brock.[8]

Courts interpret arbitration agreements using state-law contract principles. *See, e.g., First Options*, 514 U.S. at 944. Under Colorado law, courts look to a contract's language to ascertain the parties' intent, giving contractual terms their "plain and generally accepted" meanings. *See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005); *Radil v. Nat'l Union Fire Ins. Co. of Pittsburg, PA*, 233 P.3d 688, 692 (Colo. 2010) ("The existence and scope of an arbitration agreement [is reviewed] applying state law principles governing contract interpretation."). Courts examine the entire contract, avoiding "strained constructions" of its terms. *See Dunning v. Jefferson Cnty. Sch. Dist. R-1*, No. 22-CV-00641-MEH, 2022 WL 3212925, at *3 (D. Colo. Aug. 9, 2022) (citations omitted). "When a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over." *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).

A few cases Flowers identifies provide minimal support for its argument that Mr. Brock's claims are arbitrable under the Uniform Arbitration Act (*see* ECF No. 33 at 11). For instance, in *Davis v. EGL Eagle Glob. Logistics L.P.*, the Fifth Circuit concluded that, where Texas's General

---

[8] The Court agrees with the Eleventh Circuit that, in this case, analyzing the state law arbitration issue after analyzing § 1 is appropriate. *See Hamrick*, 1 F.4th at 1353 ("We would only look to state arbitration law after we decided the federal issue of whether the transportation worker exemption applied to the drivers." (emphasis omitted)).

Arbitration Act and the Federal Arbitration Act applied according to an arbitration agreement, a claim was arbitrable because Texas law rendered the arbitration agreement enforceable, notwithstanding the applicability of an exception under the Federal Arbitration Act. *See Davis v. EGL Eagle Glob. Logistics L.P.*, 243 F. App'x 39, 44 (5th Cir. 2007). But in this case, the Court's analysis begins with the plain text of the parties' Arbitration Agreement. *See, e.g., Level 3*, 535 F.3d at 1154. The Arbitration Agreement states that disputes "shall be submitted to and determined *exclusively* by binding arbitration under the Federal Arbitration Act" (ECF No. 28-1 at 38 (emphasis added)). Elsewhere, the Arbitration Agreement states that it "shall be governed by the FAA and Colorado law *to the extent* Colorado law is *not inconsistent* with the FAA" (*id.* at 40 (italics added)). Notwithstanding the exclusive application of the Federal Arbitration Act to any disputes between the parties—under which Mr. Brock qualifies for § 1's transportation exemption—application of the Uniform Arbitration Act, which does *not* have a similar transportation worker exemption, would be wholly inconsistent with § 1. Simply put, the Arbitration Agreement mandates application of the Federal Arbitration Act and applying Colorado law to require Mr. Brock to arbitrate would be inconsistent with the Act.

Accordingly, interpreting the Arbitration Agreement's relevant and unambiguous provisions, the plain meaning of the phrases "exclusively" and "to the extent Colorado law is not inconsistent with the FAA" mean that Mr. Brock's claims, which are exempt from arbitration under § 1, cannot be arbitrated under the Uniform Arbitration Act (*see* ECF No. 28-1 at 38, 40). *See East Ridge*, 109 P.3d at 974; *Level 3*, 535 F.3d at 1154. To conclude otherwise would result in an impermissibly strained construction of the Arbitration Agreement's terms. *See Dunning*, 2022

WL 3212925, at *3; *see also Dean Witter*, 537 U.S. at 84 ("[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." (quotations omitted)).[9]

\* \* \*

The Court makes one final note. Flowers argues that exempting Mr. Brock "would flout" the Federal Arbitration Act's "history and purpose" (ECF No. 28 at 17). To be sure, § 1 provides a narrow exception relative to § 2's broad enforcement requirement. *See, e.g., Saxon*, 142 S. Ct. at 1792. But the Court cannot "pave over bumpy statutory texts in the name of more expeditiously advancing a policy goal." *Id.* (quotations omitted); *see also id.* at 1792–93 ("[W]e have no warrant to elevate vague invocations of statutory purpose over the words Congress chose."); *Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1737 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.").

Section 1 of the Federal Arbitration Act and *Southwest Airlines Company v. Saxon* establish a clear framework for determining whether § 1's transportation worker exemption applies. Mr. Brock loads and unloads interstate bakery products that he has ordered as an independent distributor for delivery to his customers. Accordingly, and for the reasons set forth above, he belongs to a class of workers engaged in foreign or interstate commerce to which § 1's exemption applies. In sum, Mr. Brock has met his burden of showing that his claims are not

---

[9] As noted above, the parties offer competing interpretations of the Arbitration Agreement and whether Mr. Brock's claims and the parties to this action fall within its scope. *Compare* ECF No. 28 at 6; ECF No. 33 at 3–7, *with* ECF No. 29 at 14, 17. The Court need not address these arguments, because—for the reasons set forth above—Mr. Brock is a "transportation worker" under § 1, and for this reason he is exempt from the Federal Arbitration Act's coverage. *See* § 1; *Wynn*, 2022 WL 18912481, at *5; *New Prime*, 139 S. Ct. at 537–38 ("The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum.").

arbitrable under § 1's and *Saxon*'s clear framework. *See Shearson/American Express*, 482 U.S. at 227.

## IV. CONCLUSION

Consistent with the above analysis, Flowers' Motion to Dismiss or Stay Proceedings and Compel Individual Arbitration (ECF No. 28) is DENIED.

DATED this 16th day of May 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

ADD 17