No. 23-1182

# In the United States Court of Appeals
# For the Tenth Circuit

ANGELO BROCK, individually and on behalf of all others similarly situated,

*Plaintiff-Appellee*,

v.

FLOWERS FOODS, INC., a Georgia limited liability company; FLOWERS BAKERIES, LLC, a Georgia limited liability company; FLOWERS BAKING CO. OF DENVER, LLC, a Colorado limited liability company,

*Defendants-Appellants*.

On Appeal from the United States District Court for the District of Colorado, Case No. 1:22-cv-02413, Hon. Charlotte N. Sweeney

## BRIEF OF CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS AND REVERSAL

JENNIFER B. DICKEY
JONATHAN D. URICK
*U.S. Chamber Litigation Center*
*1615 H Street NW*
*Washington, DC 20062*
*(202) 463-5337*

ARCHIS A. PARASHARAMI
DANIEL E. JONES
*Mayer Brown LLP*
*1999 K Street NW*
*Washington, DC 20006*
*(202) 263-3000*
*aparasharami@mayerbrown.com*

*Counsel for* Amicus Curiae *the Chamber of Commerce of the United States of America*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF *AMICUS CURIAE* ............................................. 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................. 3

ARGUMENT .................................................................. 9

I.    The Text And Structure Of The FAA Demonstrate That Plaintiff Is Not Included Within A "Class Of Workers Engaged In . . . Interstate Commerce." ........................................... 9

    A.    Section 1's Residual Clause Is Limited To Classes Of Workers Directly Involved In Transporting Goods Across State Or International Borders................................... 9

    B.    Section 1's Residual Clause Additionally Requires That Direct Involvement In Transporting Goods Across State Or International Borders Is A Central Part Of The Workers' Job Description.............................................. 17

    C.    Section 1 Also Does Not Apply For The Independent Reason That Plaintiff Does Not Work In The Transportation Industry. ....................................... 19

II.    The District Court's Erroneous Reading Of Section 1 Harms Businesses And Workers............................................... 25

CONCLUSION ................................................................ 33

CERTIFICATE OF COMPLIANCE........................................ 34

CERTIFICATE OF DIGITAL SUBMISSION ........................... 35

CERTIFICATE OF SERVICE.............................................. 36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*14 Penn Plaza LLC v. Pyett,*
    556 U.S. 247 (2009)........................................................................29

*Allied-Bruce Terminix Cos. v. Dobson,*
    513 U.S. 265 (1995)................................................................3, 9, 29

*Amos v. Amazon Logistics, Inc.,*
    --- F.4th ----, 2023 WL 4713756 (4th Cir. July 25, 2023) ....................5

*Bissonnette v. LePage Bakeries Park St., LLC,*
    49 F.4th 655 (2d Cir. 2022), *reh'g en banc denied,*
    59 F.4th 594 (2d Cir. 2023)........................................................ *passim*

*Canales v. CK Sales Co.,*
    67 F.4th 38 (1st Cir. 2023)....................................................8, 24, 25

*Capriole v. Uber Techs., Inc.,*
    7 F.4th 854 (9th Cir. 2021) ..........................................................17, 18

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001)................................................................. *passim*

*Cunningham v. Lyft, Inc.,*
    17 F.4th 244 (1st Cir. 2021)....................................................4, 17, 18

*Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-
    Kan.-Tex. R.R. v. Mo.-Kan.-Tex. R.R. Co.,*
    320 U.S. 323 (1943)........................................................................23

*Golightly v. Uber Techs., Inc.,*
    2021 WL 3539146 (S.D.N.Y. Aug. 11, 2021) ......................................28

*Hamrick v. Partsfleet, LLC,*
    1 F.4th 1337 (11th Cir. 2021) ..................................................... *passim*

*Harper v. Amazon.com Servs., Inc.*,
   12 F.4th 287 (3d Cir. 2021) .................................................................. 4

*Hill v. Rent-A-Center, Inc.*,
   398 F.3d 1286 (11th Cir. 2005) ......................................... 8, 20, 21, 24

*Lamps Plus, Inc. v. Varela*,
   139 S. Ct. 1407 (2019) ....................................................................... 29

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ............................................................................... 26

*New Prime, Inc. v. Oliveira*,
   139 S. Ct. 532 (2019) ......................................................................... 10

*Rittmann v. Amazon.com, Inc.*,
   971 F.3d 904 (9th Cir. 2020) ................................................. 16, 27, 28

*Rogers v. Lyft, Inc.*,
   452 F. Supp. 3d 904 (N.D. Cal. 2020), *aff'd*, 2022 WL 474166
   (9th Cir. Feb. 16, 2022) ..................................................................... 21

*Singh v. Uber Techs., Inc.*,
   571 F. Supp. 3d 345 (D.N.J. 2021) ................................................. 4, 28

*Singh v. Uber Techs., Inc.*,
   67 F.4th 550 (3d Cir. 2023) .......................................................... 18, 19

*Singh v. Uber Techs. Inc.*,
   939 F.3d 210 (3d Cir. 2019) ............................................................... 28

*Southwest Airlines Co. v. Saxon*,
   142 S. Ct. 1783 (2022) ............................................................. *passim*

*Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers*,
   207 F.2d 450 (3d Cir. 1953) ............................................................... 22

*Viking River Cruises, Inc. v. Moriana*,
   142 S. Ct. 1906 (2022) ......................................................................... 3

*Waithaka v. Amazon.com, Inc.*,
   966 F.3d 10 (1st Cir. 2020) ................................................................ 16

*Wallace v. Grubhub Holdings, Inc.*,
  970 F.3d 798 (7th Cir. 2020) ...................................................... *passim*

