**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| ANGELO BROCK, individually and on behalf of all others similarly situated, | |
| | |
| Plaintiff - Appellee, | |
| | |
| v. | No. 23-1182 |
| | |
| FLOWERS FOODS, INC., a Georgia limited liability company; FLOWERS BAKERIES, LLC, a Georgia limited liability company; FLOWERS BAKING CO. OF DENVER, LLC, a Colorado limited liability company, | |
| | |
| Defendants - Appellants. | |
| | |
| ------------------------------ | |
| | |
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | |
| | |
| Amicus Curiae. | |

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-02413-CNS-MEH)**

_____

Traci L. Lovitt (Matthew W. Lampe, Jack L. Millman, and Amanda K. Rice, of Jones Day, New York, New York and Detroit, Michigan; Jared Lee Palmer and David Lee Zwisler of Ogletree Deakins, San Francisco, California and Denver, Colorado, with her on the briefs), for Defendants-Appellants.

Shaun Markley of Nicholas & Tomasevic, LLP, San Diego, California, for
Plaintiff-Appellee.

_____

Before **MATHESON**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Flowers Foods, Inc., Flowers Bakeries, LLC, and Flowers Baking Co. of
Denver, LLC (collectively, "Flowers") appeal the district court's interlocutory
order denying their motion to compel arbitration. This litigation arises from a
putative class-action complaint alleging wage and hour violations. In 2016,
Angelo Brock began working as an independent distributor for Flowers Baking
Co. of Denver, LLC ("Flowers Denver"). He delivered baked goods produced
out-of-state to various retail stores in Colorado. But the working relationship
soured. Brock sued Flowers for violations of the Fair Labor Standards Act and
Colorado labor law on behalf of himself and other similarly situated workers.
Flowers then moved to compel arbitration of Brock's claims based on the
parties' Arbitration Agreement. The district court denied that motion.

This appeal focuses on whether the Arbitration Agreement requires Brock
to arbitrate his claims individually. Flowers challenges the district court's order
denying arbitration under the Federal Arbitration Act (FAA) and Colorado law.
First, Flowers argues that the district court erred by concluding that § 1 of the
FAA exempts Brock from arbitration. Flowers asserts that Brock's class of
workers is not directly engaged in interstate commerce and that the parties'

2

Distributor Agreement does not qualify as a contract of employment. Second, Flowers argues that the district court erred by concluding that the plain language of the Arbitration Agreement foreclosed arbitration under Colorado law.

On the interstate-commerce question, we agree with the district court: Brock's class of workers is engaged in interstate commerce. Because we either decline to review or lack jurisdiction over all other issues, we affirm.

## BACKGROUND

### I.    Factual Background

### A.    The Parties

Flowers Foods, Inc., a packaged-bakery-foods company, produces "fresh breads, buns, rolls, and snack cakes" that are sold in supermarkets, drug stores, and convenience stores throughout the United States. App. vol. I, at 47, 140. Flowers Foods, Inc. owns various subsidiaries, including Flowers Bakeries, LLC and Flowers Denver.[1] To "bring bakery products to market," Flowers uses a "direct-store-delivery" system. *Id.* at 47, 49, 141. Under this system, Flowers contracts with independent distributors who buy the rights to distribute Flowers products in particular geographic areas. These distributors buy baked goods from Flowers and then resell and deliver the goods to stores along their routes.

---

[1] Flowers Foods, Inc. is the ultimate parent company of Flowers Bakeries, LLC and Flowers Denver. Flowers Bakeries, LLC wholly owns Flowers Denver.

The independent distributors also stock shelves, maintain special displays, and develop and preserve positive customer relations. Flowers, in turn, produces and markets the baked goods. Flowers operates the second-largest baking company in the United States and generates billions in sales, with approximately 85% of sales coming from the direct-store-delivery system. This system allows Flowers to "sell[] its products through a network of independent distributors to retail and foodservice customers." *Id.* at 129.

Flowers Denver contracted with independent distributor Brock, Inc., the company owned and operated by Angelo Brock. Brock, Inc. purchased the rights to distribute Flowers products in certain parts of Colorado, as governed by a "Distributor Agreement."[2] Under the direct-store-delivery system, Brock, Inc. orders products from Flowers Denver or its affiliates. Most of these products "are produced by out-of-state [Flowers] bakeries in response to [Brock's] specific orders." *Id.* at 49, 130–31. Flowers Denver then delivers the completed products to an agreed-on warehouse where Brock picks up the products.[3] Flowers unloads the shipments and places the orders in a designated

---

[2] Flowers Finance, LLC, a subsidiary of Flowers Foods, Inc., financed Brock, Inc.'s purchase of the distribution route. The Secured Promissory Note of Corporation governs Brock's repayment of the principal balance and interest to Flowers Finance, LLC. For most independent distributors, a Flowers subsidiary finances a portion of the route's purchase price through interest-bearing notes.

[3] Though the district court referred to the warehouse as "Brock's warehouse," *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1182–83 (D.

(*footnote continued*)

area of the warehouse. Brock arrives at the warehouse within a day of delivery, signs off on the products, loads the products onto his vehicle, and delivers the products to the various stores that serve as his end customers. According to Flowers, Brock, Inc.'s profit equals the price it sells the Flowers products to its customers, minus the price expended for its purchasing products from Flowers as well as its business expenses.

