No. 23-1182

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

### ANGELO BROCK,

*Plaintiff-Appellee*,

v.

### FLOWERS FOODS, INC.; FLOWERS BAKERIES, LLC; FLOWERS BAKING CO. OF DENVER, LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Colorado, Case No. 1:22-cv-02413-CNS-MEH
The Honorable Charlotte N. Sweeney, District Judge

### DEFENDANTS-APPELLANTS'
### PETITION FOR REHEARING EN BANC

Jared Lee Palmer
OGLETREE DEAKINS
One Embarcadero Center, Suite 900
San Francisco, CA 94111
(415) 442-4810

David Lee Zwisler
OGLETREE DEAKINS
2000 South Colorado Blvd.
Tower 3, Suite 900
Denver, CO 80222
(303) 764-6800

Traci L. Lovitt
Matthew W. Lampe
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-7830
tlovitt@jonesday.com

Amanda K. Rice
JONES DAY
150 W. Jefferson Ave.,
Suite 2100
Detroit, MI 48226

November 26, 2024          *Counsel for Defendants-Appellants*

**TABLE OF CONTENTS**

Page

INTRODUCTION AND RULE 35(B)(1) STATEMENT ......................................1

BACKGROUND ...............................................................................................3

ARGUMENT .....................................................................................................5

      I.      THE PANEL'S DECISION DEEPENS AN
             ACKNOWLEDGED CIRCUIT SPLIT. ............................................5

      II.     THIS ISSUE IS IMPORTANT. ........................................................7

      III.    THE PANEL'S DECISION IS WRONG. ..........................................9

CONCLUSION ...............................................................................................14

CERTIFICATE OF COMPLIANCE ...............................................................16

CERTIFICATE OF DIGITAL SUBMISSION ................................................17

CERTIFICATE OF SERVICE ........................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995)................................................................8

*Bissonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024)...............................................9–11, 13–14

*Carmona Mendoza v. Domino's Pizza, LLC*,
    73 F.4th 1135 (9th Cir. 2023) ...........................................13

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001)........................................1, 7–9, 12, 14

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991)................................................................7

*Hamrick v. Partsfleet, LLC*,
    1 F.4th 1337 (11th Cir. 2021) .........................................2, 6

*Hill v. Rent-A-Center Inc.*,
    398 F.3d 1286 (11th Cir. 2005) ........................................14

*Jamison v. Encarnacion*,
    281 U.S. 635 (1930)...........................................................12

*Lopez v. Cintas Corp.*,
    47 F.4th 428 (5th Cir. 2022) ..........................................6–7

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)................................................................7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)..............................................................7–8

*Omni Tech Corp. v. MPC Sols. Sales, LLC*,
432 F.3d 797 (7th Cir. 2005) ...............................................................4

*Palcko v. Airborne Exp., Inc.*,
372 F.3d 588 (3d Cir. 2004) ..............................................................4

*Reyes v. Hearst Commc'ns, Inc.*,
No. 21-cv-3362, 2021 WL 3771782 (N.D. Cal. Aug. 24, 2021).......................13

*Rittmann v. Amazon.com, Inc.*,
971 F.3d 904 (9th Cir. 2020) ...............................................................6

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010)...............................................................8

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)......................................................2, 9–11, 13–14

*United States v. Yellow Cab. Co.*,
332 U.S. 218 (1947)......................................................11–12

*Waithaka v. Amazon.com, Inc.*,
966 F.3d 10 (1st Cir. 2020) ...............................................................6

*Wallace v. Grubhub Holdings, Inc.*,
970 F.3d 798 (7th Cir. 2020) .......................................................2, 11

**STATUTES**

9 U.S.C. § 1 ...............................................................1–14

9 U.S.C. § 16 ...............................................................4

45 U.S.C. § 51 ...............................................................12

**OTHER AUTHORITIES**

10th Cir. R. 35.1...............................................................2, 7

Fed. R. App. P. 35 ...............................................................1, 7

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

Businesses and individuals frequently agree to arbitrate their disputes because arbitration is often simpler, quicker, and more cost-effective than litigation. For almost a century, the Federal Arbitration Act ("FAA") has protected arbitration agreements by requiring courts to enforce them. In recent years, however, that protection has been eroded by ever-expanding constructions of FAA § 1, which provides a limited carveout for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Notwithstanding the Supreme Court's repeated insistence that this exemption should be construed "narrow[ly]" to sweep in only those workers akin to "seamen" and "railroad employees," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001), some Courts of Appeals have applied § 1 to workers far removed from the channels of interstate commerce. Unfortunately, the Panel joined those courts, holding that a worker who executes purely intrastate transactions—and *never* interacts with vehicles transporting goods across state lines—is exempt from the FAA under § 1.

That ruling warrants en banc review for three reasons. *First*, it "conflicts with the authoritative decisions of other United States Courts of Appeals." Fed. R. App. P. 35(b)(1)(B). *Second*, it "involves . . . a question of exceptional importance." *Id.* *Third*, it is simply wrong.

1

En banc review is warranted, first and foremost, because the Panel's Decision acknowledged and deepened a circuit split about whether workers who move goods entirely intrastate are "engaged in foreign or interstate commerce" under § 1. The Fifth and Eleventh Circuits recognize that § 1 "is directed at what the class of workers is engaged in, and not what it is carrying." *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1350 (11th Cir. 2021); *see also Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802 (7th Cir. 2020) (Barrett, J.) ("[W]orkers must be connected not simply to the goods, but to the act of moving those goods across state or national borders."). Accordingly, those courts have rejected § 1 claims by workers like Plaintiff who are not "actively engaged in transportation of . . . goods across borders via the channels of foreign or interstate commerce." *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (internal quotation marks omitted). The Panel, however, expressly "decline[d] to follow" that approach. Panel Op. 29. Instead, it joined the First and Ninth Circuits in holding that the mere handling of goods that have traveled across state lines is sufficient to bring workers within the scope of § 1.

En banc review is also warranted because this case involves an issue of "exceptional public importance." 10th Cir. R. 35.1(A); *see also* Fed. R. App. P. 35(b)(1). Left standing, the Panel's goods-focused approach will virtually unlimit FAA §1, voiding arbitration agreements in almost every sector of the economy given the fact that goods are frequently shipped across state lines. It will also lead to

extensive threshold litigation and mini-trials that will undercut the efficiency arbitration is designed to promote.

Finally, the Panel's Decision is wrong. Its goods-focused approach conflicts with both Supreme Court precedent and the text of § 1. And its multi-factorial, diagram-heavy analysis is a powerful demonstration of the complex § 1 litigation in which the courts in this Circuit will be mired for years to come.

This Court should grant en banc review and return § 1 to its appropriately narrow scope.

## BACKGROUND

Plaintiff owns an independent franchise business that markets, sells, and distributes Flowers Foods products pursuant to a Distributor Agreement between his business and a Flowers subsidiary. Vol. 1 App. 47–48 ¶ 4. Plaintiff's business operates under a straightforward business model: It orders products from a Flowers subsidiary at one price, takes title to those products at a warehouse in Colorado, and then resells those products to its Colorado customers at a higher price. *Id.* at 49 ¶ 10; *id.* at 55 ¶ 4.1. Although the Distributor Agreement does not require Plaintiff to perform any work himself, Plaintiff chose to perform delivery work for his company. Specifically, Plaintiff picked up goods from a Colorado warehouse and delivered them to his business's Colorado customers. *Id.* at 48–49 ¶¶ 8, 10–11; *id.* at 82.

Plaintiff neither transported goods across state lines nor moved goods onto or off of vehicles traveling interstate. *Id.* at 48 ¶ 5.