**Statutes**

9 U.S.C. § 1 ................................................................... *passim*

9 U.S.C. § 2 ........................................................................... 3, 9

**Other Authorities**

Black's Law Dictionary (2d ed. 1910) ...................................................... 13

Michael Delikat & Morris M. Kleiner, *An Empirical Study of
  Dispute Resolution Mechanisms: Where Do Plaintiffs Better
  Vindicate Their Rights?*, 58 Disp. Resol. J. 56 (Nov. 2003–Jan.
  2004) ............................................................................. 30

Matthew W. Finkin, *"Workers' Contracts" under the United States
  Arbitration Act: An Essay in Historical Clarification*, 17
  Berkeley J. Emp. & Lab. L. 282 (1996) ............................................. 22

Lewis L. Maltby, *Private Justice: Employment Arbitration and
  Civil Rights*, 30 Colum. Hum. Rts. L. Rev. 29 (1998) .................. 30, 32

Nat'l Workrights Inst., *Employment Arbitration: What Does the
  Data Show?* (2004) ............................................................... 32

Nam D. Pham, Ph.D. & Mary Donovan, *Fairer, Faster, Better III:
  An Empirical Assessment of Consumer and Employment
  Arbitration*, NDP Analytics (March 2022) .................................... 30, 31

Sales and Contracts to Sell in Interstate and Foreign Commerce,
  and Federal Commercial Arbitration: Hearing on S. 4213 and
  S. 4214 Before a Subcomm. of the Senate Comm. on the
  Judiciary, 67th Cong., 9 (1923) ......................................................... 22

David Sherwyn, Samuel Estreicher, & Michael Heise, *Assessing
  the Case for Employment Arbitration: A New Path for
  Empirical Research*, 57 Stanford L. Rev. 1557 (2005) ................. 30, 31

Theodore J. St. Antoine, *Labor and Employment Arbitration Today: Mid-Life Crisis or New Golden Age?*, 32 Ohio St. J. on Disp. Resol. 1 (2017) ...................................................................... 31, 32

## INTEREST OF *AMICUS CURIAE*[1]

The Chamber of Commerce of the United States of America is the world's largest business federation.  It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community, including cases involving the enforceability of arbitration agreements and interpretation of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16.

Many of the Chamber's members and affiliates regularly rely on arbitration agreements in their contractual relationships.  Arbitration allows them to resolve disputes promptly and efficiently while avoiding

---

[1] No counsel for a party authored this brief in whole or in part, and no person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(c)(5).  All parties have consented to the filing of this brief.

1

the costs associated with traditional litigation in court. Arbitration is speedy, fair, inexpensive, and less adversarial than litigation. Based on the policy embodied in the FAA, the Chamber's members and affiliates have structured millions of contractual relationships around the use of arbitration to resolve disputes.

The district court's decision holding that the FAA does not apply to franchise owners in the bakery industry whose work takes place solely within a single state and is several steps removed from the actual movement of goods in interstate commerce cannot be squared with the text and structure of the statute or the Supreme Court's recent interpretation of it in *Southwest Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022). And the district court's decision improperly limits the FAA's protections and introduces uncertainty that will engender costly and protracted disputes over the application of the FAA, harming both businesses and workers. The Chamber therefore has a significant interest in the proper interpretation of the FAA and in reversal of the decision below.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Congress enacted the Federal Arbitration Act (FAA) in 1925 "in response to judicial hostility to arbitration." *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1917 (2022). For nearly a century, the FAA has embodied Congress's strong commitment to protecting the enforceability of arbitration agreements.

To that end, Section 2 of the FAA broadly protects arbitration agreements "evidencing a transaction involving commerce." 9 U.S.C. § 2. The Supreme Court has held that the phrase "involving commerce" "signals an intent to exercise Congress' commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 277 (1995).

In recent years, opponents of arbitration increasingly have tried to avoid the FAA's protections by invoking the limited exemption in Section 1, which excludes from the Act's coverage "contracts of employment of seamen, railroad employees, or any *other class of workers engaged in foreign or interstate commerce*." 9 U.S.C. § 1 (emphasis added).

This case presents a prime example. Defendants' brief explains (at 6-9) that plaintiff belongs to a class of workers that markets, sells, and

distributes baked goods entirely within a single state—here, Colorado— and many of their responsibilities have nothing to do with the transportation of the goods. Notwithstanding the purely intrastate character of these workers' responsibilities, plaintiff resisted enforcement of his arbitration agreement by asserting that he is covered by the Section 1 exemption. The district court agreed, holding that it sufficed that "the products" themselves previously "arrive[d] from out-of-state bakeries." Add. 12.[2]

As defendants explain (Opening Br. 21-39), the district court committed several fundamental errors in its Section 1 analysis. The Chamber writes separately to address two of those errors.[3]

_____

[2] Because plaintiff handles goods, the Court does not have occasion in this case to address the issue whether Section 1 is limited to classes of workers who transport goods, and does not include those who transport passengers and their effects. *See, e.g.*, *Cunningham v. Lyft, Inc.*, 17 F.4th 244, 249 (1st Cir. 2021) (declining to "address this contention" because the Section 1 exemption does not apply to rideshare drivers for other reasons).