### B.    The Distributor Agreement

In 2016, Brock signed a Distributor Agreement to become an independent distributor for Flowers. The Distributor Agreement governs the business relationship between Flowers Denver and Brock, Inc. Relevant to this appeal, the Distributor Agreement contains a "Mandatory and Binding Arbitration" provision that incorporates an "Arbitration Agreement." *Id.* at 67, 84 (Ex. K to the Distributor Agreement). The Arbitration Agreement requires that "any claim, dispute, and/or controversy" be arbitrated "exclusively" under the FAA, "except as otherwise agreed to by the parties and/or specified herein." *Id.* at 84. Covered claims include claims challenging the independent distributor's status as an independent contractor and claims for unpaid compensation. The

---

Colo. 2023), the record shows that Brock does not own any of the warehouses used for product pick-up. Instead, the Distributor Agreement required Brock to choose one of three warehouse locations for product delivery and to pay a fee to use the warehouse. App. vol. I, at 61, 82. A declaration from Robert Shaw, the Distributor Enablement Operations Coordinator for Flowers Denver, states that Flowers Denver "has a warehouse in Denver, Colorado, from where Brock, Inc. accepts its ordered product." *Id.* at 281–82. The record thus indicates that Flowers owns the warehouse where Brock picks up the products.

Arbitration Agreement also states that it "shall be governed by the FAA and Colorado law to the extent Colorado law is not inconsistent with the FAA." *Id.* at 86.

The Distributor Agreement also outlines parameters for Brock, Inc.'s operations. We provide a snapshot of some parameters here. Brock, Inc. must use "commercially reasonable best efforts to develop and maximize the sale" of Flowers products in its geographic territory. *Id.* at 55. And it must do so in accordance with "Good Industry Practice," which includes "maintaining an adequate and fresh supply" of Flowers products, "actively soliciting" unserved stores in the territory, and promptly removing stale products. *Id.* at 53–55. Brock, Inc.'s employees must "maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [Flowers Denver], and customer requirements." *Id.* at 55. Brock, Inc. may not sell products that compete with Flowers's products or products that otherwise interfere with the distribution of Flowers's products in the defined territory. If Brock, Inc. believes a certain account is unprofitable, it must provide Flowers Denver with written notice and a detailed financial analysis.

Finally, Brock signed a "Personal Guaranty," under which he personally guaranteed performance and compliance with the terms of the Distributor Agreement. The Personal Guaranty includes an acknowledgment that Brock is "subject to the Arbitration Agreement." *Id.* at 79.

## II.    Procedural Background

Brock filed this putative collective and class action against Flowers for violations of the Fair Labor Standards Act and Colorado labor law. He alleges that Flowers misclassifies its delivery-driver distributors as independent contractors to systematically underpay its employees. Flowers moved to compel arbitration under the FAA, 9 U.S.C. § 4, and to either dismiss or stay the case pending the requested arbitration. Flowers argued that the parties' Distributor Agreement and Arbitration Agreement required Brock to arbitrate his claims individually.

The district court denied Flowers's motion. *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1190–91 (D. Colo. 2023). First, the court concluded that Brock fell within the "transportation workers exemption" under § 1 of the FAA, which exempts transportation workers engaged in interstate commerce from arbitration. *Id.* at 1184–89. The district court concluded that Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products." *Id.* at 1186. The court also determined that Brock "actively engaged in the transportation of Flowers' products across state lines into Colorado." *Id.* at 1188. Second, the district court rejected Flowers's assertion that Brock was nevertheless required to arbitrate under Colorado's Uniform Arbitration Act. *Id.* at 1189–90. The court noted that the Arbitration Agreement applied Colorado law only "*to the extent* Colorado law is *not inconsistent* with the FAA." *Id.* at 1190 (quoting the

Arbitration Agreement). It had earlier concluded that Brock fell within the

FAA's § 1 exemption for transportation workers—an exemption that did not

exist under Colorado law. *Id.* The court determined that the plain language of

the Arbitration Agreement therefore did not allow for arbitration under

Colorado law, because Colorado law was "inconsistent with" the FAA. *Id.* at

1190. Flowers timely appealed the district court's decision.

## STANDARDS OF REVIEW

We review de novo a district court's decision to grant or deny a motion

to compel arbitration. *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008,

1011 (10th Cir. 2021). We accept the district court's findings of fact, subject to

clear error review. *In re Cox Enters., Inc. Set-top Cable Television Box

Antitrust Litig.*, 790 F.3d 1112, 1116 (10th Cir. 2015).

## DISCUSSION

Flowers appeals the district court's denial of arbitration. Its arguments

fall into two buckets—one based on the FAA and one based on Colorado law.

First, Flowers argues that the district court erred by concluding that § 1 of the

FAA exempted Brock from arbitration. According to Flowers, Brock does not

qualify for the § 1 exemption, because he does not directly engage in interstate

commerce. Flowers also asserts—for the first time on appeal—that the

Distributor Agreement is not a contract of employment and is therefore outside

the scope of § 1. Second, Flowers argues that the district court erred by finding

that the text of the Arbitration Agreement foreclosed arbitration under Colorado

8

law. Flowers contends that the § 1 exemption did not create an "inconsistency" with Colorado law but merely created a gap in arbitration enforcement that Colorado law could freely fill. We start with the FAA challenge and then review the Colorado law challenge.

## I.  The Arbitration Agreement is not enforceable under the FAA because Brock falls within § 1's exemption for transportation workers.