Plaintiff filed this lawsuit in 2022, alleging he was misclassified as an independent contractor and thus entitled to overtime wages and other damages under federal and state law. D.Ct. Dkt. 1. Flowers moved to compel arbitration pursuant to an arbitration provision in the Distributor Agreement. D.Ct. Dkt. 26. The District Court denied the motion, concluding, in relevant part, that Plaintiff was exempt from the FAA under § 1 because Plaintiff was a "worker engaged in foreign or interstate commerce." D.Ct. Dkt. 34 at 13.[1]

The Panel affirmed. Relying on cases from the First and Ninth Circuits, as well as Sherman Act cases interpreting the term "affecting commerce," the Panel held that the § 1 inquiry turns on "whether the goods moved in a continuous interstate journey or as part of multiple independent transactions." Panel Op. 13– 14, 19. The Panel then identified three non-exclusive factors as central to that

---

[1] The District Court also found that Plaintiff could not be compelled to arbitrate under the Colorado Uniform Arbitration Act, D.Ct. Dkt. 34 at 14, and the Panel held that it lacked jurisdiction to consider that question, Panel Op. 31. That holding was also incorrect. *See Omni Tech Corp. v. MPC Sols. Sales, LLC*, 432 F.3d 797, 800 (7th Cir. 2005) (holding that "once an interlocutory order is before the court for review" under 9 U.S.C. § 16(a)(1), the court "may resolve the appeal on any proper legal ground—for it is the order, and not the district judge's opinion, that is on appeal"); *Palcko v. Airborne Exp., Inc.*, 372 F.3d 588, 594–95 (3d Cir. 2004) (exercising pendent appellate jurisdiction over the question whether to order arbitration under state law).

inquiry in this case: "(1) the buyer-seller relationship between Flowers and Brock; (2) the buyer-seller relationship between Brock and Brock's customers, and (3) the buyer-seller relationship, if any, between Flowers and Brock's customers." *Id.* at 19 & n.5. Then, relying primarily on the Distributor Agreement, the Panel concluded that, "for Flowers, the goods' delivery concludes at the various [customer] stores' locations, not the warehouse" where Plaintiff picked them up. *Id.* at 22–23, 27. Accordingly, the Panel held that Plaintiff was "engaged in commerce" for purposes of § 1 because his "intrastate delivery route forms the last leg of the products' continuous interstate route." *Id.* at 27.

## ARGUMENT

### I. THE PANEL'S DECISION DEEPENS AN ACKNOWLEDGED CIRCUIT SPLIT.

En banc review is warranted because the Panel's Decision cements this Court's position in an active and deepening circuit split. In holding that whether a driver who delivers goods intrastate is "engaged in interstate commerce" turns on whether the "intrastate route formed a constituent part of the goods' interstate journey," *id.* at 19, the Panel's Decision deepened a circuit split between the First and Ninth Circuits on the one hand, and the Fifth and Eleventh Circuits on the other.

The Panel expressly relied on reasoning from the First and Ninth Circuits in concluding that Plaintiff is a "worker engaged in foreign or interstate commerce." *Id.* In those circuits, § 1 covers any worker who handles goods moving continuously

in interstate commerce, regardless of whether that worker is actively engaged in transporting those goods across state lines. *See Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 915 (9th Cir. 2020) (holding that § 1 applies when workers "carry . . . goods that remain in the stream of interstate commerce until they are delivered"); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 26 (1st Cir. 2020) (holding § 1 applicable "[b]y virtue of [the worker's] work transporting goods or people within the flow of interstate commerce" (internal quotation marks and citation omitted)).

The Fifth and Eleventh Circuits, by contrast, "focus on what a class of *worker*[*s*] [is] engaged in doing and not the *goods*" a class of workers happens to carry. *Hamrick*, 1 F.4th at 1349; *accord Lopez v. Cintas Corp.*, 47 F.4th 428, 433 (5th Cir. 2022). Accordingly, in these circuits, the mere fact that a worker handles goods moving through an interstate supply chain is insufficient to render that worker "engaged in foreign or interstate commerce" for purposes of § 1. *Hamrick*, 1 F.4th at 1350; *Lopez*, 47 F.4th at 433 (holding that "local delivery drivers" lacked a sufficiently "'direct and necessary role' in the transportation of goods across borders" because they were not "actively engaged in transportation of those goods across borders"). Instead, in line with the text of § 1 and Supreme Court precedent, *see infra* Part III, these courts hold that a class of workers must play a "'direct and necessary role' in the transportation of goods across borders" to be "engaged in interstate or foreign commerce" under § 1. *Lopez*, 47 F.4th at 433.

Accordingly, this case would have come out differently in the Fifth and Eleventh Circuits. Indeed, the Panel expressly acknowledged that it was departing from the Fifth Circuit's decision in *Lopez*, which held that "last-mile delivery drivers did not engage in interstate commerce because '[o]nce the goods arrive[] at the . . . warehouse and [a]re unloaded, anyone interacting with those goods [is] no longer engaged in interstate commerce." Panel Op. 29 (quoting *Lopez*, 47 F.4th at 433).

## II.     THIS ISSUE IS IMPORTANT.

This case also warrants en banc review because questions about the scope of FAA § 1 arise frequently and are profoundly important to dispute resolution across the country. *See* Fed. R. App. P. 35(b); 10th Cir. R. 35.1(A). In passing the FAA, Congress aimed "to reverse the longstanding judicial hostility to arbitration," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991), and set out a uniform and "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Federal policy favors arbitration because arbitration offers "real benefits," including "avoid[ing] the costs of litigation," *Circuit City*, 532 U.S. at 122–23; "adaptability and access to expertise"; and "streamlined proceedings and expeditious results," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633 (1985). The Panel's Decision, however, threatens to turn the FAA on its head by precluding

arbitration in vast swaths of the national economy and generating needless threshold litigation the FAA was designed to avoid.

In the modern economy, virtually all goods move in interstate commerce at some point in their lifecycle. And almost every business must at least occasionally move goods. The Panel's reading of § 1, however, threatens to sweep all workers who even occasionally transport, load, or unload goods that have traveled across borders into § 1's scope. That reading fundamentally transforms the "narrow" exemption the Court described in *Circuit City*, 532 U.S. at 118, into an exceedingly broad one—nullifying valid arbitration agreements in all manner of employment contracts.

Moreover, the Panel's approach—which requires a complex analysis of various business relationships—will undercut the efficiency of arbitration. Parties frequently choose arbitration because it results in "lower costs" and "greater efficiency and speed." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010). But to realize these benefits, federal courts must step aside when a dispute is governed by an agreement to arbitrate. The FAA therefore envisions "an expeditious and summary hearing" on motions to compel arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 22. Extended threshold litigation about the applicability of the FAA "unnecessarily complicat[es] the law and breed[s] litigation from a statute that seeks to avoid it." *Allied-Bruce Terminix Cos. v. Dobson*, 513

U.S. 265, 275 (1995). Yet that is precisely what has happened in this case—and the Panel's complex, multi-factor approach to § 1 guarantees that, in this Circuit, this threshold litigation will balloon even further. *See infra* 13–14.

The full Court should intervene to restore § 1 to its intended narrow scope and ensure that parties within this Circuit receive the speedy, inexpensive dispute resolution for which they bargained and which the FAA was designed to ensure.

## III. THE PANEL'S DECISION IS WRONG.

Finally, en banc review is warranted because the Panel's Decision is simply wrong.

**A.** As the Supreme Court has repeatedly recognized, the phrase "engaged in foreign or interstate commerce," as used in § 1, is a "term of art" that warrants "a narrow construction." *Circuit City*, 532 U.S. at 118; *see also Saxon*, 596 U.S. at 458; *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 256 (2024). It thus long ago rejected the argument that § 1 "express[es] congressional intent to regulate to the outer limits of authority under the Commerce Clause." *Circuit City*, 532 U.S. at 115–16. Instead, the Court held that § 1's residual clause "exempts . . . only contracts of employment of transportation workers"—*i.e.*, those workers who, like "seamen" and "railroad employees," play a "necessary role in the free flow of goods." *Id.* at 119, 121.

In two recent cases, the Supreme Court has elaborated further on what it means for a class of transportation workers to be "engaged in foreign or interstate commerce." In *Saxon*, the Court explained that "to be 'engaged' in something means to be 'occupied,' 'employed,' or 'involved' in it." 596 U.S. at 457. Accordingly, to qualify for § 1's exemption, a class of workers must be "actively" and "directly involved in transporting goods across state or international borders." *Id.* at 457–58. In *Bissonnette*, the Court reiterated that § 1 is limited to classes of workers who are "actively engaged in transportation of goods across borders via the channels of foreign or interstate commerce." 601 U.S. at 256 (internal quotation marks and alteration omitted). As a result, the Court explained that § 1 does not extend to "*all* workers who load or unload goods—from pet shop employees to grocery store clerks." *Id.* (emphasis added). "Direct" engagement in border crossing—whether by carrying goods across borders or directly engaging with the interstate channel itself—is required. *See id.*

Those precedents resolve this case, because Plaintiff has no role in interstate or foreign transport—much less an "active[]" or "direct[]" one. He purchases goods from Flowers and picks them up from a Colorado warehouse *after* they have been unloaded. Vol. 1 App. 48–49 ¶¶ 8, 10–11; *id.* at 82. He then delivers those goods to his Colorado customers. *Id.* at 49 ¶ 11. Although the goods traveled across borders before arriving at the warehouse, Plaintiff himself has nothing to do with

cross-border transportation. *Id.* at 48–49 ¶¶ 5, 11. Indeed, another company delivers the goods across state lines and unloads them at the warehouse before Plaintiff arrives to pick them up. *Id.* at 49 ¶ 11.