[3] Defendants also convincingly explain why the district court erred in concluding that defendants could not enforce the arbitration agreements in the alternative under Colorado law. Opening Br. 15-21. Courts have repeatedly enforced arbitration agreements under state law in recognition of the principle that "[f]inding the § 1 exemption applies does not mean all state law about arbitration vanishes," regardless of whether an arbitration provision is governed by the FAA. *Harper v. Amazon.com Servs., Inc.*, 12 F.4th 287, 295 (3d Cir. 2021); *accord Singh v. Uber Techs.*,

*First*, even assuming plaintiff's agreement is a "contract of employment" (*but see* Opening Br. 35-39; *Amos v. Amazon Logistics, Inc.*, --- F.4th ----, 2023 WL 4713756, at *3-4 (4th Cir. July 25, 2023)), the district court's expansive interpretation of what it means to be "engaged in . . . commerce" cannot be squared with the plain meaning of the statute. More than two decades ago, the Supreme Court instructed that Section 1's exemption must be given a "narrow construction" and "precise reading." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118, 119 (2001). In *Saxon*, the Court reaffirmed that Section 1 must be interpreted according to its "contemporary, common meaning" at the time the FAA was enacted in 1925—which included a circumscribed view of what it meant to be "engaged in . . . commerce." 142 S. Ct. at 1788 (quotation marks omitted). The relevant language in Section 1—"other class of workers engaged in foreign or interstate commerce"—is also cabined by "the application of the maxim *ejusdem generis*" because it is a "residual phrase, following, in the same sentence, explicit reference to 'seamen' and

---

*Inc.*, 571 F. Supp. 3d 345, 365 (D.N.J. 2021) (compelling arbitration under New Jersey law in the alternative to the FAA, and collecting cases compelling arbitration under state law when the Section 1 exemption is held or assumed to apply), *aff'd on other grounds*, 67 F.4th 550 (3d Cir. 2023).

'railroad employees.'" *Circuit City*, 532 U.S. at 114; *see Saxon*, 142 S. Ct. at 1790.

These interpretive principles make clear that what matters is "the actual *work*" performed by the "class of workers" rather than the origin and movement of the goods. *Saxon*, 142 S. Ct. at 1788 (emphasis added). The district court failed to focus on the work, instead resting its conclusion on the previous interstate journey of the distributed goods. That approach, if upheld, would result in Section 1's residual clause sweeping far beyond workers "*directly involved* in transporting goods across state or international borders." *Id.* at 1789 (emphasis added); *see also, e.g.*, *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1350 (11th Cir. 2021); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) (Barrett, J.).

Indeed, the district court's focus on the goods, rather than the work, misinterprets Section 1 for the additional reason that the residual clause is limited to classes of workers whose duties *center* on interstate movement. Then-Judge Barrett explained that, for a class of workers to perform work analogous to "seamen" and "railroad employees," "interstate movement of goods" must be "a *central part* of the class

members' job description." *Wallace*, 970 F.3d at 801 (emphasis added). And the Supreme Court agreed in *Saxon* that the word "engaged" in Section 1 "emphasizes the actual work that the members of the class, as a whole, *typically* carry out." 142 S. Ct. at 1788 (emphasis added). Yet here the class of workers does not engage in interstate movement of goods at all, let alone as a typical or central part of their jobs.

*Second*, plaintiff independently falls outside Section 1's residual clause because he does not work in the "transportation industry." *Bissonnette v. LePage Bakeries Park St., LLC*, 49 F.4th 655, 660-62 (2d Cir. 2022), *reh'g en banc denied*, 59 F.4th 594 (2d Cir. 2023); *accord Hamrick*, 1 F.4th at 1346. That requirement stems from the Supreme Court's repeated recognition that Section 1 "exempts . . . only those contracts involving 'transportation workers'" and from the Court's instruction to interpret the residual clause by reference to "the specific classes of 'seamen' and 'railroad employees' that precede it." *Saxon*, 142 S. Ct. at 1789-90 (quoting *Circuit City*, 532 U.S. at 109, 115). Thus, as the Second and Eleventh Circuits have recognized, Section 1's enumerated terms "seamen" and "railroad employees" "are telling because they locate the 'transportation worker' in the context of a

7

*transportation industry*." *Bissonnette*, 49 F.4th at 660; *see Hill v. Rent-A-Center, Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005) (similar).

Because the plaintiff here works in the bakery industry, the Section 1 exemption does not apply. The district court disagreed, relying on a recent First Circuit decision parting ways with the Second and Eleventh Circuits and rejecting a transportation industry requirement. Add. 6 (citing *Canales v. CK Sales Co.*, 67 F.4th 38 (1st Cir. 2023)). As discussed below, *Canales* is unpersuasive and rests on a misreading of *Saxon*. This Court should either adopt the Second and Eleventh Circuits' reasoning on this point or, at least, find the Section 1 exemption inapplicable because plaintiff does not belong to a class of workers engaged in interstate commerce and reserve this issue to avoid deepening the circuit split.

In all events, this Court should reject the district court's expansive approach to what counts as being "engaged in foreign or interstate commerce," which would create serious practical problems. If adopted, that approach would generate significant litigation over whether the FAA applies to a broad and indeterminate array of workers. Businesses and workers would face uncertainty over whether the FAA protects their

8

arbitration agreements and delay in referring disputes to arbitration even if the FAA ultimately does protect those agreements. As a result, wide sectors of the economy could be deprived of the benefits secured by the FAA, including lower costs and greater efficiency. And the increased costs of litigating both the applicability of the Section 1 exemption, and, if necessary, the merits in court would be passed on in the form of decreased payments to workers or increased costs to consumers.

The district court's order should be reversed.

## ARGUMENT

I.  **The Text And Structure Of The FAA Demonstrate That Plaintiff Is Not Included Within A "Class Of Workers Engaged In . . . Interstate Commerce."**

A.  **Section 1's Residual Clause Is Limited To Classes Of Workers Directly Involved In Transporting Goods Across State Or International Borders.**

**1.** The FAA's principal substantive provision, Section 2, provides that an arbitration agreement in "a contract evidencing a transaction *involving commerce* . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2 (emphasis added). The Supreme Court has instructed that *Section 2's* "involving commerce" language must be read "expansively" to reach all arbitration agreements within Congress's commerce power. *Allied-Bruce*, 513 U.S. at 274.