The FAA promotes a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Through the FAA, Congress sought to remedy the widespread "hostility of American courts to the enforcement of arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Yet the FAA does not authorize federal courts "to favor arbitration over litigation"; it makes "arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (internal quotation marks omitted); *cf. Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 24 (1st Cir. 2020) ("[T]he FAA's pro-arbitration purpose cannot override the original meaning of the statute's text.").

Within this context, § 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Though courts must generally enforce valid arbitration agreements, § 1 of the FAA carves out certain workers from the FAA's purview: It exempts "contracts of

employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Id.* § 1. In effect, § 1 shields workers with these types of employment contracts from compelled arbitration under the FAA.

This appeal deals with § 1's residual clause—"any other class of workers engaged in foreign or interstate commerce." *Id.* The Supreme Court employs a two-step framework to analyze whether an individual falls within this clause (and therefore falls within the exemption). *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). First, we must "defin[e] the relevant 'class of workers' to which [the individual] belongs." *Id.* Second, we must "determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.*

We have jurisdiction under 9 U.S.C. § 16(a)(1) to review the district court's interlocutory order denying arbitration under the FAA. Here, though the Arbitration Agreement requires that "any claim" be "determined exclusively by binding arbitration," the district court concluded that Brock qualified for the exemption for transportation workers under § 1's residual clause. *Brock*, 673 F. Supp. 3d at 1183, 1189. Specifically, the court determined that (1) Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products," and (2) Brock, as a member of this class of workers, is engaged in interstate commerce. *Id.* at 1186, 1188–89. Flowers asserts that the district court erred in finding that

10

Brock fell within this exemption. We review the district court's decision under *Saxon*'s two-step framework.

### A.    We accept the district court's defined class of workers.

At step one, Flowers initially argued on appeal that Brock is not a "transportation worker" because he does not work in the transportation industry. *See Circuit City*, 532 U.S. at 119 ("Section 1 exempts from the FAA only contracts of employment of transportation workers."). But it now concedes that *Bissonnette v. LePage Bakeries Park St., LLC*, an intervening case, has foreclosed this argument. 601 U.S. 246, 256 (2024) ("A transportation worker need not work in the transportation industry to fall within the exemption from the FAA provided by § 1 of the Act."). Flowers does not otherwise challenge the district court's determination that Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products."[4] *Brock*, 673 F. Supp. 3d at 1186. So we decline to disturb this finding, and we accept that Brock is a transportation worker under § 1 of the FAA.

### B.    The class of workers is directly engaged in interstate commerce.

We now turn to the second step—whether the defined class of workers is engaged in interstate commerce. As an initial matter, "neither Brock nor any

---

[4] The district court provides another iteration of the defined class of workers as "independent distributors who load and unload Flowers bakery products." *Brock*, 673 F. Supp. 3d at 1189. We treat this iteration of the defined class as identical to the one listed above.

others he employed crossed state lines to deliver goods in connection with the operation of his business." App. vol. I, at 48, 73, 82, 120. This fact alone is not dispositive. In *Saxon*, the Supreme Court reviewed the text of § 1 and concluded that "any class of workers *directly involved* in transporting goods across state or international borders falls within § 1's exemption." 596 U.S. at 457 (emphasis added). In holding that a class of airplane cargo loaders "engaged in foreign or interstate commerce," the Court rejected the view that § 1 exempts "only workers who physically move goods or people" across state or international borders. *Id.* at 456–57, 461. The Court stated "[t]here could be no doubt" that a worker who loads or unloads cargo "from a vehicle carrying goods in interstate transit" is engaged in interstate commerce. *Id.* at 458–59 (cleaned up). Like the airplane cargo loaders in *Saxon*, Brock does not physically cross state borders when delivering Flowers products from the warehouse to his customers. Because Brock's intrastate deliveries may still qualify as engagement in interstate commerce, we closely examine Brock's intrastate delivery role in relation to the goods' interstate journey.

To engage in interstate commerce, a class of workers "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 458 (quoting *Circuit City*, 532 U.S. at 121); *see New Prime Inc. v. Oliveira*, 586 U.S. 105, 108, 112–13 (2019) (noting the parties' agreement that interstate truckers are workers engaged in interstate commerce). We have yet to consider whether a class of workers making intrastate deliveries can qualify as engaging

12

in interstate commerce under § 1 of the FAA. But two circuits have found circumstances where delivery drivers were engaged in interstate commerce despite making wholly intrastate deliveries of interstate goods. *See Waithaka*, 966 F.3d at 26 (1st Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020). Other circuits have also addressed similar issues involving rideshare drivers and food-delivery drivers. We therefore begin with an overview of cases from other circuits for guiding principles and then analyze Brock's intrastate delivery route in relation to the goods' interstate journey.

### 1.    Legal Framework

We first review the legal landscape relevant to this appeal. Two lines of cases help us define the boundary for when an intrastate delivery qualifies as direct engagement in interstate commerce: (a) "Last-mile" delivery driver cases, and (b) rideshare and food-delivery cases. We expound on both below.

### a.    Last-Mile Delivery Driver Cases

The First and Ninth Circuits have concluded that last-mile delivery drivers—drivers who make the last intrastate leg of an interstate delivery route—are directly engaged in interstate commerce. *See Waithaka*, 966 F.3d at 26; *Rittmann*, 971 F.3d at 919; *see also Saxon*, 596 U.S. at 457 n.2 (leaving this question unresolved); *but see Lopez v. Cintas Corp.*, 47 F.4th 428, 432–33 (5th Cir. 2022) (concluding that last-mile delivery drivers did not engage in interstate commerce because the interstate delivery ended once the goods were unloaded at the local warehouse). Both circuits focused on whether the goods

13

moved in a continuous interstate journey or as part of multiple independent transactions.