It is not enough that the goods traveled across state lines before Plaintiff touched them. As the Court recognized in *Saxon*, § 1's text is focused on "workers," not "goods." *See* 596 U.S. at 456; *see also Wallace*, 970 F.3d at 802 (Barrett, J.) (requiring that workers have a connection "to the act of moving those goods across state or national borders."). Moreover, a goods-focused rule would sweep in the "pet shop employees" and "grocery store clerks" that *Bissonnette* made clear are *not* covered by § 1. 601 U.S. at 356.

Nor is it enough that *Flowers* is involved in interstate transportation. Again, as the Court recognized in both *Saxon* and *Bissonnette*, § 1's focus is "on what a worker does for an employer, 'not what [the employer] does generally.'" *Bissonnette*, 601 U.S. at 251 (quoting *Saxon*, 596 U.S. at 456). Accordingly, whether Flowers is engaged in interstate commerce has nothing to do with whether *Plaintiff* belongs to a class of workers that is covered by § 1. *See generally Bissonnette*, 601 U.S. at 252–54 (rejecting the argument that § 1 focuses on the employer's activities).

**B.** The Panel's extensive reliance on *United States v. Yellow Cab. Co.*, 332 U.S. 218 (1947), *overruled by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S.

752, 759–60 (1984), reflects how far it went astray. *Yellow Cab* addressed whether alleged agreements "to control the operation and purchase of taxicabs by the principal operating companies" sufficiently affected interstate commerce to fall within the scope of the Sherman Act. *See* 332 U.S. at 224. According to *Yellow Cab*, cab drivers were "'clearly a part of the stream of commerce'" for purposes of the Sherman Act "where railroads contracted with those drivers to provide same-city station transfers for rail customers traveling interstate," but were "unrelated to interstate commerce" when "transporting rail customers during [their] normal local taxi service." Panel Op. 20–21 (quoting *Yellow Cab*, 332 U.S. at 228–31). As the Panel acknowledged, however, "'affecting interstate commerce' does not equate to being 'engaged in interstate commerce.'" Panel Op. 20 n.6. Indeed, "[t]he [Sherman] Act is broadly construed, whereas the FAA exception . . . is narrowly construed." *Id.* (second alternation in original).[2] And *Circuit City* expressly *distinguished* the phrase "affecting commerce" from § 1's "engaged in commerce," which "ha[s] a more limited reach." 532 U.S. at 115. Nevertheless, the Panel relied extensively on *Yellow Cab*'s reasoning to hold "any buyer-seller relationship

---

[2] *Waithaka*'s reliance on cases addressing the Federal Employers' Liability Act suffers from a similar infirmity. *See* Panel Op. 14. FELA is a broadly interpreted remedial statute that, unlike § 1, focuses on the work of the employer, not the work of the individual employee. *See* 45 U.S.C. § 51; *Jamison v. Encarnacion*, 281 U.S. 635, 640 (1930).

between Flowers and Brock's customers" would be dispositive under § 1. Panel Op. 19.[3]

Of course, neither buyers nor sellers are mentioned in § 1. The Supreme Court has never suggested that a buyer-seller relationship has anything to do with § 1, either. To the contrary, the Court has consistently rebuffed arguments that the employer's activities inform the § 1 analysis. *See Bissonnette*, 601 U.S. at 251–53; *Saxon*, 596 U.S. at 456.

In addition to having no basis in text or precedent, the Panel's multi-factorial, buyer-seller focused approach—which required five different diagrams to articulate—raises more questions than it answers. Are "contractual relationships" and buyer-seller diagrams dispositive of whether a newspaper-company employee who delivers out-of-state papers to local customers is "engaged in foreign or interstate commerce," or do unidentified "other factors" need "consideration"? Panel Op. 19 n.5; *see Reyes v. Hearst Commc'ns, Inc.*, No. 21-cv-3362, 2021 WL 3771782 (N.D. Cal. Aug. 24, 2021). What about a franchisor's employees delivering ingredients to instate franchisees? *See Carmona Mendoza v. Domino's Pizza, LLC*, 73 F.4th 1135 (9th Cir. 2023). Or a "pizza delivery person who deliver[s] pizza

---

[3] The Panel Decision was also wrong in its assessment of Flowers' control over Plaintiff's business and the relationship between Flowers and Brock's customers. *E.g.* Panel Op. 26. In all events, the Panel failed to explain how control informs the § 1 analysis.

across a state line to a customer in a neighboring town?" *Hill v. Rent-A-Center Inc.*, 398 F.3d 1286, 1289–90 (11th Cir. 2005). And how can courts possibly answer those "arcane riddles"—or determine which diagram applies—without engaging in the kind of protracted litigation the FAA was designed to avoid? *See Bissonnette*, 601 U.S. at 254.

Unless the en banc Court intervenes, courts in this Circuit will be forced to grapple with all of these questions and more. They should not have to. Consistent with the text of § 1 and the Supreme Court's decisions in *Circuit City*, *Saxon*, and *Bissonnette*, these cases should all turn on one question: What is a class of workers actually engaged to do? If the class of workers is "actively engaged in transportation of goods across borders via the channels of foreign or interstate commerce," § 1 applies. *Bissonnette*, 601 U.S. at 256 (internal quotation marks and alteration omitted). If not, the FAA controls. This Court should grant en banc review and adopt that far simpler approach—which is compelled by § 1's text and binding precedent.

## CONCLUSION

The Court should grant this petition and rehear this case en banc.

Dated: November 26, 2024

Respectfully submitted,

*/s/ Traci L. Lovitt*

Jared Lee Palmer
OGLETREE DEAKINS
One Embarcadero Center, Suite 900
San Francisco, CA 94111
(415) 442-4810

David Lee Zwisler
OGLETREE DEAKINS
2000 South Colorado Blvd.
Tower 3, Suite 900
Denver, CO 80222
(303) 764-6800

Traci L. Lovitt
Matthew W. Lampe
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-7830
tlovitt@jonesday.com

Amanda K. Rice
JONES DAY
150 W. Jefferson Ave.,
Suite 2100
Detroit, MI 48226

*Counsel for Defendants-Appellants*

<u>**CERTIFICATE OF COMPLIANCE**</u>

This document complies with the word limit of Fed. R. App. P. 35 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3378 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft 365 in Size 14 Times New Roman font.

Dated: November 26, 2024 *   /s/ Traci L. Lovitt*
                                          Traci L. Lovitt

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

    (1) all required privacy redactions have been made per 10th Cir. R. 25.5;

    (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

    (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Windows Defender (Version 4.18.2103.7), and according to the program are free of viruses.


Dated: November 26, 2024           */s/ Traci L. Lovitt*
                                      Traci L. Lovitt

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 26, 2024, I electronically filed the foregoing using the court's CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: November 26, 2024          */s/ Traci L. Lovitt*
                                               Traci L. Lovitt

FILED
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**November 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

| | |
|---|---|
| ANGELO BROCK, individually and on behalf of all others similarly situated,<br><br>      Plaintiff - Appellee,<br><br>v.<br><br>FLOWERS FOODS, INC., a Georgia limited liability company; FLOWERS BAKERIES, LLC, a Georgia limited liability company; FLOWERS BAKING CO. OF DENVER, LLC, a Colorado limited liability company,<br><br>      Defendants - Appellants.<br><br>------------------------------<br><br>CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,<br><br>      Amicus Curiae. | No. 23-1182 |

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:22-CV-02413-CNS-MEH)**
_____

Traci L. Lovitt (Matthew W. Lampe, Jack L. Millman, and Amanda K. Rice, of Jones Day, New York, New York and Detroit, Michigan; Jared Lee Palmer and David Lee Zwisler of Ogletree Deakins, San Francisco, California and Denver, Colorado, with her on the briefs), for Defendants-Appellants.

Shaun Markley of Nicholas & Tomasevic, LLP, San Diego, California, for Plaintiff-Appellee.

_____

Before **MATHESON**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

Flowers Foods, Inc., Flowers Bakeries, LLC, and Flowers Baking Co. of Denver, LLC (collectively, "Flowers") appeal the district court's interlocutory order denying their motion to compel arbitration. This litigation arises from a putative class-action complaint alleging wage and hour violations. In 2016, Angelo Brock began working as an independent distributor for Flowers Baking Co. of Denver, LLC ("Flowers Denver"). He delivered baked goods produced out-of-state to various retail stores in Colorado. But the working relationship soured. Brock sued Flowers for violations of the Fair Labor Standards Act and Colorado labor law on behalf of himself and other similarly situated workers. Flowers then moved to compel arbitration of Brock's claims based on the parties' Arbitration Agreement. The district court denied that motion.