9

Section 1, by contrast, creates a very limited exception to Section 2's broad coverage, providing that the FAA's federal-law protections for arbitration agreements do not apply to "contracts of employment of seamen, railroad employees, or any other class of workers *engaged in* foreign or interstate *commerce*." 9 U.S.C. § 1 (emphasis added). The Supreme Court has instructed that the Section 1 "engaged in . . . commerce" exemption requires a "narrow construction" and "precise reading." *Circuit City*, 532 U.S. at 118-19.

The Supreme Court's recent decision in *Saxon* reaffirms three interpretive principles that inform the proper "narrow" and "precise reading."

*First*, the Section 1 exemption must be interpreted based on the "ordinary, contemporary, common meaning" of the statutory text at the time Congress enacted the FAA in 1925. *Saxon*, 142 S. Ct. at 1788 (quotation marks omitted); *accord New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (also recognizing the "reliance interests in the settled meaning of a statute").

*Second*, the words of the statutes must be interpreted "'in their context.'"  *Saxon*, 142 S. Ct. at 1788 (quoting *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019)).

*Third*, with respect to Section 1's residual clause in particular, the Court has instructed that under "the *ejusdem generis* canon," the clause should be "'controlled and defined by reference' to the specific classes of 'seamen' and 'railroad employees' that precede it."  *Saxon*, 142 S. Ct. at 1789-90 (quoting *Circuit City*, 532 U.S. at 115).  In other words, the residual clause must be construed narrowly to reach only classes of workers that are similar—in terms of their engagement with foreign or interstate commerce—to the enumerated groups of "seamen" and "railroad employees."

Applying these three principles, the Court held that a class of workers must be "typically" and "directly involved in transporting goods across state or international borders" in order to be "engaged in foreign or interstate commerce" within the meaning of Section 1's residual clause.  *Saxon*, 142 S. Ct. at 1788-89; *see id.* at 1790 ("Put another way, transportation workers must be actively engaged in transportation of

those goods across borders via the channels of foreign or interstate commerce.") (quotation marks omitted).

**2.** The class of workers that includes plaintiff does not satisfy this standard. As defendants' brief details (at 6-9, 23-24), these workers market, sell, and distribute baked goods entirely within a single state. And unlike the cargo loaders in *Saxon*, these workers are not involved at all in the goods' crossing of state borders, which occurs before the goods come into the workers' hands, separate and apart from the workers' in-state activities. *Cf. Saxon*, 142 S. Ct. at 1790 (comparing the act of loading cargo to "wharfage," which Section 1 refers to as a "matter[] in foreign commerce") (quoting 9 U.S.C. § 1).

The district court's reliance on the fact that distributors like plaintiff order the baked goods that they market, sell, and deliver to in-state customers from "out-of-state bakeries" (Add. 12) cannot be squared with the Supreme Court's recent direction to assess the actual work performed by the class.

That conclusion follows from Section 1's use of the word "workers," which "directs the interpreter's attention to 'the *performance* of work.'" *Saxon*, 142 S. Ct. at 1788 (quoting *New Prime*, 139 S. Ct. at 540-41). In

addition, "the word 'engaged'" "similarly emphasizes the *actual work* that the members of the class, as a whole, typically carry out." *Id.* (emphasis added).

Moreover, given the Supreme Court's instruction that Section 1 be given a "narrow construction" (*Circuit City*, 532 U.S. at 118), each of Section 1's relevant terms—including "workers," "engaged," and "commerce"—must be interpreted based on their ordinary meanings at the time of the FAA's enactment, rather than any expansive modern conceptions of what qualifies as interstate commerce. *Saxon*, 142 S. Ct. at 1788-89 (collecting contemporary dictionary definitions); *see also*, *e.g.*, Black's Law Dictionary 651 (2d ed. 1910) (defining "interstate commerce" as "commerce between two states," specifically—"traffic, intercourse, commercial trading, or [] transportation" "between or among the several states of the Union, or from or between points in one state and points in another state"); *Hamrick*, 1 F.4th at 1350 (relying on this contemporary definition of "interstate commerce" to conclude that the class of workers must "actually engage[]" in cross-border transportation).

Pre-*Saxon* decisions from other circuits are in accord. In addressing the applicability of Section 1 to "drivers who make local deliveries of

goods and materials that have been shipped from out-of-state to a local warehouse," the Eleventh Circuit held that the district court had erred by "focus[ing] on the movement of the goods" rather than whether the class of workers, "in the main, actually engages in interstate commerce," meaning the transportation of goods "across state lines." *Hamrick*, 1 F.4th at 1340, 1346, 1350-52.  It held, contrary to the district court here, that workers who move goods from one in-state location to another do not fall within the Section 1 exemption just because the goods "had been previously transported interstate."   *Id.* at 1349 (quotation marks omitted).  That is because, "in the text of the exemption, 'engaged in foreign or interstate commerce' modifies 'workers' and not 'goods.'" *Id.* at 1350.