In *Waithaka*, the First Circuit held that last-mile delivery drivers for Amazon engaged in interstate commerce, despite transporting goods "entirely within a single state." 966 F.3d at 20, 26. The First Circuit looked to the Supreme Court's line of cases addressing the Federal Employers' Liability Act (FELA) for guidance on intrastate deliveries of interstate goods. *Id.* at 19–20. FELA contains language identical to the FAA's; it covers injuries that railroad employees sustained if both the railroad and employee were "engaged in interstate commerce" at the time of injury. *Id.* at 19. In the FELA cases, the Court distinguished intrastate railroad workers who operated railroad cars carrying "interstate freight," *Phila. & Reading Ry. Co. v. Hancock*, 253 U.S. 284, 285–86 (1920), from those who operated cars carrying "intrastate freight," *Ill. Cent. R.R. Co. v. Behrens*, 233 U.S. 473, 477–78 (1914). The former are "engaged in interstate commerce," while the latter are not. *Hancock*, 253 U.S. at 286; *Behrens*, 233 U.S. at 478. With this context, the First Circuit concluded that last-mile delivery workers "who haul goods on the final [intrastate] legs of interstate journeys are transportation workers engaged in interstate commerce." *Waithaka*, 966 F.3d at 26 (cleaned up).

Likewise, in *Rittmann*, the Ninth Circuit held that Amazon's last-mile delivery providers engaged in interstate commerce when transporting packages in the final intrastate leg of the interstate journey. 971 F.3d at 915. The Ninth

14

Circuit concurred with the First Circuit's reasoning in *Waithaka*—a "nearly identical case"—and applied that reasoning to the facts before it. *Id.* at 910, 915. It underscored that the "Amazon packages [that delivery providers] carry are goods that remain in the stream of interstate commerce until they are delivered." *Id.* at 915. The Ninth Circuit distinguished the circumstances in *Rittmann* from *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935). There, the Supreme Court concluded that the interstate transaction of live poultry ended when the poultry reached the slaughterhouses for "slaughter and local sale to retail dealers and butchers who in turn sold directly to consumers." *A.L.A. Schechter Poultry Corp.*, 295 U.S. at 543. At that point, the poultry "had come to a permanent rest within the state." *Id.* Any sales to retail dealers and butchers were "local sale[s]." *Id.* By contrast, the Ninth Circuit in *Rittmann* stated that "Amazon packages do not 'come to rest,' at Amazon warehouses," so "the interstate transactions do not conclude at those warehouses." 971 F.3d at 916. The packages are held at the warehouse as "part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Id.* The Ninth Circuit determined that "[t]he interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations." *Id.* For that reason, the last-mile delivery drivers "are engaged in the movement of interstate commerce." *Id.*

### b.    Rideshare and Food-Delivery Cases

On the other end of the spectrum, courts have declined to find direct engagement in interstate commerce for app-based rideshare and food-delivery drivers. *See Cunningham v. Lyft, Inc.*, 17 F.4th 244, 253 (1st Cir. 2021); *Immediato v. Postmates, Inc.*, 54 F.4th 67, 78 (1st Cir. 2022); *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 560 (3d Cir. 2023); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802–03 (7th Cir. 2020); *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 863–64, 866–67 (9th Cir. 2021). The First and Ninth Circuits' cases are particularly instructive because of their discussions contrasting rideshare and food-delivery cases from last-mile-driver cases. We review those cases below.

After *Waithaka*, the First Circuit refined its distinction between wholly intrastate trips and intrastate trips occurring as part of an interstate journey. *See Cunningham*, 17 F.4th at 250–51, 253; *Immediato*, 54 F.4th at 77–79. In *Cunningham*, the First Circuit concluded that Lyft rideshare drivers who transported passengers to and from Boston's Logan Airport did not engage in interstate commerce. 17 F.4th at 250–51, 253.

In reaching this decision, the First Circuit considered two scenarios from *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 759–60 (1984). In the first scenario, railroads agreed to provide passengers with transit when interstate rail journeys required passengers to disembark at one station

16

and travel up to two miles to board another train at a different station. *Yellow Cab*, 332 U.S. at 228. The railroads contracted with cab companies to transport passengers between connecting stations. *Id.* The *Yellow Cab* Court held that this first scenario implicated interstate commerce. *Id.* at 228–29. In the second scenario, the rail passengers hailed taxi cabs during the cab drivers' normal local taxi service to and from stations. *Id.* at 230. The Court held that "such transportation is too unrelated to interstate commerce." *Id.*

Using the *Yellow Cab* scenarios for comparison, the First Circuit concluded that the class of Lyft drivers more closely resembled the second scenario because they "contract[ed] with the passenger as part of the driver's normal local service to take the passenger to the start (or from the finish) of the passenger's interstate journey." *Cunningham*, 17 F.4th at 250. By contrast, the First Circuit observed that the drivers in *Waithaka* more closely resembled the first scenario:

> Amazon (like the railroads in *Yellow Cab*) agreed with Amazon customers to transport goods interstate from their point of origin to the customer's home. The local delivery drivers (like the taxi companies in the first scenario of *Yellow Cab*) then agreed <u>with Amazon</u> to carry the goods for a portion of that single interstate journey ("the so-called 'last mile'").

*Id.* at 251 (citations omitted).