This appeal focuses on whether the Arbitration Agreement requires Brock to arbitrate his claims individually. Flowers challenges the district court's order denying arbitration under the Federal Arbitration Act (FAA) and Colorado law. First, Flowers argues that the district court erred by concluding that § 1 of the FAA exempts Brock from arbitration. Flowers asserts that Brock's class of workers is not directly engaged in interstate commerce and that the parties'

2

Distributor Agreement does not qualify as a contract of employment. Second, Flowers argues that the district court erred by concluding that the plain language of the Arbitration Agreement foreclosed arbitration under Colorado law.

On the interstate-commerce question, we agree with the district court: Brock's class of workers is engaged in interstate commerce. Because we either decline to review or lack jurisdiction over all other issues, we affirm.

## BACKGROUND

### I.     Factual Background

#### A.     The Parties

Flowers Foods, Inc., a packaged-bakery-foods company, produces "fresh breads, buns, rolls, and snack cakes" that are sold in supermarkets, drug stores, and convenience stores throughout the United States. App. vol. I, at 47, 140. Flowers Foods, Inc. owns various subsidiaries, including Flowers Bakeries, LLC and Flowers Denver.[1] To "bring bakery products to market," Flowers uses a "direct-store-delivery" system. *Id.* at 47, 49, 141. Under this system, Flowers contracts with independent distributors who buy the rights to distribute Flowers products in particular geographic areas. These distributors buy baked goods from Flowers and then resell and deliver the goods to stores along their routes.

---

[1] Flowers Foods, Inc. is the ultimate parent company of Flowers Bakeries, LLC and Flowers Denver. Flowers Bakeries, LLC wholly owns Flowers Denver.

The independent distributors also stock shelves, maintain special displays, and develop and preserve positive customer relations. Flowers, in turn, produces and markets the baked goods. Flowers operates the second-largest baking company in the United States and generates billions in sales, with approximately 85% of sales coming from the direct-store-delivery system. This system allows Flowers to "sell[] its products through a network of independent distributors to retail and foodservice customers." *Id.* at 129.

Flowers Denver contracted with independent distributor Brock, Inc., the company owned and operated by Angelo Brock. Brock, Inc. purchased the rights to distribute Flowers products in certain parts of Colorado, as governed by a "Distributor Agreement."[2] Under the direct-store-delivery system, Brock, Inc. orders products from Flowers Denver or its affiliates. Most of these products "are produced by out-of-state [Flowers] bakeries in response to [Brock's] specific orders." *Id.* at 49, 130–31. Flowers Denver then delivers the completed products to an agreed-on warehouse where Brock picks up the products.[3] Flowers unloads the shipments and places the orders in a designated

---

[2] Flowers Finance, LLC, a subsidiary of Flowers Foods, Inc., financed Brock, Inc.'s purchase of the distribution route. The Secured Promissory Note of Corporation governs Brock's repayment of the principal balance and interest to Flowers Finance, LLC. For most independent distributors, a Flowers subsidiary finances a portion of the route's purchase price through interest-bearing notes.

[3] Though the district court referred to the warehouse as "Brock's warehouse," *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1182–83 (D.

(*footnote continued*)

area of the warehouse. Brock arrives at the warehouse within a day of delivery, signs off on the products, loads the products onto his vehicle, and delivers the products to the various stores that serve as his end customers. According to Flowers, Brock, Inc.'s profit equals the price it sells the Flowers products to its customers, minus the price expended for its purchasing products from Flowers as well as its business expenses.

### B.    The Distributor Agreement

In 2016, Brock signed a Distributor Agreement to become an independent distributor for Flowers. The Distributor Agreement governs the business relationship between Flowers Denver and Brock, Inc. Relevant to this appeal, the Distributor Agreement contains a "Mandatory and Binding Arbitration" provision that incorporates an "Arbitration Agreement." *Id.* at 67, 84 (Ex. K to the Distributor Agreement). The Arbitration Agreement requires that "any claim, dispute, and/or controversy" be arbitrated "exclusively" under the FAA, "except as otherwise agreed to by the parties and/or specified herein." *Id.* at 84. Covered claims include claims challenging the independent distributor's status as an independent contractor and claims for unpaid compensation. The

---

Colo. 2023), the record shows that Brock does not own any of the warehouses used for product pick-up. Instead, the Distributor Agreement required Brock to choose one of three warehouse locations for product delivery and to pay a fee to use the warehouse. App. vol. I, at 61, 82. A declaration from Robert Shaw, the Distributor Enablement Operations Coordinator for Flowers Denver, states that Flowers Denver "has a warehouse in Denver, Colorado, from where Brock, Inc. accepts its ordered product." *Id.* at 281–82. The record thus indicates that Flowers owns the warehouse where Brock picks up the products.

Arbitration Agreement also states that it "shall be governed by the FAA and Colorado law to the extent Colorado law is not inconsistent with the FAA." *Id.* at 86.

The Distributor Agreement also outlines parameters for Brock, Inc.'s operations. We provide a snapshot of some parameters here. Brock, Inc. must use "commercially reasonable best efforts to develop and maximize the sale" of Flowers products in its geographic territory. *Id.* at 55. And it must do so in accordance with "Good Industry Practice," which includes "maintaining an adequate and fresh supply" of Flowers products, "actively soliciting" unserved stores in the territory, and promptly removing stale products. *Id.* at 53–55. Brock, Inc.'s employees must "maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [Flowers Denver], and customer requirements." *Id.* at 55. Brock, Inc. may not sell products that compete with Flowers's products or products that otherwise interfere with the distribution of Flowers's products in the defined territory. If Brock, Inc. believes a certain account is unprofitable, it must provide Flowers Denver with written notice and a detailed financial analysis.

Finally, Brock signed a "Personal Guaranty," under which he personally guaranteed performance and compliance with the terms of the Distributor Agreement. The Personal Guaranty includes an acknowledgment that Brock is "subject to the Arbitration Agreement." *Id.* at 79.

## II.    Procedural Background

Brock filed this putative collective and class action against Flowers for violations of the Fair Labor Standards Act and Colorado labor law. He alleges that Flowers misclassifies its delivery-driver distributors as independent contractors to systematically underpay its employees. Flowers moved to compel arbitration under the FAA, 9 U.S.C. § 4, and to either dismiss or stay the case pending the requested arbitration. Flowers argued that the parties' Distributor Agreement and Arbitration Agreement required Brock to arbitrate his claims individually.

The district court denied Flowers's motion. *Brock v. Flowers Food, Inc.*, 673 F. Supp. 3d 1180, 1190–91 (D. Colo. 2023). First, the court concluded that Brock fell within the "transportation workers exemption" under § 1 of the FAA, which exempts transportation workers engaged in interstate commerce from arbitration. *Id.* at 1184–89. The district court concluded that Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products." *Id.* at 1186. The court also determined that Brock "actively engaged in the transportation of Flowers' products across state lines into Colorado." *Id.* at 1188. Second, the district court rejected Flowers's assertion that Brock was nevertheless required to arbitrate under Colorado's Uniform Arbitration Act. *Id.* at 1189–90. The court noted that the Arbitration Agreement applied Colorado law only "*to the extent* <u>Colorado</u> law is *not inconsistent* with the FAA." *Id.* at 1190 (quoting the

7

Arbitration Agreement). It had earlier concluded that Brock fell within the
FAA's § 1 exemption for transportation workers—an exemption that did not
exist under Colorado law. *Id.* The court determined that the plain language of
the Arbitration Agreement therefore did not allow for arbitration under
Colorado law, because Colorado law was "inconsistent with" the FAA. *Id.* at
1190. Flowers timely appealed the district court's decision.

## STANDARDS OF REVIEW

We review de novo a district court's decision to grant or deny a motion
to compel arbitration. *Reeves v. Enter. Prods. Partners, LP*, 17 F.4th 1008,
1011 (10th Cir. 2021). We accept the district court's findings of fact, subject to
clear error review. *In re Cox Enters., Inc. Set-top Cable Television Box
Antitrust Litig.*, 790 F.3d 1112, 1116 (10th Cir. 2015).

## DISCUSSION

Flowers appeals the district court's denial of arbitration. Its arguments
fall into two buckets—one based on the FAA and one based on Colorado law.
First, Flowers argues that the district court erred by concluding that § 1 of the
FAA exempted Brock from arbitration. According to Flowers, Brock does not
qualify for the § 1 exemption, because he does not directly engage in interstate
commerce. Flowers also asserts—for the first time on appeal—that the
Distributor Agreement is not a contract of employment and is therefore outside
the scope of § 1. Second, Flowers argues that the district court erred by finding
that the text of the Arbitration Agreement foreclosed arbitration under Colorado

8

law. Flowers contends that the § 1 exemption did not create an "inconsistency" with Colorado law but merely created a gap in arbitration enforcement that Colorado law could freely fill. We start with the FAA challenge and then review the Colorado law challenge.