Writing for the Seventh Circuit, then-Judge Barrett likewise *rejected* the plaintiffs' argument that the Section 1 "exemption is not so much about what the worker does as about where the goods have been." *Wallace*, 970 F.3d at 802.  Instead, engaging in foreign or interstate commerce requires "workers [to] be connected not simply to the goods but to the *act of moving those goods across* state or national borders."  *Id.* (emphasis added).  Indeed, focusing on the origin and movement of the

goods "would sweep in numerous categories of workers whose occupations have nothing to do with interstate transport—for example, dry cleaners who deliver pressed shirts manufactured in Taiwan and ice cream truck drivers selling treats made with milk from an out-of-state dairy." *Id.* The Seventh Circuit therefore held that local food delivery drivers who deliver meals and packaged items from restaurants to diners are not "engaged in . . . interstate commerce" within the meaning of Section 1 of the FAA, because "the interstate movement of goods" was not "a central part of the job description of the class of workers." *Id.* at 803.

In declaring *Wallace* "distinguishable," the district court relied on the First and Ninth Circuits' pre-*Saxon* decisions holding that contracts of "last leg" delivery drivers performing work for Amazon are exempt from the FAA under Section 1 on the theory the goods are still in interstate commerce until they reach the Amazon customer who ordered them from out of state. Add. 11 (citing *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10 (1st Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904 (9th Cir. 2020)); *see also Saxon*, 142 S. Ct. at 1787 n.2 (leaving open the question whether last-mile drivers fall within the Section 1 exemption).

The Chamber maintains that the exemption does not apply to such drivers for the reasons discussed in its *amicus* briefs in those cases,

including that the drivers' work is too far removed from the transportation of goods across state lines. Indeed, although the Supreme Court had no occasion to rule on that issue in *Saxon*, it suggested that the applicability of the exemption to such drivers was not "so plain" as its applicability to cargo loaders because last leg delivery drivers "carr[y] out duties further removed from the channels of interstate commerce or the actual crossing of borders." 142 S. Ct. at 1789 n.2.

But the Court need not disagree with *Waithaka* or *Rittmann* in order to reverse here, because the district court ignored critical distinguishing characteristics of the workers at issue in those cases. As defendants explain (Br. 28-29), the class of workers here does not provide last-mile delivery services as part of a single, unbroken interstate transaction—and therefore they are not "last-leg" or "last-mile" drivers at all. Instead, the workers purchase the baked goods from defendants and independently market, sell, and distribute them to customers within a single state. Thus, their work more closely resembles the "'independent local service'" that courts—including the First and Ninth Circuits—have recognized does *not* trigger Section 1's residual clause. *Cunningham*, 17 F.4th at 250-51 (quoting *United States v. Yellow Cab Co.*, 332 U.S. 218,

233 (1947), *overruled on other grounds by Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752 (1984)); *accord Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 863-64 (9th Cir. 2021).

**B.    Section 1's Residual Clause Additionally Requires That Direct Involvement In Transporting Goods Across State Or International Borders Is A Central Part Of The Workers' Job Description.**

The district court's interpretation of Section 1 was incorrect for another reason: the exemption's residual clause applies only if transportation of goods across state or national borders is *central* to the work performed by the relevant class of workers.

As the Seventh Circuit has explained, Congress viewed seamen and railroad employees as workers "whose occupations [we]re *centered* on the transport of goods in interstate and foreign commerce." *Wallace*, 970 F.3d at 802 (emphasis added).  Under the residual clause, therefore, a party seeking to avoid the FAA's coverage must also "demonstrate that the interstate movement of goods is a *central part* of the job description of the class of workers to which they belong." *Id.* at 803 (emphasis added).

Applying this standard, the First, Third, and Ninth Circuits have agreed, for example, that rideshare drivers (such as those who use the Uber and Lyft platforms to offer rides) do not fall within the Section 1

exemption because they overwhelmingly provide local, intrastate rides. *See Singh v. Uber Techs., Inc.*, 67 F.4th 550, 553 (3d Cir. 2023); *Cunningham*, 17 F.4th at 252-53; *Capriole*, 7 F.4th at 865-66. It "cannot even arguably be said" that rideshare drivers (and other local workers) are classes of "workers primarily devoted to the movement of goods and people beyond state boundaries." *Cunningham*, 17 F.4th at 253. Or, as the Ninth Circuit similarly put it, such local workers, even if they occasionally cross state lines, stand in stark "contrast" to "seamen and railroad workers," for whom "the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and 'central part of the job description.'" *Capriole*, 7 F.4th at 865 (quoting *Wallace*, 970 F.3d at 803); *see also Saxon*, 142 S. Ct. at 1788-89 (instructing courts to look at "the actual work that the members of the class, as a whole, *typically* carry out" and noting that Saxon belonged to a class of workers "who physically load and unload cargo on and off airplanes on a *frequent* basis") (emphasis added). The Third Circuit made clear that this approach is wholly consistent with *Saxon*, explaining that rideshare drivers are not "typically involved with the channels of interstate commerce," as Section 1 requires. *Singh*, 67 F.4th at 559.

The class of workers here does not satisfy these standards either. For the reasons above, the class is not "directly involved" or "actively engaged" in cross-border transportation at all. *Saxon*, 142 S. Ct. at 1789-90 (quotation marks omitted). It follows that such transportation cannot be a central part of their job description. Moreover, many of the responsibilities of the distributors have nothing to do with the transportation of goods, even intrastate. For this reason, too, plaintiff does not belong to a class of workers "engaged in . . . interstate commerce" within the meaning of Section 1.

### C. Section 1 Also Does Not Apply For The Independent Reason That Plaintiff Does Not Work In The Transportation Industry.