The *Yellow Cab* scenarios informed the First Circuit's reasoning again in *Immediato*. The First Circuit held that couriers who delivered meals prepared at local restaurants and goods sold by local retailers did not engage in interstate

commerce. *Immediato*, 54 F.4th at 78. Citing *Yellow Cab*, it stated that being engaged in interstate commerce "excludes intrastate transactions that bear only a 'casual' or 'incidental' relationship to the interstate movement of goods or people." *Id.* at 79. The First Circuit distinguished *Immediato* from *Waithaka*: In *Waithaka*, the customers bought goods directly from Amazon, Amazon orchestrated the interstate movement of the goods, and Amazon arranged, as part of the purchase, for the goods' delivery directly to the customer. *Id.* at 78. The Amazon delivery drivers thus engaged in interstate commerce. *Id.* at 74–75. In *Immediato*, customers purchased goods from local vendors after the goods had "already exited the flow of interstate commerce." *Id.* at 78. These local delivery drivers merely engaged in intrastate commerce. *Id.*

Similarly, in *Capriole*, the Ninth Circuit held that Uber drivers are not "engaged in foreign or interstate commerce." 7 F.4th at 863. The Ninth Circuit invoked the *Yellow Cab* scenarios as well and concluded that the class of Uber drivers more closely resembled the second scenario of local taxi services. *Id.* at 863–64. In contrasting *Capriole*'s rideshare drivers from *Rittmann*'s last-mile drivers, the Ninth Circuit stated that "Uber drivers are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce like [Amazon's last-mile delivery] workers." *Id.* at 867.

2.    **Analysis**

We find the First and Ninth Circuits' cases on this issue persuasive and adopt their reasoning as guideposts for our own analysis. These cases suggest that we should consider the following factors to determine if Brock's intrastate route formed a constituent part of the goods' interstate journey or an entirely separate local transaction: (1) the buyer-seller relationship between Flowers and Brock, (2) the buyer-seller relationship between Brock and Brock's customers, and (3) the buyer-seller relationship, if any, between Flowers and Brock's customers. *See Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 240 (1st Cir. 2023) (finding that First Circuit cases "suggest that the contractual relationships among the various actors play an important role in determining whether an intrastate trip is part of an integrated interstate journey"). In our view, the third factor—any buyer-seller relationship between Flowers and Brock's customers—is key to whether the interstate leg of the goods' journey and Brock's intrastate delivery of the goods form one continuous interstate journey.[5]

---

[5] Though the facts here make the contractual relationships important to the outcome, we clarify that we do not foreclose the consideration of other factors in this analysis. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 227–28 (3d Cir. 2019) (listing potential factors, including the parties' agreements, to consider in inquiry of whether a worker belonged to a class of transportation workers engaged in interstate commerce).

Some diagrams may better illustrate the importance of a buyer-seller relationship between Flowers and Brock's customers to this case. Below, each arrow represents a buyer-seller relationship.[6]

As depicted in the first two diagrams, courts have found the final intrastate leg of a journey to be part of a continuous interstate journey where the product's originating company contracts with both the customer and the intrastate delivery driver.

(1) *Yellow Cab* scenario one: Affecting Interstate Commerce (Sherman Act)



*See Yellow Cab*, 332 U.S. at 228–29 (holding that cab drivers were "clearly a part of the stream of interstate commerce" where railroads contracted with drivers to provide same-city station transfers for rail customers traveling interstate).

---

[6] *Yellow Cab* considered interstate commerce in the context of the Sherman Antitrust Act. 332 U.S. at 225, 228–29. The Sherman Act "outlaws unreasonable restraints on interstate commerce." *Id.* at 225. We recognize that "affecting interstate commerce" does not equate to being "engaged in interstate commerce." *See Cunningham*, 17 F.4th at 251 ("The [Sherman] Act is broadly construed, whereas the FAA exception at issue here is narrowly construed. (citations omitted)). So a case that merely "affects" interstate commerce may not meet the threshold for being "engaged in interstate commerce." We find the *Yellow Cab* scenarios to be useful comparators with cases under the FAA only to illustrate the various relationships between parties.

(2) <u>Amazon Last-Mile Drivers:</u> Engaged in Interstate Commerce (FAA)



*See Cunningham*, 17 F.4th at 251 (observing that Amazon's last-mile drivers in *Waithaka* resembled the first *Yellow Cab* scenario because Amazon contracted with the local delivery driver *and* with the customer).

\*     \*     \*

By contrast and as depicted in the next two diagrams, courts have found the final intrastate leg of the journey to be wholly separate where the customer has a separate relationship with the intrastate delivery driver.

(3) <u>*Yellow Cab* scenario two:</u> No Interstate Commerce (Sherman Act)



*See Yellow Cab*, 332 U.S. at 230–31 (holding that cab drivers transporting rail customers during the drivers' normal local taxi service is "too unrelated to interstate commerce").

(4) <u>Rideshare Drivers:</u> Not Engaged in Interstate Commerce (FAA)



21

*See Cunningham*, 17 F.4th at 250–51 (finding that Lyft drivers with intrastate routes did not engage in interstate commerce by transporting customers traveling interstate to the airport and noting that this case matched the second scenario in *Yellow Cab*).

\*    \*    \*

And finally, we end with a diagram depicting the buyer-seller relationships between Flowers, Brock, and the retail stores.