## I.    The Arbitration Agreement is not enforceable under the FAA because Brock falls within § 1's exemption for transportation workers.

The FAA promotes a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Through the FAA, Congress sought to remedy the widespread "hostility of American courts to the enforcement of arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001). Yet the FAA does not authorize federal courts "to favor arbitration over litigation"; it makes "arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (internal quotation marks omitted); *cf. Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 24 (1st Cir. 2020) ("[T]he FAA's pro-arbitration purpose cannot override the original meaning of the statute's text.").

Within this context, § 2 of the FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Though courts must generally enforce valid arbitration agreements, § 1 of the FAA carves out certain workers from the FAA's purview: It exempts "contracts of

9

employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Id.* § 1. In effect, § 1 shields workers with these types of employment contracts from compelled arbitration under the FAA.

This appeal deals with § 1's residual clause—"any other class of workers engaged in foreign or interstate commerce." *Id.* The Supreme Court employs a two-step framework to analyze whether an individual falls within this clause (and therefore falls within the exemption). *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022). First, we must "defin[e] the relevant 'class of workers' to which [the individual] belongs." *Id.* Second, we must "determine whether that class of workers is 'engaged in foreign or interstate commerce.'" *Id.*

We have jurisdiction under 9 U.S.C. § 16(a)(1) to review the district court's interlocutory order denying arbitration under the FAA. Here, though the Arbitration Agreement requires that "any claim" be "determined exclusively by binding arbitration," the district court concluded that Brock qualified for the exemption for transportation workers under § 1's residual clause. *Brock*, 673 F. Supp. 3d at 1183, 1189. Specifically, the court determined that (1) Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products," and (2) Brock, as a member of this class of workers, is engaged in interstate commerce. *Id.* at 1186, 1188–89. Flowers asserts that the district court erred in finding that

10

Brock fell within this exemption. We review the district court's decision under *Saxon*'s two-step framework.

### A.    We accept the district court's defined class of workers.

At step one, Flowers initially argued on appeal that Brock is not a "transportation worker" because he does not work in the transportation industry. *See Circuit City*, 532 U.S. at 119 ("Section 1 exempts from the FAA only contracts of employment of transportation workers."). But it now concedes that *Bissonnette v. LePage Bakeries Park St., LLC*, an intervening case, has foreclosed this argument. 601 U.S. 246, 256 (2024) ("A transportation worker need not work in the transportation industry to fall within the exemption from the FAA provided by § 1 of the Act."). Flowers does not otherwise challenge the district court's determination that Brock "belongs to a class of workers who deliver Flowers goods in trucks to their customers, by loading and unloading Flowers' bakery products."[4] *Brock*, 673 F. Supp. 3d at 1186. So we decline to disturb this finding, and we accept that Brock is a transportation worker under § 1 of the FAA.

### B.    The class of workers is directly engaged in interstate commerce.

We now turn to the second step—whether the defined class of workers is engaged in interstate commerce. As an initial matter, "neither Brock nor any

---

[4] The district court provides another iteration of the defined class of workers as "independent distributors who load and unload Flowers bakery products." *Brock*, 673 F. Supp. 3d at 1189. We treat this iteration of the defined class as identical to the one listed above.

others he employed crossed state lines to deliver goods in connection with the operation of his business." App. vol. I, at 48, 73, 82, 120. This fact alone is not dispositive. In *Saxon*, the Supreme Court reviewed the text of § 1 and concluded that "any class of workers *directly involved* in transporting goods across state or international borders falls within § 1's exemption." 596 U.S. at 457 (emphasis added). In holding that a class of airplane cargo loaders "engaged in foreign or interstate commerce," the Court rejected the view that § 1 exempts "only workers who physically move goods or people" across state or international borders. *Id.* at 456–57, 461. The Court stated "[t]here could be no doubt" that a worker who loads or unloads cargo "from a vehicle carrying goods in interstate transit" is engaged in interstate commerce. *Id.* at 458–59 (cleaned up). Like the airplane cargo loaders in *Saxon*, Brock does not physically cross state borders when delivering Flowers products from the warehouse to his customers. Because Brock's intrastate deliveries may still qualify as engagement in interstate commerce, we closely examine Brock's intrastate delivery role in relation to the goods' interstate journey.

To engage in interstate commerce, a class of workers "must at least play a direct and 'necessary role in the free flow of goods' across borders." *Id.* at 458 (quoting *Circuit City*, 532 U.S. at 121); *see New Prime Inc. v. Oliveira*, 586 U.S. 105, 108, 112–13 (2019) (noting the parties' agreement that interstate truckers are workers engaged in interstate commerce). We have yet to consider whether a class of workers making intrastate deliveries can qualify as engaging

12

in interstate commerce under § 1 of the FAA. But two circuits have found circumstances where delivery drivers were engaged in interstate commerce despite making wholly intrastate deliveries of interstate goods. *See Waithaka*, 966 F.3d at 26 (1st Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904, 919 (9th Cir. 2020). Other circuits have also addressed similar issues involving rideshare drivers and food-delivery drivers. We therefore begin with an overview of cases from other circuits for guiding principles and then analyze Brock's intrastate delivery route in relation to the goods' interstate journey.

### 1.    Legal Framework

We first review the legal landscape relevant to this appeal. Two lines of cases help us define the boundary for when an intrastate delivery qualifies as direct engagement in interstate commerce: (a) "Last-mile" delivery driver cases, and (b) rideshare and food-delivery cases. We expound on both below.

### a.    Last-Mile Delivery Driver Cases

The First and Ninth Circuits have concluded that last-mile delivery drivers—drivers who make the last intrastate leg of an interstate delivery route—are directly engaged in interstate commerce. *See Waithaka*, 966 F.3d at 26; *Rittmann*, 971 F.3d at 919; *see also Saxon*, 596 U.S. at 457 n.2 (leaving this question unresolved); *but see Lopez v. Cintas Corp.*, 47 F.4th 428, 432–33 (5th Cir. 2022) (concluding that last-mile delivery drivers did not engage in interstate commerce because the interstate delivery ended once the goods were unloaded at the local warehouse). Both circuits focused on whether the goods

moved in a continuous interstate journey or as part of multiple independent transactions.

In *Waithaka*, the First Circuit held that last-mile delivery drivers for Amazon engaged in interstate commerce, despite transporting goods "entirely within a single state." 966 F.3d at 20, 26. The First Circuit looked to the Supreme Court's line of cases addressing the Federal Employers' Liability Act (FELA) for guidance on intrastate deliveries of interstate goods. *Id.* at 19–20. FELA contains language identical to the FAA's; it covers injuries that railroad employees sustained if both the railroad and employee were "engaged in interstate commerce" at the time of injury. *Id.* at 19. In the FELA cases, the Court distinguished intrastate railroad workers who operated railroad cars carrying "interstate freight," *Phila. & Reading Ry. Co. v. Hancock*, 253 U.S. 284, 285–86 (1920), from those who operated cars carrying "intrastate freight," *Ill. Cent. R.R. Co. v. Behrens*, 233 U.S. 473, 477–78 (1914). The former are "engaged in interstate commerce," while the latter are not. *Hancock*, 253 U.S. at 286; *Behrens*, 233 U.S. at 478. With this context, the First Circuit concluded that last-mile delivery workers "who haul goods on the final [intrastate] legs of interstate journeys are transportation workers engaged in interstate commerce." *Waithaka*, 966 F.3d at 26 (cleaned up).

Likewise, in *Rittmann*, the Ninth Circuit held that Amazon's last-mile delivery providers engaged in interstate commerce when transporting packages in the final intrastate leg of the interstate journey. 971 F.3d at 915. The Ninth

14

Circuit concurred with the First Circuit's reasoning in *Waithaka*—a "nearly
identical case"—and applied that reasoning to the facts before it. *Id.* at 910,
915. It underscored that the "Amazon packages [that delivery providers] carry
are goods that remain in the stream of interstate commerce until they are
delivered." *Id.* at 915. The Ninth Circuit distinguished the circumstances in
*Rittmann* from *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495
(1935). There, the Supreme Court concluded that the interstate transaction of
live poultry ended when the poultry reached the slaughterhouses for "slaughter
and local sale to retail dealers and butchers who in turn sold directly to
consumers." *A.L.A. Schechter Poultry Corp.*, 295 U.S. at 543. At that point, the
poultry "had come to a permanent rest within the state." *Id.* Any sales to retail
dealers and butchers were "local sale[s]." *Id.* By contrast, the Ninth Circuit in
*Rittmann* stated that "Amazon packages do not 'come to rest,' at Amazon
warehouses," so "the interstate transactions do not conclude at those
warehouses." 971 F.3d at 916. The packages are held at the warehouse as "part
of a process by which a delivery provider transfers the packages to a different
vehicle for the last mile of the packages' interstate journeys." *Id.* The Ninth
Circuit determined that "[t]he interstate transactions between Amazon and the
customer do not conclude until the packages reach their intended destinations."
*Id.* For that reason, the last-mile delivery drivers "are engaged in the movement
of interstate commerce." *Id.*

### b.    Rideshare and Food-Delivery Cases

On the other end of the spectrum, courts have declined to find direct engagement in interstate commerce for app-based rideshare and food-delivery drivers. *See Cunningham v. Lyft, Inc.*, 17 F.4th 244, 253 (1st Cir. 2021); *Immediato v. Postmates, Inc.*, 54 F.4th 67, 78 (1st Cir. 2022); *Singh v. Uber Techs., Inc.*, 67 F.4th 550, 560 (3d Cir. 2023); *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 802–03 (7th Cir. 2020); *Capriole v. Uber Techs., Inc.*, 7 F.4th 854, 863–64, 866–67 (9th Cir. 2021). The First and Ninth Circuits' cases are particularly instructive because of their discussions contrasting rideshare and food-delivery cases from last-mile-driver cases. We review those cases below.