The Supreme Court reaffirmed in *Saxon* that Section 1 exempts "only those contracts involving 'transportation workers.'" 142 S. Ct. at 1789 (quoting *Circuit City*, 532 U.S. at 109). While the Court has "not provide[d] a complete definition of 'transportation worker'" (*id.* at 1790), the Second Circuit—in a case with one of the same Flowers Foods defendants as this one—recently reaffirmed post-*Saxon* that a transportation worker must work "in the transportation industry," just as seamen and railroad workers do. *Bissonnette*, 49 F.4th at 660-62. The

Eleventh Circuit also reaffirmed the same conclusion shortly before *Saxon. Hamrick*, 1 F.4th at 1346 (quoting *Hill*, 398 F.3d at 1290).

That requirement follows from application of the *ejusdem generis* canon to interpret the residual clause by reference to "the specific classes of 'seamen' and 'railroad employees' that precede it." *Saxon*, 142 S. Ct. at 1790 (quoting *Circuit City*, 532 U.S. at 115); *see also id.* at 1792 (explaining that "the inference embodied in *ejusdem generis* is that Congress remained focused on some common attribute shared by the preceding list of specific items when it used the catchall phrase") (alterations and quotation marks omitted). Those examples, the Eleventh Circuit explained, make it "apparent [that] Congress was concerned only with giving the arbitration exemption to 'classes' of transportation workers within the transportation industry." *Hill*, 398 F.3d at 1290; *accord Bissonnette*, 49 F.4th at 661-62; *Hamrick*, 1 F.4th at 1345.

Limiting the residual clause to those workers in the transportation industry whose engagement with foreign or interstate commerce mirrors that of seamen and railroad employees also ensures that Section 1's narrow exemption does not sweep in countless workers outside of the

20

transportation industry "who incidentally transport[] goods interstate" in performing work outside of that industry. *Hill*, 398 F.3d at 1289-90. Thus, Section 1 does not cover "a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town," or the account manager in *Hill* who occasionally crossed the border between Georgia and Alabama in delivering furniture and other items to customers. *Id.* at 1290; *see Bissonnette*, 49 F.4th at 661 (citing *Hill*). As another court put it, citing *Hill*, "[n]otwithstanding the fact that pizzas are crossing state lines, no pizza delivery person belongs to a 'class of workers engaged in foreign or interstate commerce.'" *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 916 (N.D. Cal. 2020), *aff'd*, 2022 WL 474166 (9th Cir. Feb. 16, 2022).

The transportation-industry requirement is further supported by Section 1's history. The Supreme Court has recognized that "seamen" and "railroad employees" were excluded from the FAA because "[b]y the time the FAA was passed, Congress had already enacted federal legislation providing for the arbitration of disputes between seamen and their employers"; "grievance procedures existed for railroad employees under federal law" in response to a history of disruptive labor disputes;

"and the passage of a more comprehensive statute providing for the mediation and arbitration of railroad labor disputes was imminent." *Circuit City*, 532 U.S. at 121 (citing pre-FAA statutes).

Although "the legislative record on the § 1 exemption is quite sparse," what little there is "suggest[s] that the exception may have been added in response to the objections of [Andrew Furuseth,] the president of the International Seamen's Union of America." *Circuit City*, 532 U.S. at 119; *see also* Sales and Contracts to Sell in Interstate and Foreign Commerce, and Federal Commercial Arbitration: Hearing on S. 4213 and S. 4214 Before a Subcomm. of the Senate Comm. on the Judiciary, 67th Cong., 9 (1923) (statement of W.H.H. Platt, Am. Bar Ass'n).  Furuseth argued in part that seamen's contracts should be excluded because they "constitute a class of workers as to whom Congress had long provided machinery for arbitration." *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers*, 207 F.2d 450, 452 (3d Cir. 1953); *see also* Matthew W. Finkin, *"Workers' Contracts" under the United States Arbitration Act: An*

*Essay in Historical Clarification*, 17 Berkeley J. Emp. & Lab. L. 282, 300-02 (1996) (quoting Andrew Furuseth, Analysis of H.R. 13522 (1923)).[4]

Congress's inclusion of "railroad employees" in Section 1 appeared to stem from the same concerns. Congress had previously enacted special dispute-resolution procedures for that industry, too, in response to a long history of labor disputes. Indeed, by the time the FAA was enacted, mediation and arbitration had been central features of the railroad dispute resolution process for nearly forty years.[5]

Congress thus decided to carve out narrow classes of workers so as not to "unsettle established or developing statutory dispute resolution schemes covering specific workers." *Circuit City*, 532 U.S. at 120-21. The residual category of other transportation workers was included for a

---

[4] While the Supreme Court recognized in *Circuit City* that "the fact that a certain interest group sponsored or opposed particular legislation" is not a basis for discerning the meaning of a statute, it pointed to the history as context for its conclusion that the "residual exclusion" of "'any other class of workers engaged in foreign or interstate commerce'" is "link[ed] to the two specific, enumerated types of workers identified in the preceding portion of the sentence." *Circuit City*, 532 U.S. at 120-21.

[5] *See generally Gen. Comm. of Adjustment of Bhd. of Locomotive Eng'rs for Mo.-Kan.-Tex. R.R. v. Mo.-Kan.-Tex. R.R. Co.*, 320 U.S. 323, 328 & n.3 (1943) (summarizing the "fifty years of evolution" of the railroad dispute resolution framework that began in 1888).

similar reason. That is, Congress contemplated extending similar legislation to other categories of workers *in the transportation industry* engaged in transportation across state or national lines: "Indeed, such legislation was soon to follow, with the amendment of the Railway Labor Act in 1936 to include air carriers and [certain of] their employees." *Id.* at 121; *accord Hill*, 398 F.3d at 1289 (quoting same).

This history further supports limiting application of Section 1's residual clause to workers in the transportation industry.