(5) <u>Flowers and Brock's Buyer-Seller Relationships:</u>



So we turn to examining the various relationships at play here. Flowers argues that Brock operates a "fundamentally local" franchise business, "whereby Brock Inc. purchases Flowers products and then sells those products to its local customers in Colorado." Flowers wants us to view the initial cross-border delivery of goods as a wholly separate transaction from Brock's intrastate deliveries of the same goods to his customers. On a surface level, this appears plausible: Brock operates his own business, takes title to the goods, services his own customers, and can increase profits through various business strategies of his choice. But on closer inspection, we view the situation differently. Though Brock, Inc. and Flowers are different companies, they form an integrated distribution chain, in which Flowers exercises a significant degree

22

of control over Brock's operations. This control makes it evident to us that Brock serves as Flowers's last-mile driver, because Flowers's real interest lies in delivering the baked goods to its true customer—the various retail stores on Brock's route, not Brock, Inc. *See Rittmann*, 971 F.3d at 916.

The Distributor Agreement, which governs the business relationship between Brock, Inc. and Flowers Denver, reveals Flowers's substantial involvement in the operation of Brock, Inc.[7] At Brock, Inc.'s inception, Flowers Finance, LLC, another Flowers entity, financed Brock's purchase of the distribution route. App. vol. I, at 87–90; *see also id.* at 260 (stating that a Flowers subsidiary finances the route's purchase price for most independent distributors). From there, the Distributor Agreement restricts Brock, Inc.'s operations in multiple ways. Certain provisions prevent Brock from selling products that compete with Flowers goods in his territory, selling noncompetitive products that interfere with the distribution of Flowers goods, or terminating any unprofitable accounts without Flowers Denver's approval. Another provision requires Brock to cooperate with Flowers on marketing and

---

[7] Brock alleges in his complaint that the Distributor Agreement does not reflect Flowers's "actual" business model. He contends that in practice, "Flowers itself negotiates, carries out, and receives gross proceeds from the vast majority of bakery sales" and that he "do[es] not, in-fact, take title and then resell the products." App. vol. I, at 14. We do not wade into this factual dispute, which the district court did not resolve in its order. Because the less-restrictive terms of the Distributor Agreement suffice to show a continuous interstate journey, we conclude that the district court did not need to resolve this factual dispute for us to decide the interstate commerce issue on appeal.

sales efforts and to ensure his employees "maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [Flowers Denver]." *Id.* at 55.

The Distributor Agreement also requires Brock to remove stale products from customers' shelves "to protect the business reputation of *both* [Brock, Inc.] and [Flowers Denver]." *Id.* at 61 (emphasis added). That provision includes an offer from Flowers Denver to repurchase a certain percentage of Brock's stale products to motivate the removal of spoiled goods. Brock could not sell out-of-code products, except for non-human consumption. And most importantly, the Distributor Agreement obligates Brock, Inc. to use "commercially reasonable best efforts to develop and maximize the sale" of Flowers products in its territory. *Id.* at 55. Had the interstate delivery truly ended, as Flowers claims, at the warehouse where Brock picks up the goods, Flowers should not have cared about Brock's actions after his receipt of the goods. Yet the terms of the Distributor Agreement belie Flowers's claim that the goods "come to rest" at the warehouse.

Other terms of the Distributor Agreement evince Flowers's continuing control over the distribution route. For example, if Flowers Denver and Brock, Inc. agree that a particular account is unprofitable, Flowers Denver can make alternate distribution arrangements for that account. Brock is barred from receiving any credit for sales associated with these alternate distribution arrangements. If Brock fails to service his territory for any reason, Flowers

Denver has the right to service the territory on its own accord (while Brock pays a daily fee and any operating expenses) and even has the right to use Brock's delivery truck for that purpose (a truck the Distributor Agreement required he purchase). *Id.* at 59, 62, 96. The Distributor Agreement provides Flowers Denver and Flowers Finance, LLC with a security interest in Brock's distribution route, meaning Brock's failure to pay any debts could revert ownership of the distribution route to Flowers. The Distributor Agreement also states that in the event of termination, Flowers Denver will operate the business for Brock, Inc.'s account and sell Brock, Inc.'s distribution rights. These terms ensure that Flowers Denver never actually loses access to Brock's distribution route. They demonstrate Flowers's significant interest in the out-of-state goods' continued route from the warehouse to various retail stores.

The terms of the Distributor Agreement also show the preserved relationship between Flowers Denver and the retail stores that purchase Flowers goods from Brock. One provision permits Flowers Denver to act on Brock, Inc.'s behalf to obtain authorization to sell Flowers products to chain stores; these authorization discussions include negotiating product space, position, and pricing.[8] Another provision allows Flowers Denver to "continue carrying the

---

[8] According to Flowers Foods, Inc.'s Form 10-K filed with the Securities and Exchange Commission, in 2022, Walmart/Sam's Club comprised 21.7% of customer sales, and Flowers's top ten largest customers comprised 54.5% of sales. These statistics suggest that Flowers can directly interact with customers for a significant number of orders.

accounts receivable" for all chain-store accounts and other major accounts. *Id.* at 58. Flowers Denver can, at its sole discretion, approve various stores for non-cash sales via electronic data with corresponding proof of delivery, charge slips, store-generated authorizations, or other forms of payment authorizations. Brock must also use Flowers's proprietary administrative services, which include "accumulation of sales histories," "automated route book information," "individual customer sales profiles," and "suggested orders for each customer." For customer pricing, Brock needs to adhere to all of Flowers's promotions and feature pricing for major accounts and chain-store accounts in his territory. These terms give Flowers significant control over Brock's business with his customers and demonstrate Flowers's intense interest in the goods' delivery route even after they reach the warehouse. We are thus not convinced that these customers are merely "Brock's" customers, rather than Flowers's customers. Indeed, even Flowers itself describes the various stores, not the independent distributors, as its customers. In its 2022 Form 10-K filed with the Securities and Exchange Commission, Flowers lists its customers as "mass merchandisers, supermarkets, and other retailers." *Id.* at 141.