After *Waithaka*, the First Circuit refined its distinction between wholly intrastate trips and intrastate trips occurring as part of an interstate journey. *See Cunningham*, 17 F.4th at 250–51, 253; *Immediato*, 54 F.4th at 77–79. In *Cunningham*, the First Circuit concluded that Lyft rideshare drivers who transported passengers to and from Boston's Logan Airport did not engage in interstate commerce. 17 F.4th at 250–51, 253.

In reaching this decision, the First Circuit considered two scenarios from *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 759–60 (1984). In the first scenario, railroads agreed to provide passengers with transit when interstate rail journeys required passengers to disembark at one station

16

and travel up to two miles to board another train at a different station. *Yellow Cab*, 332 U.S. at 228. The railroads contracted with cab companies to transport passengers between connecting stations. *Id.* The *Yellow Cab* Court held that this first scenario implicated interstate commerce. *Id.* at 228–29. In the second scenario, the rail passengers hailed taxi cabs during the cab drivers' normal local taxi service to and from stations. *Id.* at 230. The Court held that "such transportation is too unrelated to interstate commerce." *Id.*

Using the *Yellow Cab* scenarios for comparison, the First Circuit concluded that the class of Lyft drivers more closely resembled the second scenario because they "contract[ed] with the passenger as part of the driver's normal local service to take the passenger to the start (or from the finish) of the passenger's interstate journey." *Cunningham*, 17 F.4th at 250. By contrast, the First Circuit observed that the drivers in *Waithaka* more closely resembled the first scenario:

> Amazon (like the railroads in *Yellow Cab*) agreed with Amazon customers to transport goods interstate from their point of origin to the customer's home. The local delivery drivers (like the taxi companies in the first scenario of *Yellow Cab*) then agreed <u>with Amazon</u> to carry the goods for a portion of that single interstate journey ("the so-called 'last mile'").

*Id.* at 251 (citations omitted).

The *Yellow Cab* scenarios informed the First Circuit's reasoning again in *Immediato*. The First Circuit held that couriers who delivered meals prepared at local restaurants and goods sold by local retailers did not engage in interstate

commerce. *Immediato*, 54 F.4th at 78. Citing *Yellow Cab*, it stated that being engaged in interstate commerce "excludes intrastate transactions that bear only a 'casual' or 'incidental' relationship to the interstate movement of goods or people." *Id.* at 79. The First Circuit distinguished *Immediato* from *Waithaka*: In *Waithaka*, the customers bought goods directly from Amazon, Amazon orchestrated the interstate movement of the goods, and Amazon arranged, as part of the purchase, for the goods' delivery directly to the customer. *Id.* at 78. The Amazon delivery drivers thus engaged in interstate commerce. *Id.* at 74–75. In *Immediato*, customers purchased goods from local vendors after the goods had "already exited the flow of interstate commerce." *Id.* at 78. These local delivery drivers merely engaged in intrastate commerce. *Id.*

Similarly, in *Capriole*, the Ninth Circuit held that Uber drivers are not "engaged in foreign or interstate commerce." 7 F.4th at 863. The Ninth Circuit invoked the *Yellow Cab* scenarios as well and concluded that the class of Uber drivers more closely resembled the second scenario of local taxi services. *Id.* at 863–64. In contrasting *Capriole*'s rideshare drivers from *Rittmann*'s last-mile drivers, the Ninth Circuit stated that "Uber drivers are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce like [Amazon's last-mile delivery] workers." *Id.* at 867.

2.    **Analysis**

We find the First and Ninth Circuits' cases on this issue persuasive and adopt their reasoning as guideposts for our own analysis. These cases suggest that we should consider the following factors to determine if Brock's intrastate route formed a constituent part of the goods' interstate journey or an entirely separate local transaction: (1) the buyer-seller relationship between Flowers and Brock, (2) the buyer-seller relationship between Brock and Brock's customers, and (3) the buyer-seller relationship, if any, between Flowers and Brock's customers. *See Fraga v. Premium Retail Servs., Inc.*, 61 F.4th 228, 240 (1st Cir. 2023) (finding that First Circuit cases "suggest that the contractual relationships among the various actors play an important role in determining whether an intrastate trip is part of an integrated interstate journey"). In our view, the third factor—any buyer-seller relationship between Flowers and Brock's customers—is key to whether the interstate leg of the goods' journey and Brock's intrastate delivery of the goods form one continuous interstate journey.[5]

---

[5] Though the facts here make the contractual relationships important to the outcome, we clarify that we do not foreclose the consideration of other factors in this analysis. *See Singh v. Uber Techs. Inc.*, 939 F.3d 210, 227–28 (3d Cir. 2019) (listing potential factors, including the parties' agreements, to consider in inquiry of whether a worker belonged to a class of transportation workers engaged in interstate commerce).

Some diagrams may better illustrate the importance of a buyer-seller relationship between Flowers and Brock's customers to this case. Below, each arrow represents a buyer-seller relationship.[6]

As depicted in the first two diagrams, courts have found the final intrastate leg of a journey to be part of a continuous interstate journey where the product's originating company contracts with both the customer and the intrastate delivery driver.

(1) *Yellow Cab* scenario one: Affecting Interstate Commerce (Sherman Act)



*See Yellow Cab*, 332 U.S. at 228–29 (holding that cab drivers were "clearly a part of the stream of interstate commerce" where railroads contracted with drivers to provide same-city station transfers for rail customers traveling interstate).

---

[6] *Yellow Cab* considered interstate commerce in the context of the Sherman Antitrust Act. 332 U.S. at 225, 228–29. The Sherman Act "outlaws unreasonable restraints on interstate commerce." *Id.* at 225. We recognize that "affecting interstate commerce" does not equate to being "engaged in interstate commerce." *See Cunningham*, 17 F.4th at 251 ("The [Sherman] Act is broadly construed, whereas the FAA exception at issue here is narrowly construed. (citations omitted)). So a case that merely "affects" interstate commerce may not meet the threshold for being "engaged in interstate commerce." We find the *Yellow Cab* scenarios to be useful comparators with cases under the FAA only to illustrate the various relationships between parties.

(2) <u>Amazon Last-Mile Drivers:</u> Engaged in Interstate Commerce (FAA)



*See Cunningham*, 17 F.4th at 251 (observing that Amazon's last-mile drivers in *Waithaka* resembled the first *Yellow Cab* scenario because Amazon contracted with the local delivery driver *and* with the customer).

*     *     *

By contrast and as depicted in the next two diagrams, courts have found the final intrastate leg of the journey to be wholly separate where the customer has a separate relationship with the intrastate delivery driver.

(3) <u>*Yellow Cab* scenario two:</u> No Interstate Commerce (Sherman Act)



*See Yellow Cab*, 332 U.S. at 230–31 (holding that cab drivers transporting rail customers during the drivers' normal local taxi service is "too unrelated to interstate commerce").

(4) <u>Rideshare Drivers:</u> Not Engaged in Interstate Commerce (FAA)



*See Cunningham*, 17 F.4th at 250–51 (finding that Lyft drivers with intrastate routes did not engage in interstate commerce by transporting customers traveling interstate to the airport and noting that this case matched the second scenario in *Yellow Cab*).

*     *     *

And finally, we end with a diagram depicting the buyer-seller relationships between Flowers, Brock, and the retail stores.