The district court's contrary holding relied heavily on a recent First Circuit decision. Add. 6 (citing *Canales*, 67 F.4th 38). But *Canales*—and by extension the decision below—expand Section 1 beyond recognition: virtually any business that manufactures or produces goods will employ or contract with workers to market, sell, and distribute those goods. Treating all such workers as workers in the transportation industry in the same manner as railroad or maritime workers would give Section 1 an enormous sweep that is contrary to the "narrow construction" mandated by the Supreme Court. *Circuit City*, 532 U.S. at 118.

These decisions also misread *Saxon*. Both expressed the view that *Saxon* rejects any consideration of the industry to which the class of

workers belongs, quoting the Supreme Court's holding that "Saxon is therefore a member of a 'class of workers' based on what she does at Southwest, not what Southwest does generally."  142 S. Ct. at 1788; *see* Add. 6; *Canales*, 67 F.4th at 45.  But the Supreme Court was answering a different question—how broadly to define the relevant "class of workers" for purposes of Section 1—and the Court rejected Saxon's overbroad "industrywide approach" because it elided differences among the actual work performed by workers within that industry.  142 S. Ct. at 1788.  The Court had no occasion to address whether Section 1's application is limited to workers in the transportation industry: "That point needed no elaboration in *Saxon* because there the plaintiff worked for an airline."  *Bissonnette*, 49 F.4th at 661.

Because plaintiff here belongs to a class of workers "in the bakery industry and not a transportation industry," *Bissonnette*, 49 F.4th at 557, the Section 1 exemption does not apply.

## II.    The District Court's Erroneous Reading Of Section 1 Harms Businesses And Workers.

The district court's failure to give Section 1 a proper construction, if adopted, will produce at least two significant practical consequences. First, it will generate time-consuming and costly litigation over the FAA's

application—thereby undermining one of Congress's key goals in enacting the FAA. Second, it will deprive businesses and individuals of the benefits of arbitration protected by the FAA.

**1.** The Supreme Court has long recognized "Congress' clear intent, in the [Federal] Arbitration Act, to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983). Straightforward, easily administrable rules are thus especially important in the context of the FAA. Indeed, the *Circuit City* Court emphasized that Section 1 should not be interpreted in a manner that introduces "considerable complexity and uncertainty . . . , in the process undermining the FAA's proarbitration purposes and 'breeding litigation from a statute that seeks to avoid it.'" 532 U.S. at 123 (quoting *Allied-Bruce*, 513 U.S. at 275).

Interpreting the residual clause in accordance with its plain meaning—requiring that the class of workers be "typically" and "*directly* involved in transporting goods across state or international borders" (*Saxon*, 142 S. Ct. at 1788-89 (emphasis added))—produces a simple test that should be easy to apply. It should not be difficult or factually complex in the mine-run of cases to determine whether a class of workers

26

is directly involved in the movement of goods across state lines or national boundaries as a central part of their job.

Under the district court's approach, by contrast, even when classes of workers primarily (or even, as here, entirely) carry out their work within a single state, courts will have to decide whether those workers are nevertheless somehow sufficiently bound up with interstate movement of goods to fall under the residual clause. And the court below offered no standard for making that determination.

Interpreting Section 1's residual clause to require such an inquiry produces "serious problems of practical application." *Rittmann*, 971 F.3d at 936 (Bress, J., dissenting). And "[u]ndertaking such confounding inquiries in the context of the FAA is particularly undesirable when the result will inevitably mean more complex civil litigation over the availability of a private dispute resolution mechanism that is supposed to itself reduce costs." *Id.* at 937 (Bress, J., dissenting) (citing *Circuit City*, 532 U.S. at 123; *Allied-Bruce*, 513 U.S. at 275).

Even if some of the parties' underlying disputes are ultimately compelled to arbitration, the intervening litigation over the FAA's application would severely undermine the FAA's purpose of ensuring

speedy and efficient dispute resolution. And this expensive and time-consuming litigation would burden courts as well.

Further compounding the costs and delays associated with resolving the FAA's application under an overly expansive reading of the Section 1 exemption is the risk of court-ordered discovery that threatens to drag on for months. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 227-28 (3d Cir. 2019); *Golightly v. Uber Techs., Inc.*, 2021 WL 3539146, at *3-4 (S.D.N.Y. Aug. 11, 2021); *see also Singh*, 571 F. Supp. 3d at 365-66 (concluding, over two years after the Third Circuit's initial remand and after months of discovery, that rideshare drivers "are not exempt from the FAA").

In sum, "[t]he problem" presented by overly expansive readings of Section 1 like the one adopted below "is the frustration of the congressional preference for arbitration by expanding the exemption beyond its purpose and any definable limits, and requiring that motions to compel arbitration run a gauntlet of expensive and uncertain litigation." *Bissonnette*, 59 F.4th at 599 (Jacobs, J., supporting denial of rehearing en banc).

**2.** The district court's approach, if adopted, also would deprive businesses and individuals of the benefits of arbitration secured by the

FAA. Without that uniform federal protection, whether businesses and workers can invoke arbitration agreements will turn on state law and vary state by state. And the overall result will be that more disputes are resolved in court rather than in arbitration, because the FAA's protection against state-law rules that disfavor arbitration will no longer apply.

The Supreme Court has repeatedly recognized the "real benefits" of "enforcement of arbitration provisions," *Circuit City*, 532 U.S. at 122-23, which include "'lower costs [and] greater efficiency and speed,'" *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1416 (2019) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)); *accord Allied-Bruce*, 513 U.S. at 280 (one of the "advantages" of arbitration is that it is "cheaper and faster than litigation") (quotation marks omitted); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 257 (2009) ("Parties generally favor arbitration precisely because of the economics of dispute resolution.").