Last, we review the mechanics of the delivery itself. Brock starts the interstate-delivery process by placing orders for products produced in out-of-state bakeries owned by Flowers. Flowers Denver then delivers the products to the agreed-upon warehouse (owned by Flowers) and unloads the products for Brock to pick up. Brock pays Flowers a fee to use the warehouse. In less than a

day after the drop-off, Brock loads the products at the warehouse onto his vehicle and delivers the goods to retail stores on his intrastate delivery route.

Viewing Brock's intrastate delivery in the context of the Distributor Agreement's terms and the interstate route that came before it, we are convinced that Brock serves as the last-mile driver for Flowers, such that he is directly engaged in interstate commerce. 9 U.S.C. § 1. Like the last-mile drivers in *Waithaka* and *Rittmann*, Brock's intrastate delivery route forms the last leg of the products' continuous interstate route; he is "an integral part of a single, unbroken stream of interstate commerce." *Capriole*, 7 F.4th at 867. The Flowers products do not "come to rest" at the warehouse. Rather, the warehouse drop-off is "simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Rittmann*, 971 F.3d at 916. The significant control that Flowers has over Brock, Inc.'s operations demonstrates that, for Flowers, the goods' delivery concludes at the various stores' locations, not the warehouse. *See id.* ("The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus [Amazon's last-mile] drivers are engaged in the movement of interstate commerce."). For these reasons, Brock's intrastate delivery of goods from the warehouse to the various stores on his route is not an isolated transaction; instead, his delivery route forms the last leg of an interstate route.

Flowers attempts to rely on the line of cases involving rideshare drivers and food-delivery drivers to support its position that Brock merely performs local deliveries. We disagree. In both *Wallace* and *Immediato*, the food-delivery drivers delivered food from local restaurants or convenience stores to intrastate customers. *Wallace*, 970 F.3d at 802; *Immediato*, 54 F.4th at 78. Any interstate transaction that occurred before the intrastate purchase, such as the purchase of raw ingredients, was far too removed from the local transaction that the delivery drivers engaged in. *Wallace*, 970 F.3d at 802; *Immediato*, 54 F.4th at 78. At no point did the customers "summon[] couriers for local deliveries" to "buy[] goods as part of an interstate transaction." *Immediato*, 54 F.4th at 78. The unnamed companies that sent the goods interstate to restaurants and grocery stores had no interest or obligation to ensure the couriers delivered those goods to consumers. The same reasoning applied to rideshare drivers in *Cunningham* and *Capriole*. In both cases, the First Circuit and Ninth Circuit concluded that the rideshare drivers "are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce." *Capriole*, 7 F.4th at 867; *see Cunningham*, 17 F.4th at 251 (concluding that the Lyft drivers' intrastate trips to take their customers to interstate flights formed a separate transaction from the flight itself due to the lack of any relationship between the Lyft drivers and the airlines).

28

By contrast, Brock places orders with out-of-state bakeries to commence the interstate delivery of products. He picks up the products within a day of the warehouse delivery, signs off on the products, loads the products onto his vehicle, and delivers the products through the final intrastate leg of the trip. And as discussed earlier in this section, Flowers retains significant control over Brock, Inc., such that we view Flowers's true customers as the various retail stores and Brock as Flowers's last-mile delivery driver. The rideshare and food-delivery driver cases are therefore not an apt comparison.

Flowers also argues that we should follow the Fifth Circuit's reasoning in *Lopez*. There, the Fifth Circuit found that last-mile delivery drivers did not engage in interstate commerce because "[o]nce the goods arrived at the Houston warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Lopez*, 47 F.4th at 433. The Fifth Circuit focused on the last-mile drivers' "customer-facing role" to support its conclusion that they did not fall within the § 1 exemption. *Id.* We agree with the district court's decision to reject the reasoning in *Lopez* and similarly find it unpersuasive. *Brock*, 673 F. Supp. 3d at 1188. As the district court noted, *Lopez* included only an "abbreviated analysis of [the] class's engagement with interstate commerce"; it also does not provide much factual background for comparison. *Id.* Given this context, we decline to follow *Lopez*.

For these reasons, we conclude that Brock's class of workers is engaged in interstate commerce and therefore falls within the § 1 exemption. We find no error in the district court's ruling.

### C.   We decline to review whether the Distributor Agreement qualifies as a contract of employment.

As a last attempt to salvage the Arbitration Agreement's enforcement under the FAA, Flowers argues that the Distributor Agreement does not qualify as a "contract of employment" for transportation services under § 1 of the FAA. Flowers concedes that it failed to make this argument before the district court but urges us to address the issue anyway. We have exercised our discretion to consider a forfeited argument on appeal when the argument involves a "pure matter of law and the proper resolution of the issue is certain." *United States v. Jarvis*, 499 F.3d 1196, 1202 (10th Cir. 2007). "But even for matters of law, we decline to consider newly presented legal arguments unless the proper legal disposition is beyond reasonable doubt." *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016). Reasonable doubt exists if an issue "involves a matter of first impression in our circuit." *Id.*

Whether a "contract of employment" under § 1 of the FAA extends to contracts between corporate entities is a matter of first impression here. We cannot determine if the Distributor Agreement between Flowers Denver and Brock, Inc. qualifies as a contract of employment without addressing this issue. Because the proper legal disposition is not beyond reasonable doubt, we decline

to consider Flowers's forfeited argument on appeal. *See, e.g.*, *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022) (declining to consider forfeited argument); *Lone Star Steel Co. v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory.").