(5) <u>Flowers and Brock's Buyer-Seller Relationships:</u>



So we turn to examining the various relationships at play here. Flowers argues that Brock operates a "fundamentally local" franchise business, "whereby Brock Inc. purchases Flowers products and then sells those products to its local customers in Colorado." Flowers wants us to view the initial cross-border delivery of goods as a wholly separate transaction from Brock's intrastate deliveries of the same goods to his customers. On a surface level, this appears plausible: Brock operates his own business, takes title to the goods, services his own customers, and can increase profits through various business strategies of his choice. But on closer inspection, we view the situation differently. Though Brock, Inc. and Flowers are different companies, they form an integrated distribution chain, in which Flowers exercises a significant degree

22

of control over Brock's operations. This control makes it evident to us that Brock serves as Flowers's last-mile driver, because Flowers's real interest lies in delivering the baked goods to its true customer—the various retail stores on Brock's route, not Brock, Inc. *See Rittmann*, 971 F.3d at 916.

The Distributor Agreement, which governs the business relationship between Brock, Inc. and Flowers Denver, reveals Flowers's substantial involvement in the operation of Brock, Inc.[7] At Brock, Inc.'s inception, Flowers Finance, LLC, another Flowers entity, financed Brock's purchase of the distribution route. App. vol. I, at 87–90; *see also id.* at 260 (stating that a Flowers subsidiary finances the route's purchase price for most independent distributors). From there, the Distributor Agreement restricts Brock, Inc.'s operations in multiple ways. Certain provisions prevent Brock from selling products that compete with Flowers goods in his territory, selling noncompetitive products that interfere with the distribution of Flowers goods, or terminating any unprofitable accounts without Flowers Denver's approval. Another provision requires Brock to cooperate with Flowers on marketing and

---

[7] Brock alleges in his complaint that the Distributor Agreement does not reflect Flowers's "actual" business model. He contends that in practice, "Flowers itself negotiates, carries out, and receives gross proceeds from the vast majority of bakery sales" and that he "do[es] not, in-fact, take title and then resell the products." App. vol. I, at 14. We do not wade into this factual dispute, which the district court did not resolve in its order. Because the less-restrictive terms of the Distributor Agreement suffice to show a continuous interstate journey, we conclude that the district court did not need to resolve this factual dispute for us to decide the interstate commerce issue on appeal.

sales efforts and to ensure his employees "maintain a clean and neat personal appearance consistent with the professional image customers and the public associate with [Flowers Denver]." *Id.* at 55.

The Distributor Agreement also requires Brock to remove stale products from customers' shelves "to protect the business reputation of *both* [Brock, Inc.] and [Flowers Denver]." *Id.* at 61 (emphasis added). That provision includes an offer from Flowers Denver to repurchase a certain percentage of Brock's stale products to motivate the removal of spoiled goods. Brock could not sell out-of-code products, except for non-human consumption. And most importantly, the Distributor Agreement obligates Brock, Inc. to use "commercially reasonable best efforts to develop and maximize the sale" of Flowers products in its territory. *Id.* at 55. Had the interstate delivery truly ended, as Flowers claims, at the warehouse where Brock picks up the goods, Flowers should not have cared about Brock's actions after his receipt of the goods. Yet the terms of the Distributor Agreement belie Flowers's claim that the goods "come to rest" at the warehouse.

Other terms of the Distributor Agreement evince Flowers's continuing control over the distribution route. For example, if Flowers Denver and Brock, Inc. agree that a particular account is unprofitable, Flowers Denver can make alternate distribution arrangements for that account. Brock is barred from receiving any credit for sales associated with these alternate distribution arrangements. If Brock fails to service his territory for any reason, Flowers

24

Denver has the right to service the territory on its own accord (while Brock pays a daily fee and any operating expenses) and even has the right to use Brock's delivery truck for that purpose (a truck the Distributor Agreement required he purchase). *Id.* at 59, 62, 96. The Distributor Agreement provides Flowers Denver and Flowers Finance, LLC with a security interest in Brock's distribution route, meaning Brock's failure to pay any debts could revert ownership of the distribution route to Flowers. The Distributor Agreement also states that in the event of termination, Flowers Denver will operate the business for Brock, Inc.'s account and sell Brock, Inc.'s distribution rights. These terms ensure that Flowers Denver never actually loses access to Brock's distribution route. They demonstrate Flowers's significant interest in the out-of-state goods' continued route from the warehouse to various retail stores.

The terms of the Distributor Agreement also show the preserved relationship between Flowers Denver and the retail stores that purchase Flowers goods from Brock. One provision permits Flowers Denver to act on Brock, Inc.'s behalf to obtain authorization to sell Flowers products to chain stores; these authorization discussions include negotiating product space, position, and pricing.[8] Another provision allows Flowers Denver to "continue carrying the

---

[8] According to Flowers Foods, Inc.'s Form 10-K filed with the Securities and Exchange Commission, in 2022, Walmart/Sam's Club comprised 21.7% of customer sales, and Flowers's top ten largest customers comprised 54.5% of sales. These statistics suggest that Flowers can directly interact with customers for a significant number of orders.

accounts receivable" for all chain-store accounts and other major accounts. *Id.* at 58. Flowers Denver can, at its sole discretion, approve various stores for non-cash sales via electronic data with corresponding proof of delivery, charge slips, store-generated authorizations, or other forms of payment authorizations. Brock must also use Flowers's proprietary administrative services, which include "accumulation of sales histories," "automated route book information," "individual customer sales profiles," and "suggested orders for each customer." For customer pricing, Brock needs to adhere to all of Flowers's promotions and feature pricing for major accounts and chain-store accounts in his territory. These terms give Flowers significant control over Brock's business with his customers and demonstrate Flowers's intense interest in the goods' delivery route even after they reach the warehouse. We are thus not convinced that these customers are merely "Brock's" customers, rather than Flowers's customers. Indeed, even Flowers itself describes the various stores, not the independent distributors, as its customers. In its 2022 Form 10-K filed with the Securities and Exchange Commission, Flowers lists its customers as "mass merchandisers, supermarkets, and other retailers." *Id.* at 141.

Last, we review the mechanics of the delivery itself. Brock starts the interstate-delivery process by placing orders for products produced in out-of-state bakeries owned by Flowers. Flowers Denver then delivers the products to the agreed-upon warehouse (owned by Flowers) and unloads the products for Brock to pick up. Brock pays Flowers a fee to use the warehouse. In less than a

day after the drop-off, Brock loads the products at the warehouse onto his vehicle and delivers the goods to retail stores on his intrastate delivery route.

Viewing Brock's intrastate delivery in the context of the Distributor Agreement's terms and the interstate route that came before it, we are convinced that Brock serves as the last-mile driver for Flowers, such that he is directly engaged in interstate commerce. 9 U.S.C. § 1. Like the last-mile drivers in *Waithaka* and *Rittmann*, Brock's intrastate delivery route forms the last leg of the products' continuous interstate route; he is "an integral part of a single, unbroken stream of interstate commerce." *Capriole*, 7 F.4th at 867. The Flowers products do not "come to rest" at the warehouse. Rather, the warehouse drop-off is "simply part of a process by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys." *Rittmann*, 971 F.3d at 916. The significant control that Flowers has over Brock, Inc.'s operations demonstrates that, for Flowers, the goods' delivery concludes at the various stores' locations, not the warehouse. *See id.* ("The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus [Amazon's last-mile] drivers are engaged in the movement of interstate commerce."). For these reasons, Brock's intrastate delivery of goods from the warehouse to the various stores on his route is not an isolated transaction; instead, his delivery route forms the last leg of an interstate route.

Flowers attempts to rely on the line of cases involving rideshare drivers and food-delivery drivers to support its position that Brock merely performs local deliveries. We disagree. In both *Wallace* and *Immediato*, the food-delivery drivers delivered food from local restaurants or convenience stores to intrastate customers. *Wallace*, 970 F.3d at 802; *Immediato*, 54 F.4th at 78. Any interstate transaction that occurred before the intrastate purchase, such as the purchase of raw ingredients, was far too removed from the local transaction that the delivery drivers engaged in. *Wallace*, 970 F.3d at 802; *Immediato*, 54 F.4th at 78. At no point did the customers "summon[] couriers for local deliveries" to "buy[] goods as part of an interstate transaction." *Immediato*, 54 F.4th at 78. The unnamed companies that sent the goods interstate to restaurants and grocery stores had no interest or obligation to ensure the couriers delivered those goods to consumers. The same reasoning applied to rideshare drivers in *Cunningham* and *Capriole*. In both cases, the First Circuit and Ninth Circuit concluded that the rideshare drivers "are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce." *Capriole*, 7 F.4th at 867; *see Cunningham*, 17 F.4th at 251 (concluding that the Lyft drivers' intrastate trips to take their customers to interstate flights formed a separate transaction from the flight itself due to the lack of any relationship between the Lyft drivers and the airlines).