These advantages extend to agreements between businesses and workers. *See Circuit City*, 532 U.S. at 123 (rejecting the "supposition that the advantages of the arbitration process somehow disappear when transferred to the employment context"). The lower costs of arbitration compared to litigation "may be of particular importance in employment

29

litigation, which often involves smaller sums of money than disputes concerning commercial contracts." *Id.*

Empirical research confirms those observations. Scholars and researchers agree, for example, that the average employment dispute is resolved up to twice as quickly in arbitration as in court. *See* Lewis L. Maltby, *Private Justice: Employment Arbitration and Civil Rights*, 30 Colum. Hum. Rts. L. Rev. 29, 55 (1998) (average resolution time for employment arbitration was 8.6 months—approximately half the average resolution time in court); *see also*, *e.g.*, Nam D. Pham, Ph.D. & Mary Donovan, *Fairer, Faster, Better III: An Empirical Assessment of Consumer and Employment Arbitration*, NDP Analytics 5-6, 15 (March 2022), https://bit.ly/3yiU23A (reporting that average resolution for arbitration was approximately two months faster than litigation); Michael Delikat & Morris M. Kleiner, *An Empirical Study of Dispute Resolution Mechanisms: Where Do Plaintiffs Better Vindicate Their Rights?*, 58 Disp. Resol. J. 56, 58 (Nov. 2003–Jan. 2004) (reporting findings that arbitration was 33% faster than analogous litigation); David Sherwyn, Samuel Estreicher, & Michael Heise, *Assessing the Case for Employment Arbitration: A New Path for Empirical Research*, 57

Stanford L. Rev. 1557, 1573 (2005) (collecting studies reaching similar conclusions).

Further, "there is no evidence that plaintiffs fare significantly better in litigation." Sherwyn, *supra*, 57 Stanford L. Rev. at 1578. To the contrary, a recent study released by the Chamber's Institute for Legal Reform found that employees were nearly *four times* more likely to win in arbitration than in court. Pham, *supra*, at 4-5, 12, 17 (surveying more than 25,000 employment arbitration cases and 260,000 employment litigation cases resolved between 2014 to 2021 and reporting a 37.7% win rate in arbitration versus 10.8% in litigation). The same study found that the median monetary award for employees who prevailed in arbitration was over double the award that employees received in cases won in court. *Id.* at 4-15, 14 ($142,332 in arbitration versus $68,956 in litigation); *see also* Theodore J. St. Antoine, *Labor and Employment Arbitration Today: Mid-Life Crisis or New Golden Age?*, 32 Ohio St. J. on Disp. Resol. 1, 16 (2017) (arbitration is "favorable to employees as compared with court litigation").

Earlier scholarship similarly found a higher employee-win rate in arbitration than in court. *See* Sherwyn, *supra*, 57 Stanford L. Rev. at 1568-69 (observing that, once dispositive motions are taken into account,

31

the actual employee-win rate in court is "only 12% [to] 15%") (citing Maltby, *supra*, 30 Colum. Hum. Rts. L. Rev. at 47) (of dispositive motions granted in court, 98% are granted for the employer); Nat'l Workrights Inst., *Employment Arbitration: What Does the Data Show?* (2004), https://bit.ly/3IVddnP (concluding that employees were 19% more likely to win in arbitration than in court).

Thus, "there is no evidence that plaintiffs fare significantly better in litigation [than in arbitration]." St. Antoine, *supra*, 32 Ohio St. J. on Disp. Resol. at 16 (quotation marks omitted; alterations in original). Rather, arbitration is generally "favorable to employees as compared with court litigation." *Id.*

In sum, adopting the district court's overbroad reading of Section 1 would impose real costs on businesses and workers. Not only is litigation more expensive than arbitration for businesses and workers alike, but the uncertainty stemming from the district court's approach would engender additional expensive disputes over the enforceability of arbitration agreements with workers. And these increased litigation costs would not be borne by businesses alone. Businesses would, in turn, pass on these litigation expenses to consumers (in the form of higher prices) and to workers (in the form of lower compensation).

## CONCLUSION

The Court should reverse the district court's order denying defendants' motion to compel arbitration.


Dated:  July 31, 2023

Respectfully submitted,

/s/ *Archis A. Parasharami*

JENNIFER B. DICKEY
JONATHAN D. URICK
  *U.S. Chamber Litigation*
  *Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *(202) 463-5337*

ARCHIS A. PARASHARAMI
DANIEL E. JONES
  *Mayer Brown LLP*
  *1999 K Street NW*
  *Washington, DC 20006*
  *(202) 263-3000*
  *aparasharami@mayerbrown.com*


*Counsel for* Amicus Curiae *the Chamber of Commerce*
*of the United States of America*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 6,499 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016 in Century Schoolbook 14-point type for text and footnotes.

Dated: July 31, 2023

/s/ *Archis A. Parasharami*
Archis A. Parasharami

*Counsel for* Amicus Curiae

## CERTIFICATE OF DIGITAL SUBMISSION

This brief complies with Circuit Rule 25.5.  No privacy redactions were required in this brief and thus no redactions were made.  The electronic version of this brief has been scanned for viruses by the most recent version of a commercial virus scanning program, Windows Defender (version 1.393.1920.0, updated regularly), and is, according to that program, free of viruses.  The electronically filed version of the brief is an exact copy of the paper version that will be filed with the clerk.

Dated: July 31, 2023                  /s/ *Archis A. Parasharami*
                                       Archis A. Parasharami

                                       *Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: July 31, 2023                    /s/ *Archis A. Parasharami*
                                        Archis A. Parasharami

                                        *Counsel for* Amicus Curiae