## II.    We do not have jurisdiction to consider Flowers's state-law arguments.

Regardless of the Arbitration Agreement's enforceability under the FAA, Flowers argues that we can enforce the Arbitration Agreement under Colorado law alone. Brock counters that we lack jurisdiction to consider an interlocutory appeal based on state law. We agree with Brock's assessment.

Section 16(a)(1) of the FAA allows us to review an interlocutory order "denying a petition under section 4 of [the FAA] to order arbitration to proceed." 9 U.S.C. § 16(a)(1). But the FAA does not permit us to review interlocutory orders denying arbitration based on state law. *See Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1383 (10th Cir. 2009) ("[Section] 16(a) permits interlocutory appeals only over those motions brought explicitly pursuant to the FAA, or motions in which it is unmistakably clear that the defendant seeks only the relief offered by the FAA."). We therefore do not have jurisdiction under § 16(a)(1) to review the district court's denial of arbitration under Colorado law. The remaining avenue for us to potentially exercise

31

jurisdiction over this portion of Flowers's appeal is pendent appellate jurisdiction.

Under pendent appellate jurisdiction, we may "exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision" given sufficient overlap with an appealable decision. *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1171 (10th Cir. 2022) (internal quotation marks omitted). "Pendent appellate jurisdiction is a matter of discretion, not of right." *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994). "Our exercise of pendent jurisdiction is *only* appropriate in either of two scenarios: (1) when the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or (2) where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one." *Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019) (cleaned up). Neither applies here.

In the first scenario, an otherwise nonappealable decision is inextricably intertwined with an appealable decision "if a ruling on the merits of the interlocutory appeal . . . resolve[s] *all of the remaining issues* presented by the pendent appeal." *United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109, 1115 (10th Cir. 1999) (internal quotation marks omitted). Our review of the nonappealable decision must "not require the consideration of legal or factual matters distinct from those raised by the claims over which we unquestionably have jurisdiction." *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1317 (10th Cir. 1999). Here, the district court found that

the plain language of the Arbitration Agreement rendered Colorado's Uniform Arbitration Act inapplicable to this case. *Brock*, 673 F. Supp. 3d at 1189. To review the district court's denial of arbitration under Colorado's Uniform Arbitration Act, we would need to consider whether the Uniform Arbitration Act is "inconsistent" with the FAA, as provided in the Arbitration Agreement and if not, whether the Uniform Arbitration Act compelled Brock to arbitrate his claims. *See* App. vol. I, at 86 (providing that the Arbitration Agreement "shall be governed by the FAA and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent with the FAA"). These issues are distinct from the FAA ruling, so the district court's denial of compelled arbitration under the FAA is not inextricably intertwined with its denial under Colorado law.

For the second scenario, a "review of the nonappealable decision is necessary to ensure meaningful review of the appealable one" if "we are . . . required to decide the core issues implicated in this ostensibly pendent matter" to resolve the appealable one. *Cummings*, 913 F.3d at 1235–37 (cleaned up). That does not apply here. The FAA and Colorado law form two separate bases for potentially enforcing the Arbitration Agreement. We do not (and did not) need to consider Colorado's Uniform Arbitration Act to resolve the FAA issue on appeal. Flowers has therefore failed to establish that we have pendent appellate jurisdiction to review the district court's decision under Colorado law.

We are not persuaded by Flowers's argument that § 16(a)(1) directly confers appellate jurisdiction over Colorado law issues. Flowers asserts that the text of § 16(a)(1), which permits appeals of any "order . . . denying a petition under section 4 [of the FAA]," confers jurisdiction over "orders," not issues. 9 U.S.C. § 16(a)(1). But this reading of § 16 elevates form over substance. Flowers's position would permit any litigant to use § 16 of the FAA as an appellate fast-track by tacking on multiple issues to an arbitration request invoking the FAA. As discussed in *Conrad*, we read the phrase "under section 4" as indicating that appellate jurisdiction "encompass[es] only those motions explicitly brought under the FAA or unmistakably invoking its remedies, rather than all motions founded at least in part on arbitration agreements." 585 F.3d at 1382. Though *Conrad* dealt with a motion to dismiss containing two offhand references to arbitration, *id.* at 1386, we conclude that the reasoning applies here as well. The phrase "under section 4" means we have appellate jurisdiction for the FAA issue, but not the Colorado-law issue. *Cf. Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594 (3d Cir. 2004) ("While we may review Airborne's appeal with respect to the FAA under 9 U.S.C. § 16(a), that section does not cover our review of a non-FAA, state-law arbitration claim in an otherwise nonappealable interlocutory order."); *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1352 (11th Cir. 2021) ("[T]he interlocutory appeal section of the Federal Arbitration Act doesn't carve out an exception to the general rule for

interlocutory orders denying motions to compel arbitration based on state law.”).

We therefore find that we do not have jurisdiction over issues of Colorado law in this case.

## CONCLUSION

For these reasons, we affirm.