28

By contrast, Brock places orders with out-of-state bakeries to commence the interstate delivery of products. He picks up the products within a day of the warehouse delivery, signs off on the products, loads the products onto his vehicle, and delivers the products through the final intrastate leg of the trip. And as discussed earlier in this section, Flowers retains significant control over Brock, Inc., such that we view Flowers's true customers as the various retail stores and Brock as Flowers's last-mile delivery driver. The rideshare and food-delivery driver cases are therefore not an apt comparison.

Flowers also argues that we should follow the Fifth Circuit's reasoning in *Lopez*. There, the Fifth Circuit found that last-mile delivery drivers did not engage in interstate commerce because "[o]nce the goods arrived at the Houston warehouse and were unloaded, anyone interacting with those goods was no longer engaged in interstate commerce." *Lopez*, 47 F.4th at 433. The Fifth Circuit focused on the last-mile drivers' "customer-facing role" to support its conclusion that they did not fall within the § 1 exemption. *Id.* We agree with the district court's decision to reject the reasoning in *Lopez* and similarly find it unpersuasive. *Brock*, 673 F. Supp. 3d at 1188. As the district court noted, *Lopez* included only an "abbreviated analysis of [the] class's engagement with interstate commerce"; it also does not provide much factual background for comparison. *Id.* Given this context, we decline to follow *Lopez*.

For these reasons, we conclude that Brock's class of workers is engaged in interstate commerce and therefore falls within the § 1 exemption. We find no error in the district court's ruling.

### C.    We decline to review whether the Distributor Agreement qualifies as a contract of employment.

As a last attempt to salvage the Arbitration Agreement's enforcement under the FAA, Flowers argues that the Distributor Agreement does not qualify as a "contract of employment" for transportation services under § 1 of the FAA. Flowers concedes that it failed to make this argument before the district court but urges us to address the issue anyway. We have exercised our discretion to consider a forfeited argument on appeal when the argument involves a "pure matter of law and the proper resolution of the issue is certain." *United States v. Jarvis*, 499 F.3d 1196, 1202 (10th Cir. 2007). "But even for matters of law, we decline to consider newly presented legal arguments unless the proper legal disposition is beyond reasonable doubt." *Ave. Cap. Mgmt. II, L.P. v. Schaden*, 843 F.3d 876, 886 (10th Cir. 2016). Reasonable doubt exists if an issue "involves a matter of first impression in our circuit." *Id.*

Whether a "contract of employment" under § 1 of the FAA extends to contracts between corporate entities is a matter of first impression here. We cannot determine if the Distributor Agreement between Flowers Denver and Brock, Inc. qualifies as a contract of employment without addressing this issue. Because the proper legal disposition is not beyond reasonable doubt, we decline

to consider Flowers's forfeited argument on appeal. *See, e.g.*, *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1207 (10th Cir. 2022) (declining to consider forfeited argument); *Lone Star Steel Co. v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory.").

## II.    We do not have jurisdiction to consider Flowers's state-law arguments.

Regardless of the Arbitration Agreement's enforceability under the FAA, Flowers argues that we can enforce the Arbitration Agreement under Colorado law alone. Brock counters that we lack jurisdiction to consider an interlocutory appeal based on state law. We agree with Brock's assessment.

Section 16(a)(1) of the FAA allows us to review an interlocutory order "denying a petition under section 4 of [the FAA] to order arbitration to proceed." 9 U.S.C. § 16(a)(1). But the FAA does not permit us to review interlocutory orders denying arbitration based on state law. *See Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1383 (10th Cir. 2009) ("[Section] 16(a) permits interlocutory appeals only over those motions brought explicitly pursuant to the FAA, or motions in which it is unmistakably clear that the defendant seeks only the relief offered by the FAA."). We therefore do not have jurisdiction under § 16(a)(1) to review the district court's denial of arbitration under Colorado law. The remaining avenue for us to potentially exercise

31

jurisdiction over this portion of Flowers's appeal is pendent appellate jurisdiction.

Under pendent appellate jurisdiction, we may "exercise jurisdiction over an otherwise nonfinal and nonappealable lower court decision" given sufficient overlap with an appealable decision. *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1171 (10th Cir. 2022) (internal quotation marks omitted). "Pendent appellate jurisdiction is a matter of discretion, not of right." *Walter v. Morton*, 33 F.3d 1240, 1242 (10th Cir. 1994). "Our exercise of pendent jurisdiction is *only* appropriate in either of two scenarios: (1) when the otherwise nonappealable decision is inextricably intertwined with the appealable decision, or (2) where review of the nonappealable decision is necessary to ensure meaningful review of the appealable one." *Cummings v. Dean*, 913 F.3d 1227, 1235 (10th Cir. 2019) (cleaned up). Neither applies here.

In the first scenario, an otherwise nonappealable decision is inextricably intertwined with an appealable decision "if a ruling on the merits of the interlocutory appeal . . . resolve[s] *all of the remaining issues* presented by the pendent appeal." *United Transp. Union Loc. 1745 v. City of Albuquerque*, 178 F.3d 1109, 1115 (10th Cir. 1999) (internal quotation marks omitted). Our review of the nonappealable decision must "not require the consideration of legal or factual matters distinct from those raised by the claims over which we unquestionably have jurisdiction." *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1317 (10th Cir. 1999). Here, the district court found that

the plain language of the Arbitration Agreement rendered Colorado's Uniform Arbitration Act inapplicable to this case. *Brock*, 673 F. Supp. 3d at 1189. To review the district court's denial of arbitration under Colorado's Uniform Arbitration Act, we would need to consider whether the Uniform Arbitration Act is "inconsistent" with the FAA, as provided in the Arbitration Agreement and if not, whether the Uniform Arbitration Act compelled Brock to arbitrate his claims. *See* App. vol. I, at 86 (providing that the Arbitration Agreement "shall be governed by the FAA and <u>Colorado</u> law to the extent <u>Colorado</u> law is not inconsistent with the FAA"). These issues are distinct from the FAA ruling, so the district court's denial of compelled arbitration under the FAA is not inextricably intertwined with its denial under Colorado law.

For the second scenario, a "review of the nonappealable decision is necessary to ensure meaningful review of the appealable one" if "we are . . . required to decide the core issues implicated in this ostensibly pendent matter" to resolve the appealable one. *Cummings*, 913 F.3d at 1235–37 (cleaned up). That does not apply here. The FAA and Colorado law form two separate bases for potentially enforcing the Arbitration Agreement. We do not (and did not) need to consider Colorado's Uniform Arbitration Act to resolve the FAA issue on appeal. Flowers has therefore failed to establish that we have pendent appellate jurisdiction to review the district court's decision under Colorado law.

33

We are not persuaded by Flowers's argument that § 16(a)(1) directly confers appellate jurisdiction over Colorado law issues. Flowers asserts that the text of § 16(a)(1), which permits appeals of any "order . . . denying a petition under section 4 [of the FAA]," confers jurisdiction over "orders," not issues. 9 U.S.C. § 16(a)(1). But this reading of § 16 elevates form over substance. Flowers's position would permit any litigant to use § 16 of the FAA as an appellate fast-track by tacking on multiple issues to an arbitration request invoking the FAA. As discussed in *Conrad*, we read the phrase "under section 4" as indicating that appellate jurisdiction "encompass[es] only those motions explicitly brought under the FAA or unmistakably invoking its remedies, rather than all motions founded at least in part on arbitration agreements." 585 F.3d at 1382. Though *Conrad* dealt with a motion to dismiss containing two offhand references to arbitration, *id.* at 1386, we conclude that the reasoning applies here as well. The phrase "under section 4" means we have appellate jurisdiction for the FAA issue, but not the Colorado-law issue. *Cf. Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 594 (3d Cir. 2004) ("While we may review Airborne's appeal with respect to the FAA under 9 U.S.C. § 16(a), that section does not cover our review of a non-FAA, state-law arbitration claim in an otherwise nonappealable interlocutory order."); *Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1352 (11th Cir. 2021) ("[T]he interlocutory appeal section of the Federal Arbitration Act doesn't carve out an exception to the general rule for

34

interlocutory orders denying motions to compel arbitration based on state law.").

We therefore find that we do not have jurisdiction over issues of Colorado law in this case.

## CONCLUSION

For these reasons, we affirm.

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**November 12, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

_____

ANGELO BROCK, individually and on
behalf of all others similarly situated,

     Plaintiff - Appellee,

v.

FLOWERS FOODS, INC., a Georgia
limited liability company; FLOWERS
BAKERIES, LLC, a Georgia limited
liability company; FLOWERS BAKING
CO. OF DENVER, LLC, a Colorado
limited liability company,

     Defendants - Appellants.

-------------------------------

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,

     Amicus Curiae.

No. 23-1182
(D.C. No. 1:22-CV-02413-CNS-MEH)
(D. Colo.)

_____

### JUDGMENT

_____

Before **MATHESON**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

This case originated in the District of Colorado and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk